# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| DUKE BRADFORD, | CIVIL ACTION NO.: 1:21-cv-03283 |
| & | **COMPLAINT** |
| ARKANSAS VALLEY ADVENTURE, LLC, d/b/a AVA Rafting and Zipline, | JURY TRIAL DEMANDED |
| & | |
| COLORADO RIVER OUTFITTERS ASSOCIATION, | |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF LABOR, | |
| & | |
| U.S. DEPARTMENT OF LABOR, WAGE & HOUR DIVISION, | |
| & | |
| JOSEPH R. BIDEN, PRESIDENT OF THE UNITED STATES, | |
| & | |
| MARTIN J. WALSH, U.S. SECRETARY OF LABOR, | |
| & | |
| JESSICA LOOMAN, ACTING ADMINISTRATOR, | |
| Defendants. | |

Plaintiffs by their attorneys, Caleb Kruckenberg, Michael A. Poon, and Steven M. Simpson of the Pacific Legal Foundation, hereby allege the following:

**PRELIMINARY STATEMENT**

Outfitters and guides are a gateway to the outdoors. Few of us have either the expertise or the wherewithal to spend a week, on our own, whitewater rafting down the Arkansas River. Fewer still can scale cliffs or ride ziplines through the mountains without an experienced guide's help. But these experiences can have profound effects on those fortunate enough to access them. Spending days in the wilderness, away from phones and the internet, can fundamentally reorient our priorities and our interaction with the world around us. Outfitters and guides make sure that ordinary Americans, including those of modest means, can explore the millions of acres of rugged federal lands set aside for everyone.

Outfitters and guides on federal lands are not federal contractors. Yet President Biden, acting through the U.S. Department of Labor, has now ordered them to be lumped in with federal contractors, and adopt a wage model that is fundamentally incompatible with the way that the guiding industry operates. The Executive Branch has previously acknowledged that such an effort "does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands," and instead "threatens to raise significantly the cost of guided hikes and tours on Federal lands, preventing many visitors from enjoying the great beauty of America's outdoors." *Exemption from Executive Order 13658 for Recreational Services on Federal Lands*, 83 Fed. Reg. 25,341, 25,341 (May 25, 2018). If the new rule takes effect on January 30, 2022, then outfitters and guides, like Duke Bradford, Arkansas Valley Adventure, LLC, and the members of the Colorado River Outfitters Association, will have no choice but to radically alter how they

2

operate and take away the opportunity for extended adventures in the outdoors, just so they can comply with hourly wage rules that make no sense for backcountry guides. The rule will harm the industry, deprive the guides themselves of their livelihood, and restrict the outdoors to the very wealthy. The agency does not have the authority to issue this rule and it should be set aside by this Court.

## PARTIES

1. Plaintiff, Duke Bradford, is an individual residing in the State of Colorado, he owns and operates Arkansas Valley Adventure, LLC.

2. Plaintiff Arkansas Valley Adventure, LLC, d/b/a AVA Rafting & Zipline (AVA), is a limited liability company operating in the State of Colorado and headquartered in Buena Vista, Colorado.

3. AVA is a licensed river outfitter regulated by the Colorado Division of Parks and Wildlife. AVA operates guided multi-day river tours and other recreational programs throughout Colorado.

4. AVA operates its programs on federal land pursuant to permits with the government. Specifically, AVA has held special use permits pursuant to 16 U.S.C. § 6802(h) with the U.S. Department of Agriculture's Forest Service for the Dillon Ranger District of the White River National Forest, special recreation permits pursuant to 43 C.F.R. § 2930 *et seq.* from the Department of the Interior's Bureau of Land Management (BLM) for rafting activities on the Upper Colorado River and Eagle River, and for the use of utility terrain vehicles at Wolford Mountain Special Recreation Management Area. AVA could not operate its business without these permits.

5. AVA employs guides on its river tours who are covered employees under wage provisions of the Fair Labor Standards Act (FLSA) and the McNamara-O'Hara Service Contract Act (SCA). Specifically, AVA's guides are non-exempt employees under the FLSA. AVA's special use permits constitute contracts with a primary purpose of providing service under the SCA.

6. AVA pays its guides in accordance with minimum and prevailing wage requirements but typically does so with fixed rates based on the number of days a trip is expected to take. If paid hourly, these rates would typically exceed $15/hour. However, because many of the trips last for multiple days, the guides often work far more than 40 hours in a typical week. AVA's wages, including applicable overtime, exceed minimum thresholds for the current federal minimum wage and/or prevailing wages.

7. AVA's wages typically do not exceed the $15/hour threshold when including time-and-a-half overtime wages. If AVA were required to pay overtime, based on a $15/hour minimum wage, it would significantly increase AVA's operating costs, which would result in higher fees to clients for services. AVA would also be forced to limit the duration of its trips and eliminate many of its multi-day adventures.

8. Plaintiff Colorado River Outfitters Association (CROA) is a nonprofit trade association representing river rafting outfitters in Colorado. It has more than 150 independently operating members. The vast majority of CROA's members operate on federal lands under special use permits with the Forest Service or BLM.

9. CROA's members generally employ guides on their river tours who are covered employees under wage provisions of the FLSA and the SCA. Relevant CROA members' guides

4

are non-exempt employees under the FLSA, and their members' federal permits constitute contracts with a primary purpose of providing service under the SCA.

10. CROA's members typically pay their employee guides a flat fee on a per-trip basis. The guides are generally considered covered employees under the FLSA, and outfitters, therefore, calculate applicable federal minimum wages for the length of a trip and pay a fixed wage above that rate. The work is seasonal, and many guides work as many hours as they can through the busy season—almost always working more than 40 hours in a week.

11. CROA's members pay their guides in accordance with minimum and prevailing wage requirements. Their guides' wages exceed minimum thresholds for the current federal minimum wage and/or prevailing wages, including applicable overtime, even though they are generally paid in flat fees.

12. Increasing the wages for guides to $15/hour and paying overtime based on that wage would dramatically alter the wage structure for CROA's members. The only way many of these outfitters could continue to operate would be to significantly raise the costs of their services to customers and eliminating some multi-day trips.

13. Plaintiffs are covered "contractors" pursuant to the Department of Labor, Wage & Hour Division's final rule, *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126, 67,225 (Nov. 23, 2021).

14. The final rule directs Plaintiffs and their members to pay any employees a minimum wage of $15/hour, regardless of locality, and overtime wages of at least $22.50/hour if employees work more than 40 hours per week. *Id.* at 67,227. The final rule is effective January 30, 2022, and requires any "new" special use permits or similar authorizations, or any such agreement that is

"renewed or extended" to include as a condition of issuance that the permit holder abide by the final rule's wage directives. *Id.* at 67,224, 67,233–34.

15. Defendant Joseph R. Biden is the President of the United States and is sued in his official capacity.

16. Defendant President Biden issued Executive Order 14026, *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 22,835 (Apr. 27, 2021), directing the U.S. Department of Labor to issue the Minimum Wage Rule. Defendant President Biden is, therefore, a party responsible for issuance of the challenged rule.

17. On November 23, 2021, the U.S. Department of Labor, Wage and Hour Division issued a final rule, *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126, which becomes effective January 30, 2022.

18. Defendant Secretary Martin J. Walsh is the U.S. Secretary of Labor and is head of the agency that promulgated the challenged rule. Defendant Secretary Walsh is sued in his official capacity.

19. Defendant U.S. Department of Labor is an agency of the United States, which is responsible for issuance of the challenged rule.

20. Defendant Acting Administrator Jessica Looman is the acting head of the U.S. Department of Labor's Wage and Hour Division, which promulgated the challenged rule. Defendant Acting Administrator Looman is sued in her official capacity.

21. Defendant U.S. Department of Labor, Wage and Hour Division, is an agency of the United States, which is responsible for issuance of the challenged rule.

22. Throughout this Complaint, Defendants are referred jointly as DOL or the Department except where otherwise specified.

## JURISDICTION AND VENUE

23. This Court has federal question jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

24. This Court has the authority to grant an injunction and declaratory judgment in this matter pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706(2).

25. Venue for this action properly lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(b)(2), (e)(1) because a defendant resides in this district, all plaintiffs reside in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

I. **LEGAL BACKGROUND**

A. **Prior Agency Actions**

26. On February 12, 2014, President Obama issued EO 13658, *Establishing a Minimum Wage for Contractors*, directing the Secretary of Labor to issue regulations establishing a federal minimum wage for "federal contractors and subcontractors." 79 Fed. Reg. 9,851, 9,852–53. In support, the President invoked the Federal Property and Administrative Services Act (the Procurement Act), 40 U.S.C. § 101. *Id*. at 9,851.

27. On October 7, 2014, the Department of Labor's Wage and Hour Division issued a final rule implementing EO 13658. *Establishing a Minimum Wage for Contractors*, 79 Fed. Reg. 60,634. The rule set out regulations at 29 C.F.R. § 10.1 *et seq.* Broadly speaking, the rule required

7

all federal contractors and subcontractors to implement a $10.10/hour minimum wage, and pay overtime of "not less than one and one-half times the regular rate of pay . . . for all hours worked over 40 hours in a workweek[.]" 29 C.F.R. §§ 10.5(a), 10.24(a). It applied to all new "contracts or contract-like instruments," which were defined as any "agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." *Id.* at § 10.2.

28. Further, the new rule only applied to employers who were already governed by one of three statutes regulating federal contractors—"the Fair Labor Standards Act, the Service Contract Act, or the Davis-Bacon Act [DBA]." 29 C.F.R. § 10.3(a)(2). In other words, the rule only applied if Congress had already imposed certain wage standards on the employer. But when it did apply, it added new requirements beyond those found in the three referenced statutes. *See* 79 Fed. Reg. at 60,656 ("In order for the minimum wage protections of the EO to extend to a particular worker performing work on or in connection with a covered contract, that worker's wages must be governed by the FLSA, SCA, or DBA.").

29. In the notice of final rule, DOL noted that it intended its definition of covered employers to be "intentionally all-encompassing." *Id*. at 60,640. This included employers who didn't have traditional contracts with the federal government, but had obtained "special use permits issued by the FS, Commercial Use Authorizations (CUAs) issued by the NPS, and outfitter and guide permits issued by the Bureau of Land Management (BLM) and the United States Fish and Wildlife Service (USFWS), respectively." *Id*. at 60,652. This was true even if the permit holder qualified for certain exemptions under the SCA, again because the rule was meant to supplement existing statutory limits. *See id.*

30. Further, noting that many of these permits were not traditionally enforceable contracts with the federal government, DOL insisted that "the determination of whether an agreement qualifies as a contract or contract-like instrument under the EO and this part does not turn on whether such agreements are characterized as 'contracts' for other purposes (such as in connection with the specific programs under which they are administered)[.]" *Id*. at 60,655. "Indeed, the Department notes that notwithstanding Executive Order 13658's express application to contracts entered into with the Federal Government in connection with Federal property or lands and relating to offering services, the Executive Order provides that it creates no rights under the Contract Disputes Act." *Id*.

31. Plaintiff Bradford, Plaintiff AVA and many of the members of Plaintiff CROA fell under the rule's provisions. As a result, Plaintiffs incurred significant new costs related to compliance and implementation of the new wage rule.

32. On May 25, 2018, President Trump issued EO 13838, titled "Exemption from EO 13658 for Recreational Services on Federal Lands." *See* 83 Fed. Reg. 25,341. In Section 1, President Trump explained the need for an exemption for recreational services on federal lands. *Id*. The minimum wage rule applied "to outfitters and guides operating on Federal lands," but

> [t]hese individuals often conduct multiday recreational tours through Federal lands, and may be required to work substantial overtime hours. The implementation of Executive Order 13658 threatens to raise significantly the cost of guided hikes and tours on Federal lands, preventing many visitors from enjoying the great beauty of America's outdoors. Seasonal recreational workers have irregular work schedules, a high incidence of overtime pay, and an unusually high turnover rate, among other distinguishing characteristics. As a consequence, a minimum wage increase would generally entail large negative effects on hours worked by recreational service workers. Thus, applying Executive Order 13658 to these service contracts does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands.

*Id*.

9

33. Section 2 of EO 13838 amended EO 13658 to add language providing that the provisions of EO 13658 do "not apply to [Federal] contracts or contract-like instruments" entered into "in connection with seasonal recreational services or seasonal recreational equipment rental." *Id*. EO 13838 additionally stated that seasonal recreational services include "river running, hunting, fishing, horseback riding, camping, mountaineering activities, recreational ski services, and youth camps." *Id*.

34. On September 26, 2018, the Department implemented EO 13838 by adding the required exclusion to the regulations for EO 13658 at 29 CFR 10.4(g). *See* 83 Fed. Reg. 48,537. DOL estimated that it would affect approximately 100,000 firms engaged in recreational activities. at 48,541.

35. Echoing the President's rationale, the Department noted that:

> Lowering the cost of business for outfitter providers could incentivize small outfitters to enter the market. Likewise, it could also incentivize existing outfitters to hire more guides and to increase the hours of current employees. What all this translates into is more affordable guided tours and recreational services for visitors to Federal lands. And ultimately, greater access to outfitter services affords ordinary Americans a greater opportunity to experience the great beauty of America's outdoors.

*Id*. at 48,540.

36. When Plaintiffs acquired additional permits for federal lands following the effective date of the 2018 rule, they were able to save significant costs associated with the prior minimum wage rule, and, simultaneously, were able to hire more guides for each season than many had been able to do in the past.

## B. The New Rule

37. On April 27, 2021, President Biden reversed course, yet again, and issued EO 14026, *Increasing the Minimum Wage for Federal Contractors*, raising the previous threshold to $15/hour for covered employees. 86 Fed. Reg. 22,835. The EO also revoked the exemption for recreational services on federal lands but provided no explanation why. *See id.* at 22,836–37.

38. On November 23, 2021, DOL issued its final rule implementing the minimum wage for federal contractors, effective January 30, 2022. *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126. Invoking the Procurement Act, 40 U.S.C. §§ 101, 121(a), DOL asserted that the President had unilateral authority to issue any policy related to "procurement" so long as he deemed it "economical and efficient." *Id*. at 67,129. The rule requires any federal "contractor" to pay any employees a minimum wage of $15/hour, regardless of locality, and overtime wages if employees work more than 40 hours per week. *Id*. at 67,227. The wage threshold is also subject to yearly increases determined by the agency. *Id.* The rule applies to "contracts" or "contract-like instruments" with the government, which include "lease agreements," "licenses, permits, or other types of agreement, regardless of nomenclature, type, or particular form, and whether entered into verbally or in writing." *Id*. at 67,225. Notably, covered contracts include "any contract that may be covered under any Federal procurement statute," and "contracts covered by the Service Contract Act, contracts covered by the Davis-Bacon Act, concessions contracts not otherwise subject to the Service Contract Act, and contracts in connection with Federal property or land and related to offering services for Federal employees, their dependents, or the general public." *Id*.

39. In response to comments from outfitters, including Plaintiffs, DOL confirmed that the final rule applied to recipients "of special use permits issued by the Forest Service, Commercial Use Authorizations (CUAs) issued by the National Park Service (NPS), and outfitter and guide permits issued by the Bureau of Land Management (BLM) and the U.S. Fish and Wildlife Service (USFWS), respectively." *Id*. at 67,147. These permits "generally qualify as SCA-covered contracts," and in many cases are also covered by the FLSA. *Id*. at 67,147–48.

40. DOL estimated the rule would affect more than 500,000 private firms, including approximately 40,000 firms that provide concessions or recreational services pursuant to special use permits or licenses on federal lands. *Id*. at 67,194–96. In total, DOL estimated the rule would result in "transfers of income from employers to employees in the form of higher wage rates" of "$1.7 billion per year over 10 years." *Id*. at 67,194. The "*average* annualized direct employer costs are estimated to be $2.4 million" for each firm. *Id*. (emphasis added). Unsurprisingly, the Office of Information and Regulatory Affairs "has determined that this final rule is economically significant[.]" *Id*.

41. Beyond direct costs associated with wages, the final rule will impose direct costs on covered entities for "(1) regulatory familiarization costs and (2) implementation costs." *Id*. at 67,204. "In addition to the costs discussed above, there may be additional costs that have not been quantified. These include compliance costs, increased consumer costs, and reduced profits." *Id*. at 67,206.

42. With respect to typical procurement contracts, DOL acknowledged that these costs would likely pass through to the government itself. *Id*. Thus, "Government expenditures may rise." *Id*.

43. DOL also noted that "[n]on-procurement contracts on Federal lands, such as concessions contracts and permittee contracts, may experience different impacts than procurement contracts. This is predominantly because these contractors cannot as directly pass costs along to the Federal Government in the form of an increased bid amount or similar charge for the next contract." *Id*. Thus, DOL acknowledged that "increased contractor costs may be passed along to the public in the form of higher prices," and covered entities "may result in reduced profits." *Id*. "Price increases and impacts may be more pronounced among affected firms which are not currently covered by Executive Order 13658, including seasonal recreational businesses exempt under Executive Order 13838." *Id*. at 67,207. DOL also noted that permittees may also face lessened competitiveness with outfitters not using federal lands, but DOL opined that "these operators may be able to remain competitive even after moderate price increases" because of the aesthetic advantages of federal land. *Id*. Next, DOL acknowledged that because "permittees pay the Federal government fees based on prices . . . price increases will result in higher fees." *Id*. at 67,208. Finally, DOL recognized the rule would result in "disemployment," potentially of up to 0.9 percent "among companies operating on Federal lands under nonprocurement contracts, who might be more limited in their ability to pass costs along to the Federal government." *Id*. at 67,211.

44. To justify the costs, the Department listed five purported benefits, although those "benefits are not monetized:" (1) improved government services; (2) increased morale and productivity; (3) reduced turnover; (4) reduced absenteeism; and (5) reduced poverty and income inequality. *Id*. at 67,195. DOL acknowledged, however, that improved government services would "not apply to the outfitters and guides industry." *Id*. at 67,212. Indeed, with respect to "such permittees, licensees, and CUA holders, the Department recognizes and acknowledges that there

13

may be particular challenges and constraints experienced by non-procurement contractors that do not exist under more traditional procurement contracts." *Id*. at 67,512. Relying on studies concerning restaurant workers, the Department asserted that minimum wage rules would improve morale and reduce turnover. *Id*. at 67,213. With respect to morale, DOL relied on studies correlating *voluntary* wage increases with morale increases, and acknowledged that the "mandated wage increase in this rule may not generate as many positive feelings towards the employer as a voluntary wage increase would." *Id*. at 67,213 n.118. Concerning turnover, DOL pointed to studies showing that wage increases might reduce turnover an unspecified amount and that one study estimated "the cost reduction due to lower turnover rates ranges from $137 to $638 for each worker." *Id*. at 67,213. Finally, DOL acknowledged that the literature was divided concerning reductions in absenteeism, and any decreases in studies might be attributable to other factors. Nevertheless, DOL claimed this was a "feasible benefit of the final rule." *Id*. at 67,214.

45. Importantly, DOL did not discuss its former rationale for exempting permittees, did not consider alternatives for the outdoors recreation industry, or discuss its legal authority to regulate that industry, because the "purpose of this rulemaking is to implement EO 14026," and thus DOL had no discretion to consider these issues. *Id*. at 67,129. Addressing comments contending that EO 14026 "does not promote economy and efficiency in Federal Government procurement," and "questioning the President's legal authority to issue the Executive order under the Procurement Act," were allegedly "not within the scope of this rulemaking action." *Id*. at 67,131. DOL also said, "that due to the prescriptive nature of Executive Order 14026, the Department does not have the discretion to implement alternatives that would violate the text of

the Executive order, such as the adoption of a higher or lower minimum wage rate, or continued exemption of recreational businesses." *Id*. at 67,216.

## II. THE EFFECT ON PLAINTIFFS

46. Plaintiffs will need to renew or amend their existing special use permits in order to operate for the upcoming 2022 season. Without these permits, Plaintiffs cannot provide services on federal lands, which are key components of their businesses.

47. After the rule's effective date, Plaintiffs will be required to pay all of their employees, including their guides, minimum wage, and overtime consistent with the rule because Plaintiffs will provide services pursuant to their special use permits.

48. Plaintiffs will be forced to significantly increase their wage costs, and expend considerable resources related to new compliance and implementation costs.

49. Plaintiffs will also be forced to limit the amount of hours their employees can work in a workweek to avoid the need to pay newly-increased overtime wages.

50. Plaintiffs will therefore be required to limit the availability of multi-day trips, stagger guide staffing, and increase their costs to customers in compliance with the rule.

**COUNT I—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)—RULE IN EXCESS OF STATUTORY AUTHORITY**

51. Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

52. The executive branch's authority "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Likewise, "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*,

15

488 U.S. 204, 208 (1988). Thus, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside" an agency's rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

53. The Procurement Act authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" "economical and efficient" government procurement "activities." 40 U.S.C. §§ 101(1), 121(a). "The policies must be consistent with" the Act. 40 U.S.C. § 121(a).

54. Plaintiffs' use of federal lands, however, is neither an "activit[y]" the President may regulate under the Act, nor related to procurement. *See id.* at § 101(1). The President may not dispose of federal lands under the Procurement Act. *See id.* at § 102(9). Rather, the President may only regulate procuring and supplying services under the Act. *See id.* at § 101(1).

55. Plaintiffs do not supply the *government* services, nor does the government supply them services. Plaintiffs only hold permits allowing the use of federal land. The President may not, therefore, regulate them under the guise of his procurement authority. *See id.*

56. Separately, "[a]ny order" under the Procurement Act "must accord with the values of 'economy' and 'efficiency'" and have "a sufficiently close nexus between those criteria and the procurement [] program[.]" *AFL-CIO v. Kahn*, 618 F.2d 784, 792 (D.C. Cir. 1979) (en banc).

57. The final rule fails this limit as well because it does not save government resources related to procurement. Indeed, EO 13838 said this explicitly, concluding that applying federal

16

minimum wage standards "to outfitters and guides operating on Federal lands," "does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands." 83 Fed. Reg. 25,341.

58. The final rule was issued in excess of statutory authority and is therefore invalid.

59. As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring enforcement of the final rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### COUNT II—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)—ARBITRARY AND CAPRICIOUS

60. Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

61. A court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

62. An agency that "changes course" must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (citations omitted). "[W]hen an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Id*. (quotation omitted). An agency is thus "required to assess whether there

17

were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915. "It would be arbitrary and capricious to ignore such matters." *Id.* at 1913 (quotation omitted).

63. DOL's rule is arbitrary and capricious because it has rescinded its prior exception for non-procurement contractors like Plaintiffs without acknowledging the significant reliance interests at stake or explaining why it has disregarded its own evidence, and while refusing to consider alternatives to the rule.

64. The rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and is, therefore, invalid under 5 U.S.C. § 706(2)(A).

65. As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring enforcement of the final rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### COUNT III—VIOLATION OF U.S. CONSTITUTION, NON-DELEGATION DOCTRINE, AND SEPARATION OF POWERS

66. Plaintiffs repeat and reallege each and every allegation hereinabove as if fully set forth herein.

67. Article I, § 1, of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

68. No agency has any inherent power to make law, and "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

69. Article II, § 3, of the Constitution directs that the President "shall take Care that the Law be faithfully executed . . . ."

18

70. A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

71. Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

72. The President, acting through his agencies, therefore, may not exercise Congress' legislative power to declare entirely "what circumstances . . . should be forbidden" by law. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418–19 (1935).

73. Congress did not bestow the President with the authority to issue a federal minimum wage requirement for entities like Plaintiffs, who do not have procurement contracts with the government.

74. Alternatively, if Congress did bestow such authority on the President, it would be an unlawful delegation of legislative authority.

75. The final rule attempts to alter legal requirements concerning Plaintiffs without a valid source of authority and thus violates the separation of powers.

76. Alternatively, if the rule were authorized by the Procurement Act, the Act unconstitutionally delegates legislative power to the President and DOL.

77. As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring enforcement of the final rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

(i) The issuance of a preliminary injunction prohibiting Defendants from enforcing the final rule pursuant to 5 U.S.C. § 705 and 28 U.S.C. § 2201;

(ii) A declaratory judgment, pursuant to 5 U.S.C. § 706(2) and 28 U.S.C. § 2202, holding unlawful and setting aside the final rule;

(iii) An award of attorneys' fees and costs to Plaintiffs; and

(iv) Any other relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiffs herein demand a trial by jury of all triable issues in the present matter.

DATED: December 7, 2021.

Respectfully submitted,

*/s/ Caleb Kruckenberg*
CALEB KRUCKENBERG
MICHAEL A. POON
STEVEN M. SIMPSON
*Attorneys for Plaintiffs*

Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington, VA 22201
202-888-6881
CKruckenberg@pacificlegal.org
MPoon@pacificlegal.org
SSimpson@pacificlegal.org