IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-03283-PAB-STV

DUKE BRADFORD,
ARKANSAS VALLEY ADVENTURE, LLC, d/b/a AVA Rafting and Zipline, and
COLORADO RIVER OUTFITTERS ASSOCIATION,

      Plaintiffs,

v.

U.S. DEPARTMENT OF LABOR,
U.S. DEPARTMENT OF LABOR, WAGE & HOUR DIVISION,
JOSEPH R. BIDEN, President of the United States,
MARTIN J. WALSH, U.S. Secretary of Labor, and
JESSICA LOOMAN, Acting Administrator,

      Defendants.

---

**ORDER**

---

    This matter is before the Court on plaintiffs' Motion for a Preliminary Injunction [Docket No. 7]. Defendants responded, Docket No. 21, and plaintiffs replied. Docket No. 22. The Court has jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

## I. BACKGROUND

    On February 12, 2014, President Obama issued an executive order establishing a minimum wage for federal contractors under the Federal Property and Administrative Services Act, 40 U.S.C. §§ 101, *et seq*. (the "Procurement Act" or "FPASA"). *See* Exec. Order No. 13658, 79 Fed. Reg. 9,851 (Feb. 12, 2014) ("E.O. 13658" or the "Obama Order"). E.O. 13658 applies, in relevant part, to (1) new "contract[s] or contract-like instrument[s] for services covered by the Service Contract Act" and those "with the

Federal Government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public," if (2) "the wages of workers under such contract[s] or contract-like instrument[s] are governed by the Fair Labor Standards Act [("FLSA")], the Service Contract Act [("SCA")], or the Davis-Bacon Act [("DBA")]." *Id.* at 9,853.  The Department of Labor ("DOL") implemented E.O. 13658 through notice-and-comment rule-making, establishing a $10.10 per hour minimum wage plus overtime in excess of 40 hours in a workweek for federal contractors.  *See Establishing a Minimum Wage for Contractors*, 79 Fed. Reg. 60,634 (Oct. 7, 2014) (29 C.F.R. pt. 10) (the "Obama Rule").   Pursuant to the Obama Rule, a "[c]ontract or contract-like instrument" includes "licenses, permits, or any other type of agreement, regardless of nomenclature, type, or particular form." *Id.* at 60,722. The Obama Rule defines a "[n]ew contract" as "a contract that results from a solicitation issued on or after January 1, 2015, or a contract that is awarded outside the solicitation process on or after January 1, 2015," or a contract entered into before then that is "renewed," "extended," or "amended pursuant to a modification that is outside the scope of the contract" on or after January 1, 2015.  *Id.*

On May 25, 2018, President Trump issued an executive order, also under the Procurement Act, exempting "seasonal recreational services" workers, including those providing "river running, hunting, fishing, horseback riding, camping, mountaineering activities, recreational ski services, and youth camps."  *See* Exec. Order 13,838, 83 Fed. Reg. 25,341, 25,341 ("E.O. 13838" or the "Trump Order").  E.O. 13838 states, in part,

These individuals often conduct multiday recreational tours through

2

> Federal lands, and may be required to work substantial overtime hours. The implementation of Executive Order 13658 threatens to raise significantly the cost of guided hikes and tours on Federal lands, preventing many visitors from enjoying the great beauty of America's outdoors. Seasonal recreational workers have irregular work schedules, a high incidence of overtime pay, and an unusually high turnover rate, among other distinguishing characteristics. As a consequence, a minimum wage increase would generally entail large negative effects on hours worked by recreational service workers. Thus, applying Executive Order 13658 to these service contracts does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands.

*Id.* DOL implemented E.O. 13838 on September 26, 2018 without notice and comment. *See Minimum Wage for Contractors; Updating Regulations to Reflect Executive Order 13838*, 83 Fed. Reg. 48,537 (Sept. 26, 2018) (29 C.F.R. pt. 10) (the "Trump Rule"); 83 Fed. Reg. at 48,538 (DOL "promulgates this final rule without notice or an opportunity for public comment because this action is limited to implementing E.O. 13838.").

On April 27, 2021, President Biden revoked President Trump's E.O. 13838 exempting outfitters, reinstated much of President Obama's E.O. 13658, and increased the minimum wage from $10.10 per hour in President Obama's rule to $15.00 per hour. *See Increasing the Minimum Wage for Federal Contractors*, Exec. Order. No. 14,026, 86 Fed. Reg. 22,835 (Apr. 27, 2021) ("E.O. 14026" or the "Biden Order"). E.O. 14026 applies to "new contracts; new contract-like instruments; new solicitations; extensions or renewals of existing contracts or contract-like instruments; and exercises of options on existing contracts or contract-like instruments . . . where the relevant contract or contract-like instrument will be entered into, . . . extended or renewed, or . . . exercised" by January 30, 2022. *Id.* at 22,837.

3

On November 24, 2021, DOL implemented the Biden Order after notice and comment with the final rule *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 24,  2021) (to be codified at 29 C.F.R. pts. 10, 23) (the "Biden Rule").  DOL explained,

> The use of the term "contract-like instrument" in Executive Order 14026 reflects that the order is intended to cover all arrangements of a contractual nature, including those arrangements that may not be universally regarded as a "contract" in other contexts, such as special use permits issued by the Forest Service, Commercial Use Authorizations issued by the National Park Service, and outfitter and guide permits issued by the Bureau of Land Management and the U.S. Fish and Wildlife Service.

*Id.* at 67,134.  The Biden Rule states that DOL's "understanding" is that outfitters enter into commercial use authorization ("CUA") agreements with the National Park Service, and outfitter and guide permit agreements with the Bureau of Land Management ("BLM") and U.S. Fish and Wildlife Service ("USFWS"), respectively.  *Id.* at 67,148.  "The principal purpose of these legal instruments," according to DOL, "seems to be furnishing services through the use of service employees."  *Id.*  "If this is true," DOL states, the SCA "and thus [E.O.14026] may generally cover the CUA and outfitter and guide permit agreements that contractors enter into with the NPS, BLM, and USFWS, respectively."  *Id.*

The Biden Rule mandates overtime pay for compensable work beyond 40 hours per workweek at $22.50 per hour, which is one and one-half times the minimum wage. *Id.* at 67,176.  In rescinding President Trump's exemption for recreational service workers, the Biden Rule states that, with respect to contracts entered into between January 1, 2015 and January 29, 2022, contracting agencies shall "take steps . . . to

4

exercise any applicable authority to insert the Executive Order 13658 contract clause"

into the existing contracts "and to ensure that those contracts comply with the

requirements of Executive Order 13658 on or after January 30, 2022." *Id.* at 67,155.

With respect to new contracts entered into on or after January 30, 2022, the Biden Rule

states that E.O. 14026 will apply. *Id.*

On December 7, 2021, plaintiffs filed this lawsuit. Docket No. 1. Plaintiffs bring

three claims: (1) the Biden Rule exceeded President Biden's authority in violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2)(C) ("APA"); (2) the Biden Rule is

arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A); and (3) President Biden

violated the Constitution's separation of powers and non-delegation doctrines by

exercising legislative power without clear congressional authorization. *Id.* at 15–19,

¶¶ 51–77.

On December 9, 2021, plaintiffs filed a motion for a preliminary injunction to

enjoin the enforcement of the Biden Rule before it takes effect on January 30, 2022,

pending a final judgment in this litigation. Docket No. 7 at 20. On January 6, 2022, the

Court held a hearing on plaintiffs' motion. The Court heard testimony from plaintiffs'

witnesses Duke Bradford, owner of Arkansas Valley Adventure, LLC ("AVA"), and David

Costlow, executive director of the Colorado River Outfitters Association ("CROA").[1]

AVA has provided outdoor excursions in central Colorado since 1998. AVA

offers, either itself or in partnership with other companies, activities including rafting,

---

[1] Plaintiffs submitted three exhibits, a declaration from Mr. Bradford, a declaration from Mr. Costlow, and a permit discussed below. Plaintiffs did not move for the admission of the declarations, and the Court does not consider them in resolving plaintiffs' motion.

ziplining, fishing, horseback riding, stand-up paddle boarding, and all-terrain vehicle tours.  AVA also offers train rides, cabin and campsite rentals, gear rentals, and other services.  Most of AVA's activities last part of a day or a full day.  However, some AVA trips are multi-day, overnight trips.  AVA operates on both federal and non-federal land.  Approximately 30% of AVA's revenue is from activities that take place on federal land, and less than 10% of AVA's revenue is from overnight trips on federal land.

AVA's business is seasonal.  It employs approximately 250 to 350 guides and other employees between mid-May and September.  AVA also employs 15 year-round employees, who handle marketing and other operations.  On federal land, AVA operates under two permits.  One permit is a "Special Recreation Permit" from BLM that authorizes, among other things, float fishing trips; shuttle services of vehicles, equipment, and clients; rental services of equipment; and rafting on the Eagle River from Squaw Creek to the Colorado River confluence in the State of Colorado (the "Eagle River Permit").  *See* Exh. 1.[2]  The Eagle River Permit was issued on April 1, 2012 and expires on March 30, 2022.  Exh. 1 at 2.  The Eagle River Permit requires AVA to pay BLM the greater of either $100 per year or 3% of AVA's gross revenue from the activities listed on the permit.  *Id.*  Pursuant to the Eagle River Permit, AVA may not represent that its activities are conducted by BLM.  *Id.* at 3.  The Eagle River Permit also includes 16 "special stipulations," which require, among other things, that AVA

_____

[2] Two versions of the Eagle River Permit were admitted into evidence, plaintiffs' Exhibit A and defendants' Exhibit 1.  The parties agree that the two exhibits are identical except that Exhibit 1 contains additional pages, including "special stipulations," which are not included in Exhibit A.  *See* Exh. 1 at 4–5.  The Court will therefore cite to Exhibit 1, as it is the more complete version of the same permit.

coordinate with other outfitters to decrease congestion on boat ramps and in parking

areas, take precautions to minimize the spread of invasive species, follow established

fish handling protocols, ensure that guests and crew wear life jackets, prohibit guides

from possessing alcohol, alert BLM about Native American discoveries, and use

existing hardened trails within riparian areas.  Exh. 1 at 4.  AVA is in the process of

renewing the Eagle River Permit in advance of the upcoming rafting season.  AVA also

has a second permit, which expires in a couple of years, issued by the United States

Forest Service ("Forest Service"), for operation on the Blue River in the State of

Colorado.

AVA's two-night/three-day trips, which are its longest advertised trips, cost

customers approximately $1000, and, for such trips, AVA pays guides a "trip salary,"

which is standard in the rafting industry, of between $400 and $500, depending on the

guide's experience level, the hours worked, and the state and federal minimum wage

requirements.  Guides typically work eight to ten hours of compensable time each day

during a multi-day trip.  Mr. Bradford testified that AVA complies with the FLSA and

pays its guides more than minimum wage, which, in Colorado, is $12.56 per hour.  If

considered as an hourly wage for compensable time, guides' trip salaries exceed

$15.00 per hour, and an experienced guide may earn $200 per day on an overnight trip.

Approximately 100 AVA guides lead overnight trips, and 40 to 60 guides work more

than 40 compensable hours each week.  Many guides lead multiple trips and work five

or six days each workweek.  Although Mr. Bradford testified that AVA complies with

wage and hour laws, AVA does not pay overtime, and no guide earns $22.50 or more

per hour.  Mr. Bradford is aware of the FLSA exemption that permits some employees

of private establishments that operate on national parks and forests to work 56 rather than 40 hours before receiving overtime pay,[3] and he is aware that non-duty time, for instance sleep time, is not compensable.

Before expiration of the Eagle River Permit, AVA will have to determine, based on the wages that it will pay guides for the upcoming season, how many guides it needs to hire, what trips it will offer, and the price of those trips. Although these determinations will not require modification of the Eagle River Permit before its expiration, AVA will seek to hire guides and to market trips before then to prepare for the coming season.

AVA expects that it will expend resources to comply with the Biden Rule, including legal fees and increased labor costs. Mr. Bradford anticipates that he will have to stop offering overnight trips if the Biden Rule takes effect because such trips would be too expensive for customers. He will also move to a four-day workweek, which will require hiring more staff to accommodate the remaining days. Instead of paying guides a trip salary, Mr. Bradford will transition guides to an hourly wage.

---

[3] Defendants refer to this exemption as "FLSA section 13(b)(29)." The Court presumes defendants are referring to 29 U.S.C. § 213(b)(29), which states that the FLSA's standard overtime provisions do not apply to

> any employee of an amusement or recreational establishment located in a national park or national forest or on land in the National Wildlife Refuge System if such employee (A) is an employee of a private entity engaged in providing services or facilities in a national park or national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture, and (B) receives compensation for employment in excess of fifty-six hours in any workweek at a rate not less than one and one-half times the regular rate at which he is employed.

Because AVA guides live in AVA housing, and AVA will need to hire more guides in order to comply with the Biden Rule, AVA's housing costs will rise.  Mr. Bradford is not certain whether the Biden Rule would ultimately affect AVA's profits because he stated that AVA can diversify the activities that it offers.  However, AVA competes with outfitters that do not operate on federal lands that would not be subject to the Biden Rule.  Those operators may continue to offer overnight trips because their costs will not increase under the Biden Rule.  As a result, Mr. Bradford is concerned about losing guides, who may wish to work more than four days each week, to outfitters who do not operate on federal land.

Plaintiff CROA looks after the interests of its 50 member outfitters.  CROA members operate primarily in Colorado, but also in Arizona, Utah, and Wyoming. CROA members primarily provide white-water rafting trips, but also provide float fishing and flyfishing trips.  At least 90% of CROA members operate on federal lands; however, Mr. Costlow is not certain of what percent of CROA members' operations are on federal lands.  Seven or eight CROA members provide overnight trips on federal lands, ranging from two-day trips to 16-day trips.  CROA members pay their guides the applicable minimum wages in the states that the members operate, and many pay guides in excess of $15.00 per hour when a trip salary is calculated that way.  Mr. Costlow testified that the earliest point a CROA member will need to change the status of a permit is February, when an outfitter intends to buy part of an "operation" from another CROA member and either the purchaser or seller requested to "transfer" a permit in February.

CROA members will expend resources to comply with the Biden Rule, including

9

hiring lawyers to review the Rule and ensuring that subcontractor contracts, such as contracts with food and transportation providers, comply with the Rule. CROA members may have to modify payroll and accounting services as well. Mr. Costlow could not testify how many members, if any, already pay their guides at least $15.00 per hour, but he believes that many do. Mr. Costlow's knowledge about CROA members is from speaking with them. Neither he nor anyone at CROA reviews members' financials or other information, and the only requirement for an outfitter to join CROA is having a Colorado river operator's license. CROA does not offer legal advice to members, and Mr. Costlow did not specify how CROA looks after its members' interests.

Mr. Costlow's understanding is that the Biden Order and Biden Rule eliminate the FLSA's 56-hour exemption. He also believes that every hour on a multi-day trip is compensatory and that, once a guide has been on a trip for 40 hours, the guide must be paid overtime, including for sleep time. However, Mr. Costlow stated that the industry and his members have not "interpreted" minimum wage laws to require overtime pay for hours worked in excess of the threshold under state law. Rather, CROA members follow the industry standard "trip salary" model.

Mr. Costlow does not know CROA members' profit margins, yet he believes many members will have difficulty absorbing any increased costs due to the Biden Rule. In order to ensure harmony in a company, members will need to increase all employees' wages as the lowest-paid employees' hourly wages increase to $15.00.

## II.  LEGAL STANDARD

### A.  Preliminary Injunction

A preliminary injunction is not meant to "remedy past harm but to protect plaintiffs from irreparable injury that will surely result without [its] issuance" and "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258, 1267 (10th Cir. 2005); *see also Hale v. Ashcroft*, 683 F. Supp. 2d 1189, 1197 (D. Colo. 2009) ("injunctive relief can only be obtained for current or prospective injury and cannot be conditioned on a past injury that has already been remedied").  "[C]ourts generally will refuse to grant injunctive relief unless plaintiff demonstrates that there is no adequate legal remedy."  Charles Alan Wright, et al., 11A *Fed. Prac. & Proc. Civ.* § 2944 (4th ed. 2020).

To obtain a preliminary injunction, a plaintiff must demonstrate four factors by a preponderance of the evidence: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009).

## III.  ANALYSIS

### A.  Standing

The party seeking redress bears the burden of establishing standing.  *Colo.*

11

*Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  To carry this burden, plaintiffs must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  *Id.* at 543 (internal quotation marks and alteration marks omitted); *Lujan*, 504 U.S. at 560–61.  Organizations with members can establish standing either in their own right or on behalf of their members.  *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

In their response to plaintiffs' preliminary injunction motion, defendants argue that, "[o]n the evidentiary record as it currently stands, it is impossible to determine when [p]laintiffs will be subject to the requirements" of E.O. 14026 and, accordingly, defendants argue, plaintiffs "have not established that they face imminent harm and thus have Article III standing."  Docket No. 21 at 8–9 n.4.

### 1.  Duke Bradford and AVA

The Court finds that Mr. Bradford and AVA have Article III standing.  As to the injury-in-fact requirement, Mr. Bradford and AVA's Eagle River Permit expires on March 30, 2022, and AVA will be subject to the Biden Rule for any new contract or permit that it enters into or receives after January 30, 2022.  At minimum, Mr. Bradford and AVA have established that complying with the Biden Rule through the renewed Eagle River Permit will require that AVA pay at least some of its employees a higher hourly wage than it currently pays.  Although defendants have argued that the financial burden may not be as great as Mr. Bradford and AVA believe, because AVA pays most of its guides more than $15.00 per hour and most overnight trips are fewer than 40 hours of

12

compensable time, the Court finds that Mr. Bradford and AVA have met their burden. First, the evidence establishes that guides often work five or six days each week and lead as many trips as possible. Thus, even if a three-day overnight trip would result in only 30 hours of work, which is below the overtime threshold, guides who work five or six days each week may exceed 40 hours of compensable time in a workweek.[4]

The Supreme Court has held that, "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017); *see also Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("Economic harm to a business clearly constitutes an injury-in-fact. And the amount is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes."). Moreover, Mr. Bradford and AVA have already begun the process of renewing the Eagle River Permit. Thus, their injury is not speculative or hypothetical, and, given that they have begun the renewal process and that the renewed Eagle River Permit will be subject to the Biden Rule, Mr. Bradford and AVA's future harm is "certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (holding that "fears of hypothetical future harm that is not certainly impending" are insufficient to create Article III standing); *Lujan*, 504 U.S. at 564 n.2 (while "'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is 'certainly impending.'" (quoting *Whitmore v. Arkansas*, 495 U.S. 149,

---

[4] No party provided argument on the applicability of 29 U.S.C. § 213(b)(29), the FLSA's 56-hour overtime threshold for certain work, and, therefore, the Court declines to consider that issue.

158 (1990)).

Mr. Bradford and AVA's economic harms are also causally connected to the Biden Rule, as AVA would not have to raise wages or incur other related costs but for the rule, and a favorable decision for them, namely, a decision striking down the Biden Rule, would redress their injury. *See Colo. Outfitters Ass'n*, 823 F.3d at 544 (citing *Lujan*, 504 U.S. at 561). Mr. Bradford and AVA, therefore, have Article III standing.

"In addition to Article III standing requirements," a plaintiff "must (i) identify some final agency action and (ii) demonstrate that its claims fall within the zone of interests protected by the statute forming the basis of its claims." *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (quoting *Catron County Bd. of Comm'rs v. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996)). The prudential standing inquiry asks whether plaintiffs "fall[] within the class of plaintiffs whom Congress has authorized to sue," or, in other words, whether plaintiffs have a cause of action under the statute. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). Standing under the APA is unavailable if a statute precludes judicial review of the agency action. *City of Albuquerque v. Dep't of Interior*, 379 F.3d 901, 915–16 (10th Cir. 2004) (citing 5 U.S.C. § 701(a)(1)). The Procurement Act does not "explicitly den[y] standing or a private right of action to any plaintiffs." *Id.* at 916. Nor does the Biden Order or Rule. In the Tenth Circuit, however, prudential standing is "not a jurisdictional limitation and may be waived." *The Wilderness Society v. Kane Cnty.*, 632 F.3d 1162, 1168 n.1 (10th Cir. 2011); *Finstuen v. Crutcher*, 496 F.3d 1139, 1147 (10th Cir. 2007). Because defendants do not address prudential standing, the issue has been waived, and the Court does not address it.

14

### 2. CROA

An organization has standing to sue on its own to challenge action that causes it direct injury, and the inquiry is "the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). Organizations may assert standing in their own right when, for instance, a defendant's conduct makes it difficult or impossible for the organization to fulfill one of its essential purposes or goals, such as when the organization faces a drain on its resources or when the defendant's actions "have perceptively impaired" the organization's ability to carry out its mission. *Id.* An association also has "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). This doctrine is known as "associational standing."

There is no indication that the Biden Rule will impair CROA in fulfilling an essential purpose or goal of its mission or that the Biden Rule will harm CROA's financial resources. Mr. Costlow did not testify how CROA advocates for its members' interests, and there is no evidence on how or whether CROA itself expends any resources, as Mr. Costlow did not testify that CROA provides advice or counsel to its members in any way, such that CROA's ability to carry out its mission would be affected by the Biden Rule. CROA, therefore, does not have organizational standing. *See Havens Realty*, 455 U.S. at 378.

Moreover, plaintiffs have not shown CROA's associational standing. The

testimony from plaintiffs about a CROA member being potentially harmed by the Biden Rule was limited to Mr. Costlow's statement that an outfitter intends to buy part of an "operation" from another CROA member and that either the purchaser or seller requested to "transfer" a permit in February.  Although Mr. Costlow did not specify which party to the transaction will have to transfer the permit, Mr. Costlow's testimony indicates that the permit falls under the ambit of the Biden Rule, and Mr. Costlow and the CROA member understand that transferring the permit would constitute a "new" contract under the Biden Rule such that the purchaser would be subject to the rule's minimum wage provisions.  However, Mr. Costlow did not testify whether the purchaser or seller already meets the wage and hour requirements in the Biden Rule, which many CROA members do.  Plaintiffs, therefore, have not shown that a CROA member will suffer even "[a] dollar of economic harm."  *See Carpenters Indus. Council*, 854 F.3d at 5; *Czyzewski*, 137 S. Ct. at 983.  Moreover, given that the transaction between the two outfitters has not been consummated and that there is no evidence or argument on the effect of a permit transfer, plaintiffs have not shown anything more than speculative or hypothetical injury.  *See Clapper*, 568 U.S. at 416.

Because plaintiffs have not established CROA's standing, the Court will confine the remainder of its preliminary injunction analysis to plaintiffs Bradford and AVA.

### B.  Likelihood of Success on the Merits

As previously mentioned, plaintiffs bring three claims: (1) the Biden Rule exceeded President Biden's authority in violation of the APA, 5 U.S.C. § 706(2)(C) ("APA"); (2) the Biden Rule is arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A); and (3) President Biden violated the Constitution's separation of powers

16

and non-delegation doctrines.  Docket No. 1 at 15–19, ¶¶ 51–77.  The Court considers plaintiffs' likelihood of success for each claim.

### 1.  Whether the Biden Rule Exceeds President Biden's Authority

In their complaint, plaintiffs argue that the Biden Rule was issued in excess of President Biden's authority under the Procurement Act.  Docket No. 1 at 15–17, ¶¶ 51–59.  Similarly, in their preliminary injunction motion, plaintiffs contend that the Procurement Act does not provide a basis for the Biden Rule.  Docket No. 7 at 6–16.

The purpose of the Procurement Act is "to provide the Federal Government with an economical and efficient system" for (1) "[p]rocuring and supplying property and nonpersonal services," (2) "[u]sing available property," (3) "[d]isposing of surplus property," and (4) "[r]ecords management."  40 U.S.C. § 101.  The Procurement Act permits the President to "prescribe policies and directives that the President considers necessary to carry out" the Act, and policies must be consistent with the Act.  *Id.* at § 121(a).

Plaintiffs first argue that the Procurement Act does not permit the President to "use or dispose of *federal lands*."  Docket No. 7 at 6.  They argue that the Biden Rule is not authorized because the Procurement Act defines "property" to exclude land in the "public domain" and "land reserved or dedicated for national forest or national park purposes."  Docket No. 7 at 6–7 (quoting *id.* at § 102(9)).  Thus, according to plaintiffs, because the other "activities" in the Act, such as records management, do not apply, President Biden has no authority under the Procurement Act over activities on the federal lands where plaintiffs operate.  *Id.*  E.O. 14026 states that it applies to contracts "related to offering services for Federal employees, their dependents, or the general

17

public," *see* 86 Fed. Reg. at 22,837, and the Biden Rule explains that, "for purposes of the minimum wage requirements of [E.O. 14026], the term contract included contracts covered by the SCA, contracts covered by the DBA, concessions contracts not otherwise subject to the SCA, and contracts in connection with Federal property or land and related to offering services for Federal employees, their dependents, or the general public, as provided in" E.O. 14026. *Id.* at 67,133. Although the Procurement Act defines "property" narrowly, as plaintiffs note, *see* 40 U.S.C. § 102(9), plaintiff's argument is not persuasive because the Procurement Act also covers "supplying . . . nonpersonal services," *see* 40 U.S.C. § 101(1), which, as the Court discusses below, courts historically construe broadly. *See, e.g.*, *AFL-CIO v. Kahn*, 618 F.2d 784, 790, 787–92 (D.C. Cir. 1979) (en banc) (detailing presidents' use of the Procurement Act).

Plaintiffs next argue that, "[c]ertainly[,] the government's provision of permits is not the 'supply[ of] non personal services,'" and plaintiffs' use of federal lands "has nothing at all to do with procurement." Docket No. 7 at 7 (quoting 40 U.S.C. § 102). Although plaintiffs are correct that outfitters are not procurement contractors, *see* 86 Fed. Reg. at 67,152 (describing outfitters as "non-procurement contractors"), plaintiffs provide no additional argument or support beyond their say-so that outfitters operating on federal lands pursuant to permits or licenses like plaintiffs do not supply nonpersonal services.

The Procurement Act defines "nonpersonal services" as "contractual services . . . other than personal and professional services." 40 U.S.C. § 102(8). Courts interpreting "nonpersonal services" in the Procurement Act have considered the phrase as it is defined in the context of the Federal Acquisition Regulations. *See, e.g.*, *Kentucky v.*

18

*Biden*, --- F.4th ----, 2022 WL 43178, at *15 n.11 (6th Cir. Jan. 5, 2022) (comparing 48 C.F.R. § 37.104(a) ("A personal services contract is characterized by the employer-employee relationship it creates between the Government and the contractor's personnel."), with 48 C.F.R. § 37.101 ("Nonpersonal services contract means a contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees.")).  The court in *Kentucky* emphasized that the term "nonpersonal services" "implies the federal government's lack of the heightened degree of 'supervision and control' it might exercise over its own employees."  *Id.*  Here, Mr. Bradford testified that, as stated in Eagle River Permit, *see* Exh. 1 at 3, AVA is not permitted to imply that BLM has any supervision over AVA or that BLM provides services through AVA.  Mr. Bradford stressed that BLM does not tell AVA how to "run rapids" or whether AVA can move a rock in a river.  To be sure, AVA must abide by certain stipulations, *see id.* at 4–5, but the fact that a party to a contract must comply with certain obligations pursuant to that contract does not mean that the party is under the control or supervision of the other party.  The Eagle River Permit does not subject AVA to the supervision and control of the government.  Plaintiffs have not shown, therefore, that outfitting and guiding are not nonpersonal services.

Moreover, the Court agrees with defendants that plaintiffs' argument that they "don't supply any services (or goods) to the government, and the government doesn't supply any services (or goods) to them," *see* Docket No. 7 at 8, is not persuasive because the Procurement Act provides an economical and efficient system for, among

19

other things, "[p]rocuring *and supplying* . . . nonpersonal services."  40 U.S.C. § 101(1)

(emphasis added).  Defendants argue that the government, here, the Forest Service

and BLM, contract with outfitters to supply recreational services to the public.  Docket

No. 21 at 11.  As the stipulations in the Eagle River Permit show, the government is

concerned with the ways in which outfitters supply recreational services to the public.

*See* Exh. 1 at 4–5.  For instance, if outfitters do not use hardened trails within riparian

areas, they may damage the land leading to costly remediation.  Plaintiffs have not

shown that the government does not contract with them and other outfitters to supply

services on federal lands.

Next, plaintiffs argue that the Biden Rule exceeds President Biden's authority

because it is not "necessary for economical and efficient procurement policy."  Docket

No. 7 at 8–11.  Plaintiffs' argument is not persuasive.  First, the Procurement Act does

not require that the policy or directive must be necessary for economical and efficient

procurement, but rather only that the President considers the policy or directive to be

necessary.  *See* 40 U.S.C. § 121(a) ("The President may prescribe policies and

directives that the President considers necessary to carry out this subtitle.").  Second,

historical precedent shows that plaintiffs are mistaken in their view of what constitutes

"economical and efficient procurement policy."  The Procurement Act "provide[s] the

Federal Government with an economical and efficient system" for "[p]rocuring and

supplying property and nonpersonal services," "[u]sing available property," "[d]isposing

of surplus property," and "[r]ecords management."  40 U.S.C. § 101.  Courts have

interpreted this language to mean that a president's policy or directive issued under the

Procurement Act must have a "sufficiently close nexus to the values of providing the

20

government an economical and efficient system for . . . procurement and supply."
*UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (citation
and internal quotation omitted).  Courts have not viewed "economy" and "efficiency"
narrowly; "economy" and "efficiency" "encompass those factors like price, quality,
suitability, and availability of goods or services."  *See Kahn*, 618 F.2d at 789.  As a
result, courts have held that the Procurement Act "grants the President particularly
direct and broad-ranging authority over those larger . . . issues that involve the
Government as a whole."  *Id.*; *see also City of Albuquerque*, 379 F.3d at 914
("Congress chose to utilize a relatively broad delegation of authority in the [Procurement
Act].  However, Congress did instruct the President's exercise of authority should
establish 'an economical and efficient system for . . . the procurement and supply' of
property.").  Courts have recognized the  "necessary flexibility and broad-ranging
authority" granted to the President under the Act, and courts will find a nexus even
where the connection seems attenuated or where arguments may be advanced that the
order will have the opposite effect than it intends.  *Chao*, 325 F.3d at 366 (quotation
omitted).

In *Chao*, President Bush used the Procurement Act to require federal contractors
to post notices at their facilities informing employees that they could not be forced to
join a union or to pay mandatory dues unrelated to representational activities.  *Id.* at
362.  President Bush explained the economies and efficiencies as follows: "When
workers are better informed of their rights, including their rights under the Federal labor
laws, their productivity is enhanced.  The availability of such a workforce from which the
United States may draw facilitates the efficient and economical completion of its

procurement contracts."  *Id.* at 366 (quoting 66 Fed. Reg. 11,221, 11,221).  Although the court noted that the "link may seem attenuated" between the rule and economy and efficiency to the government and that "one can with a straight face advance an argument claiming opposite effects or no effects at all," the court ultimately held that President Bush had shown "enough of a nexus" to the requirements of economy and efficiency under the Procurement Act.  *Id.* at 366–67.[5]

Decades before *Chao*, the D.C. Circuit, en banc, upheld President Carter's minimum wage executive order issued under the Procurement Act.  *See Kahn*, 618 F.2d at 796.  The court in *Kahn* explained that the Procurement Act "was designed to centralize [g]overnment property management and to introduce into the public procurement process the same flexibility that characterizes such transactions in the private sector."  *Id.* at 787.  The court noted that the language in the act permitting the President to "prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act" was "open-ended."  *Id.* at 788 (quoting 40 U.S.C. § 486(a), now codified at 40 U.S.C. § 121(a)).  The court explained that Congress, in enacting the law, emphasized "the leadership role of the President in setting [g]overnment-wide procurement policy on matters common to all agencies" and "intended that the President play a direct and active part in supervising the [g]overnment's management functions."  *Id.*

---

[5] Although plaintiffs argued at the hearing that *Chao* is an outlier, the Sixth Circuit in *Kentucky* noted that the "requirement" in *Chao* "has a 'close nexus'" to the government's management of labor.  2022 WL 43178, at *14 (finding that "instances in which the federal government said federal contractors . . . had to hang posters advising employees that they could not be forced to join a union" "has a 'close nexus' to the ordinary hiring, firing, and management of labor").

The court in *Kahn* detailed the sorts of presidential directives that courts have upheld under the Act.  In 1961, for instance, President Kennedy used the Procurement Act to direct contractors to hire minority workers.  *Id.* at 791.[6]  According to *Kahn*, presidents used the Procurement Act – and only the Procurement Act – for authority to enact anti-discrimination requirements for government contractors between 1953 and 1964.  *Id.* at 790–91.  Later, "President Johnson directed by Executive Order that federal contractors not 'discriminate (against persons) because of their age except upon the basis of a bona fide occupational qualification, retirement plan, or statutory requirement.'"  *Id.* at 790 (quoting 3 C.F.R. § 179).  In 1967, the General Services Administrator issued a regulation under the Procurement Act requiring goods used in procurement and supplies to be produced in the United States.  *Id.*  In 1973, President Nixon used the Procurement Act to exclude certain state prisoners from employment on federal contract work.  *Id.*  The *Chao* court, citing *Kahn*, described the standard of showing the economy and efficiency nexus as "lenient."  *Chao*, 325 F.3d at 367.

In determining the limits of an agency's congressional mandate, courts may look to historical practice.  *See, e.g.*, *Nat'l Fed. of Indep. Bus. v. Dep't of Labor*, No. 21A244, 21A447, 2022 WL 120952, at *4 (U.S. Jan. 13, 2022) ("It is telling that OSHA, in its half

---

[6] Plaintiffs argued at the hearing and in their reply brief that the President "does not have, for example, the power to order federal subcontractors to prevent racial discrimination and take affirmative action in hiring."  Docket No. 22 at 4 (citing *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981)).  The Court finds *Liberty Mutual*'s persuasiveness minimal given the numerous anti-discrimination measures described in *Kahn* that have been upheld and the Sixth Circuit's recent statement that anti-discrimination orders have a "close nexus" to the management of labor.  *See Kentucky*, 2022 WL 43178, at *14 (finding that governments' requirement that federal contractors "could not discriminate" has a "'close nexus' to the ordinary hiring, firing, and management of labor").

century of existence, has never before adopted a broad public health regulation of this kind . . . .  This 'lack of historical precedent,' coupled with the breadth of authority that the Secretary now claims, is a 'telling indication' that the mandate extends beyond the agency's legitimate reach."); *Kentucky*, 2022 WL 43178, at \*15 n.11 ("It is telling that none of the history from 1949 to present supplied by the government involves the imposition of a medical procedure upon the federal-contractor workforce under the rationale of 'reducing absenteeism.'  The dearth of analogous historical examples is strong evidence that [the Procurement Act] does not contain such a power." (citing *In re MCP No. 165, OSHA Interim Final Rule: COVID-19 Vaccination & Testing*, 20 F.4th 264, 284 (6th Cir. 2021) (Sutton, C.J., dissenting) ("A 'lack of historical precedent' tends to be the most 'telling indication' that no authority exists."))).

There is, of course, recent precedent of presidents using the Procurement Act to regulate contractor minimum wages.  Just as President Biden did, President Obama and President Trump relied on their Procurement Act authority to issue their executive orders.  President Obama's order begins, "[b]y the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act . . . and in order to promote economy and efficiency in procurement by contracting with sources who adequately compensate their workers . . . ."  79 Fed. Reg. at 9,851.  President Trump's order begins, "[b]y the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act . . . and in order to ensure that the Federal Government can economically and efficiently provide the services that allow visitors of all means to enjoy the natural beauty of

Federal parks and other Federal lands . . . ."  83 Fed. Reg. at 25,341.

President Obama and President Trump invoked the Procurement Act as the proper vehicle for the Executive to regulate minimum wages paid to federal contractors, including outfitters and guides operating on federal land.  President Obama stated that regulating federal contractor minimum wages is, at least in the context of the Procurement Act, related to economical and efficient government contracting.  Similarly, President Trump stated that regulating outfitter and guide wages on federal land is related to the government's provision of services to allow the public to enjoy federal land.  The rules implementing President Obama's and President Trump's orders confirm their administrations' understanding that the Procurement Act provided sufficient authority for their actions.  *See, e.g.*, 79 Fed. Reg. at 60,636 ("The President issued [E.O.13658] pursuant to his authority under 'the Constitution and the laws of the United States,' expressly including the . . . Procurement Act . . . .  The Procurement Act authorizes the President to 'prescribe policies and directives that the President considers necessary to carry out' the statutory purposes of ensuring 'economical and efficient' government procurement and administration of government property." (first quoting 29 Fed. Reg. at 9,851, then quoting 40 U.S.C. §§ 101, 121(a)); 83 Fed. Reg. at 48,538 ("The President issued E.O. 13838 pursuant to his authority under the Constitution and the [Procurement Act].  The Procurement Act authorizes the President to 'prescribe policies and directives that [the President] considers necessary to carry out' the statutory purposes of ensuring 'economical and efficient' government procurement and administration of government property." (quoting 40 U.S.C. §§ 101, 121(a)));  President Trump's order also states, "applying [E.O.13658] to [recreational]

25

service contracts does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands.  That rationale, however, does not apply with the same force to lodging and food services associated with seasonal recreational services, which generally involve more regular work schedules and normal amounts of overtime work.  Executive Order 13658 therefore should continue to apply to lodging and food services associated with seasonal recreational services."  83 Fed. Reg. at 25,341.  President Obama's and President Trump's executive orders and rules are historical precedent for President Biden using the Procurement Act similarly.

The Court finds that the Biden Rule meets the "lenient" economy and efficiency nexus.  *See Chao*, 325 F.3d at 367; *Kahn*, 618 at 790–92.  The Biden Order states that President Biden's goal is to "promote economy and efficiency in procurement by contracting with sources that adequately compensate their workers."  86 Fed. Reg. at 22,835.  The Order also states that "ensuring that [f]ederal contractors pay their workers an hourly wage of at least $15.00 will bolster economy and efficiency in [f]ederal procurement" because raising the minimum "enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs."  *Id.*  President Biden's statement of economy and efficiency is similar to President Bush's in *Chao*, which was held to be sufficient.  *See Chao*, 325 F.3d at 366 (President Bush's statement was that, "[w]hen workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced.  The availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts." (quoting 66 Fed. Reg. at 11,221)).

26

Moreover, DOL "anticipates that the economy and efficiency benefits of [E.O. 14026] will offset potential costs, including for the holders of [recreational service permits and licenses]."  86 Fed. Reg. at 67,152.  DOL found that "several factors . . . will substantially offset any potential adverse economic effects on their businesses arising from application of" E.O. 14026.  *Id.* at 67,153.  DOL concluded that "increasing the minimum wage of [outfitters and guides] can reduce absenteeism and turnover in the workplace, improve employee morale and productivity, reduce supervisory and training costs, and increase the quality of services provided to the Federal Government and the general public."  *Id.*  DOL also noted "the potential that increased efficiency and quality of services will attract more customers and result in increased sales.  Such benefits may be realized even where the contractor has limited ability to transfer costs to the contracting agency or raise prices of the services that it offers."  *Id.*

Plaintiffs argue that the Biden Rule will actually result in more costs to non-procurement contractors who are unable to pass along the costs to the government in higher priced bids, which plaintiffs argue is the opposite of the Procurement Act's goal. Docket No. 7 at 9–10.  DOL has disputed this, concluding that "there is no evidence to suggest that the[] benefits" of "improved government services, increased morale and productivity, reduced turnover, reduced absenteeism, increased equity, and reduced poverty and income . . . would not apply to the outfitters and guide industry as well" as to other federal contract workers.  86 Fed. Reg. at 67,212.  The relevant savings is not to individual contractors or contractors as a whole, but rather to the government.  *Kahn*, 618 F.2d at 793 (emphasizing "the importance . . . of the nexus between [President Carter's] wage and price standards and the likely savings to the [*g*]*overnment*"

27

(emphasis added)).  Regardless, even if the portion of the rule concerning outfitters and guides does not result in savings to the government, plaintiffs, who seek to enjoin enforcement of the entire rule, have not shown that the remainder of the rule, which concerns procurement and non-procurement contractors across industries, will not yield savings to the government through the benefits that DOL enumerated.

In their motion, plaintiffs make three alternative arguments that President Biden exceeded his authority under the Procurement Act.  Docket No. 7 at 11–16.  Plaintiffs contend that the Procurement Act: (1) "must not be read to displace congressional action concerning federal contractors"; (2) "must be read to avoid major questions"; and (3) "must be read to avoid a non-delegation problem."  *Id.*  Defendants address only plaintiffs' third argument because plaintiffs' first and second claims do not appear in their complaint.  Docket No. 21 at 15 n.7 (citing *Hoeck v. Miklich*, No. 13-cv-00206-PAB-KLM, 2015 WL 4979843, at *2 (D. Colo. Aug. 20, 2015) (noting that a "[p]laintiff's complaint defines the claims at issue," and a plaintiff "may not expand the scope of the complaint through a motion for injunctive relief")); *cf. Occupy Denver v. City & Cnty. of Denver*, No. 11-cv-03048-REB-MJW, 2011 WL 6096501, at *3 (Dec. 7, 2011) (not proper or equitable for plaintiff to expand the scope of claims through evidence not specified in complaint).  Regardless, plaintiffs' arguments are not convincing.[7]

In support of their first argument, which is that the Biden Rule displaces congressional action on federal contractors, plaintiffs contend that Congress has already directly addressed federal minimum wage in the FLSA, and federal contractor

---

[7] The Court will consider the parties' non-delegation doctrine arguments below.

minimum wage in the SCA, DBA, and Walsh-Healey Public Contract Act of 1936 (the "PCA"). Docket No. 7 at 12. Plaintiffs insist that "Congress's longstanding rules governing federal contractor wages cannot be read as a free pass for the agency to legislate wherever the statutes end." *Id.* at 13. The Court is not convinced that the three statutes plaintiffs cite, which are at least 50 years old, constitute the entirety of federal contractor minimum wage requirements and leave no room for agency rulemaking. The Biden Rule does not conflict with the statutes to which plaintiffs cite and, therefore, it is not clear how the Biden Rule displaces any of them. Moreover, plaintiffs do not explain why the SCA, DBA, and PCA, which "establish 'minimum' wage . . . floors," would be inconsistent with DOL's efforts "to establish a higher minimum wage rate," as DOL explained. *See* 86 Fed. Reg. at 67,129 (E.O. 14026 "clearly does not authorize [DOL] to essentially nullify the policy, premise, and essential coverage protections of the order . . . by declining to extend the Executive order minimum wage to any worker covered by the DBA, FLSA, or SCA where such rate differs from the applicable minimum wages established under those laws. Indeed, in order to effectuate the purposes of [E.O.14026], it must apply to workers who would otherwise be subject to lower minimum wage requirements under the DBA, FLSA, and/or SCA.").

Plaintiffs' second argument is that the Procurement Act must be read to avoid "major questions." Docket No. 7 at 14. "The Supreme Court has said in a few cases that sometimes an agency's exercise of regulatory authority can be of such 'extraordinary' significance that a court should hesitate before concluding that Congress intended to house such sweeping authority in an ambiguous statutory provision." *Am. Lung Ass'n v. E.P.A.*, 985 F.3d 914, 959 (D.C. Cir. 2021) (citing *King v. Burwell*, 576

29

U.S. 473, 485–486 (2015); *Gonzales v. Oregon*, 546 U.S. 243, 262, 266–267 (2006);

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000); *Utility Air Regul.*

*Group v. EPA (UARG)*, 573 U.S. 302, 324 (2014); *MCI Telecommc'ns v. AT&T*, 512

U.S. 218, 231 (1994)).  "Where there are special reasons for doubt, the doctrine asks

whether it is implausible in light of the statute and subject matter in question that

Congress authorized such unusual agency action."  *Id.* (citing *UARG*, 573 U.S. at 324

(considering whether the challenged rule would "bring about an enormous and

transformative expansion in EPA's regulatory authority without clear congressional

authorization")); *Brown & Williamson*, 529 U.S. at 161 (holding that the FDA could not

regulate tobacco because it was "plain that Congress ha[d] not given the FDA the

authority that it s[ought] to exercise") (citing Stephen Breyer, *Judicial Review of*

*Questions of Law and Policy*, 38 Admin L. Rev. 363, 370 (1986) ("Congress is more

likely to have focused upon, and answered, major questions, while leaving interstitial

matters to answer themselves in the course of the statute's daily administration.")).

     First, the "major questions" doctrine does not apply to this case because plaintiffs

have identified no "special reasons for doubt" or that the Procurement Act is "an

ambiguous statutory provision."  *See Am. Lung Ass'n*, 985 F.3d at 959.  Plaintiffs argue

that courts cannot "assume that Congress has assigned to the Executive Branch

questions of 'deep economic and political significance' unless Congress has done so

'expressly,'" which it has not done here.  Docket No. 7 at 14 (quoting *King*, 576 U.S. at

486).  Plaintiffs cite DOL's finding that the Biden Rule is "economically significant," *see*

86 Fed. Reg. at 67,194 (indicating that "economically significant" rules or "significant

regulatory action" has an annual effect on the economy of at least $100 million),

because the rule will affect 327,300 employees, and because wage increases will amount to $1.7 billion per year over 10 years. *Id.* Although the Biden rule may meet that definition, the economic effect is far below the range that the Office of Management and Budget quantifies to have a measurable effect, in macroeconomic terms, on the gross domestic product. *See* 86 Fed. Reg. 67,224 (regulations have no measurable effect below 0.25% of the GDP, which is $52.3 billion). Moreover, the Supreme Court's decision in *King* also shows how different this case is from *King*. The relevant question in *King* was whether courts should defer to the Internal Revenue Service ("IRS") in the rule implementing the tax credit provision of the Affordable Care Act. The Court held that the IRS was not entitled to deference because the issue "involv[ed] billions of dollars in spending each year and affect[ed] the price of health insurance for millions of people." *King*, 576 U.S. at 485. The Court found it "especially unlikely that Congress would have delegated this decision to the *IRS*, which has no expertise in crafting health insurance policy of this sort." *Id.* at 486 (emphasis in original). The Biden Rule on minimum wages, on the other hand, is not "unusual agency action" or a rule of "extraordinary" significance such that the Court should "hesitate before concluding that Congress intended to house such sweeping authority in an ambiguous statutory provision." *See Am. Lung Ass'n.*, 985 F.3d at 959. It also does not "significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citing *Forest Service v. Cowpasture River Preservation Ass'n*, 140 S. Ct. 1837, 1850 (2020)). Rather, the Biden Rule would have a small economic impact and is clearly within DOL's area of expertise.

31

In light of the caselaw upholding a diverse array of presidential actions under the Procurement Act, *see, e.g.*, *Kahn*, 618 F.2d at 789–92 (collecting cases), the President's broad-ranging authority under the Act, *id.* at 789; *City of Albuquerque*, 379 F.3d at 914, the consistent views of Presidents Obama, Trump, and Biden that regulating the minimum wages of guides and outfitters is permitted under the Act, and the Act's lenient standard, *Chao* 325 F.3d at 367, the Court finds that plaintiffs have not shown a likelihood of success that President Biden's minimum wage directive was issued without statutory authority.

### 2. Whether the Biden Rule is Arbitrary and Capricious

Plaintiffs' second claim is that the Biden Rule violates the APA because it is arbitrary and capricious.  Docket No. 1 at 17–18, ¶¶ 60–65.  Plaintiffs allege that DOL rescinded the Trump Rule "without acknowledging the significant reliance interests at stake or explaining why it has disregarded its own evidence, and while refusing to consider alternatives to the rule."  *Id.* at 18, ¶ 63; Docket No. 7 at 16–18.

Under the APA, a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Nat'l Ass'n of Clean Air Agencies v. E.P.A.*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).  The Court "determine[s] only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'"  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The Supreme Court has called this a "narrow" standard of review.  *Id.* (quoting *State Farm*, 463 U.S. at 43); *F.C.C. v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 513 (2009) *Blanca Tel. Co. v. F.C.C.*, 991 F.3d 1097, 1110 (10th Cir. 2021).  "An agency's decision need not be 'a model of analytic precision to survive a challenge' under this standard," *United Airlines, Inc. v. Transp. Sec. Admin.*, 20 F.4th 57, 62 (D.C. Cir. 2021) (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)), and the Court "will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"  *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).  "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency."  *F.C.C. v. Prometheus Radio Proj.*, 141 S. Ct. 1150, 1158 (2021).

The Tenth Circuit has held that the "arbitrary or capricious" standard requires an agency's action to be supported by "'substantial evidence in the administrative record,' meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *N.M. Farm & Livestock Bureau v. Dep't of Interior*, 952 F.3d 1216, 1226 (10th Cir. 2020) (quoting *Colo. Wild, Heartwood v. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006)); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994).  "This is something more than a mere scintilla but something less than the weight of the evidence."  *Foust v. Lujan*, 942 F.2d 712, 714 (10th Cir. 1991); *Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141, 1152 (10th Cir. 2016).  "Evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion." *Hoyl v. Babbitt*, 129 F.3d 1377, 1383 (10th Cir. 1997); *Heartwood*, 435 F.3d at 1213.

The review is "[h]ighly deferential" and "presumes the validity of agency action."  *Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1228 (citing *AT&T Corp. v. F.C.C.*, 349 F.3d 692, 698 (D.C. Cir. 2003)); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1283 (D.C. Cir. 2019) ("Our review is, as always, highly deferential and presumes the validity of agency action." (quotation and citation omitted)).  The agency may rely on comments submitted during the notice and comment period as justification for the rule, so long as the submissions are examined critically.  *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 516 (D.C. Cir. 2020) (citing *Nat'l Ass'n of Regul. Util. Comm'rs v. F.C.C.*, 737 F.2d 1095, 1125 (D.C. Cir. 1984)).

"[T]he burden of proof rests with the party challenging" the agency action.  *WildEarth Guardians v. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017) (quoting *Kobach v. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014)).  Plaintiffs argue that the Biden Rule is arbitrary and capricious "because the rule rescinded DOL's prior exception for non-procurement firms like [p]laintiffs without acknowledging the significant reliance interests at stake, explaining why it has disregarded its own prior conclusions, or considering alternatives to the rule."  Docket No. 7 at 17.

The Supreme Court has stressed that there is "no basis in the Administrative Procedure Act or in [the Court's] opinions for a requirement that all agency change be subjected to more searching review."  *Fox Television*, 556 U.S. at 514.  The Court has "neither held nor implied that every action representing a policy change be justified by reasons more substantial than those required to adopt a policy in the first instance."  *Id.* However, "[a]n agency may not, for example, depart from a prior policy *sub silentio* or

simply disregard rules that are still on the books." *Id.* at 515 (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).  An agency must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy'" when it does change its policy.  *Renewable Fuels Ass'n v. E.P.A.*, 948 F.3d 1206, 1255 (10th Cir. 2020) (quoting *Fox Television*, 556 U.S. at 515), *rev'd on other grounds sub nom. HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021).

Plaintiffs cannot show that DOL changed the policy *sub silento*, given that the Biden Rule includes an entire section on rescission of the Trump Rule.  *See* 86 Fed. Reg. at 67,154–55.  The agency thus acknowledged the policy change rescinding President Trump's order and rule, and it did not "simply disregard" President Trump's directives.  *See Fox Television*, 556 U.S. at 515.  Thus, plaintiffs are mistaken in their claim that the Biden Rule "blows past [DOL's] own prior rulemaking" and that DOL promulgated the Biden Rule with "mere *silence.*"  *See* Docket No. 7 at 17.

Moreover, DOL "show[s] that there are good reasons for the new policy," *see Fox Television*, 556 U.S. at 515, even if plaintiffs or the Court may disagree with those reasons.  *See Prometheus Radio*, 141 S. Ct. at 1158 (noting that courts should not substitute their policy judgments for the agency's).  DOL "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute," *see Fox Television*, 556 U.S. at 515, which the Court has found the Biden Rule to be, "that there are good reasons for it," *see id.*, which DOL has enumerated, including attracting higher quality workers to provide higher quality services, improved morale and productivity

through increased employee retention, reduced turnover, reduced absenteeism, and reduced poverty and income inequality, *see* 86 Fed. Reg. at 67,212–15, "and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *See Fox Television*, 556 U.S. at 515.  The Biden Rule, by explicitly rescinding the Trump Rule, "adequately indicates" that President Biden and DOL believe the Biden Rule to be better.

Plaintiffs argue that, because the Biden Rule "rests upon factual findings that contradict those which underlay its prior policy," a "more detailed justification" is required.  Docket No. 7 at 16 (quoting *Fox Television*, 556 U.S. at 515).  Assuming that the Biden and Trump rules rely upon contradictory factual findings – i.e., President Biden's Administration determined that increased minimum wage for outfitters would have salutary effects, while President Trump's Administration concluded the opposite – plaintiffs have not shown why DOL's substantial justification for the Biden Rule is not sufficiently detailed.  DOL concluded, contrary to President Trump's finding, that "there is no evidence to suggest that the[] benefits" of "increased morale and productivity and decreased turnover," which "tend to be general rather than industry specific," "would not apply to the outfitters and guide industry as well" as to other federal contract workers. 86 Fed. Reg. at 67,212.  DOL reached this conclusion after considering both approving and disapproving comments for President Biden's rescission of President Trump's order.  *See id.* at 67,151–52. DOL acknowledged that non-procurement contractors, such as plaintiffs and other outfitters, "may [face] particular challenges and constraints . . . that do not exist under more traditional procurement contract" and considered comments that E.O. 14026 will "significantly increase the labor costs of entities

36

performing overnight and/or multi-day excursions in national parks, where overtime costs will be substantial and are unavoidable."  *Id.* at 67,152.  DOL explained that such comments were not persuasive because the comments "generally do not account for several factors that [DOL] expects will substantially offset any potential adverse economic effects on their businesses arising from application of the" Biden Order.  *Id.* at 67,152–53 ("In particular, these commenters do not seem to consider that increasing the minimum wage of their workers can reduce absenteeism and turnover in the workplace, improve employee morale and productivity, reduce supervisory and training costs, and increase the quality of services provided to the [f]ederal [g]overnment and the general public.  These commenters similarly do not account for the potential that increased efficiency and quality of services will attract more customers and result in increased sales.  Such benefits may be realized even where the contractor has limited ability to transfer costs to the contracting agency or raise prices of the services that it offers.").  Thus, DOL carefully considered these positive and negative comments in issuing the final rule, and the Court finds that the agency provided a sufficiently detailed explanation for departing from President Trump's rule.  *See Nat'l Ass'n of Regul. Util. Comm'rs*, 737 F.2d at 1125 (noting that an agency may rely on comments submitted during the notice and comment period as justification for the rule, so long as the submissions are examined critically).

Plaintiffs argue that the Biden Rule is arbitrary and capricious because DOL did not "consider . . . alternatives."  Docket No. 7 at 16–17 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912–13 (2020) (noting that *State Farm*, one of the "leading modern administrative law cases," "teaches that when an

agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' 'that are within the ambit of the existing [policy].'" (quoting *State Farm*, 463 U.S. at 51)). Plaintiffs argue that the statements in the Biden Rule that DOL had "no authority to exempt small businesses from the minimum wage requirements of the order," 86 Fed. Reg. at 67,223, and that DOL "notes that[,] due to the prescriptive nature of [E.O. 14026], [DOL] does not have the discretion to implement alternatives that would violate the text of [E.O. 14026], such as the adoption of a higher or lower minimum wage rate, or continued exemption of recreational businesses," *id.* at 67,216, indicate that DOL did not consider alternatives. Plaintiffs are not entirely correct, however, as DOL did consider several alternatives. First, DOL considered defining the term "United States" to exclude contracts performed outside of the 50 states and the District of Columbia. *Id.* at 67,216–17. Second, DOL considered excluding contractors who perform less than 20% of their workweek performing "in connection" with covered contracts. DOL rejected these alternatives. *Id.* It is correct, however, that DOL did not consider excluding outfitters, which DOL believed it did not have authority to consider, in light of President Biden's clear direction. Plaintiffs do not argue that DOL had authority to contradict the President's direction or that President Biden's decision to rescind President Trump's exemption is reviewable under the APA. Nor could they. Because the President is not an "agency" for purposes of the APA, his actions generally are not subject to review under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 799–801 (1992) (holding that, "[o]ut of respect for the separation of powers and the unique constitutional position of the President," the President's actions are not subject to the APA's requirements and that the determinative consideration is whether "the

President's authority to direct the [agency] in making policy judgments" is curtailed in any way or whether the President is "required to adhere to the policy decisions" of the agency).  Moreover, courts have held that, where an agency acts "solely on behalf of the President" and exercises "purely presidential prerogatives," rather than acting pursuant to a congressional delegation of power or to an executive order issued to carry out a congressional mandate, the presidential direction is not reviewable under the APA.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Dep't of State*, 658 F. Supp. 2d 105, 109, 113 (D.D.C. 2009) (State Department decision to issue a presidential permit was unreviewable presidential action because Department was acting on behalf of the President and in accordance with his directives); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 99 (D.D.C. 2016) (actions involving the exercise of discretionary authority vested in the President by law are not reviewable under the APA), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *op. amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018).  Here, there is no question that a president may rescind his, or his predecessors', executive orders, and a court may not review such discretionary action. *Cf. Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (noting that the Supreme Court "has directly addressed the nature of review of discretionary Presidential decisionmaking, . . . has highlighted the separation of powers concerns that inhere in such circumstances and has cautioned that these concerns bar review for abuse of discretion altogether").

Plaintiffs' final argument is that DOL failed to acknowledge the "significant reliance interests" at stake.  Docket No. 7 at 16–17.  It is true that, where a policy change impacts "longstanding polic[y that] may have 'engendered serious reliance

interests,'" the agency enacting the change generally must take those interests into account. *Regents*, 140 S. Ct. at 1913. However, given that the Obama Rule imposing a $10.10 hourly minimum wage applied to outfitters from 2015 to 2018 and the Trump Rule has exempted outfitters since just September 26, 2018, the Court does not find it likely that President Trump's exemption was a "longstanding policy" or that there has been "serious reliance interest" on it. Moreover, Mr. Bradford testified that AVA has always paid its employees Colorado minimum wage. While the Trump Rule has been in effect, the Colorado's minimum wage has always exceeded the federal contractor minimum wage that President Trump preserved from the Obama Rule, and minimum wage has increased annually. *See Minimum Wage History*, Colo. Dep't of Labor & Emp., http://cdle.colorado.gov/wage-and-hour- law/minimum-wage (last visited Jan. 23, 2022). Thus, AVA has not shown how it has relied on the Trump or Obama rules when AVA apparently has always paid higher wages than provided in those rules.

Moreover, the hourly wage increase between the Trump and Biden Rules is not the sudden, unexplained "goalpost-moving" that courts have found arbitrary and capricious. *See, e.g.*, *Qwest v. F.C.C.*, 689 F.3d 1214, 1228 (10th Cir. 2012) (citing *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996)(noting that "[s]udden and unexplained change [in an agency's position], or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion" (quoting 5 U.S.C. § 706(2)(A)); *Hatch v. Fed. Energy Regul. Comm'n*, 654 F.2d 825, 834-35 (D.C. Cir. 1981) (holding that an agency's sudden shift in the nature of proof required of the regulated party was not sufficiently explained and necessitated remand); *Pub. Serv. Co. of Ind., Inc. v. Fed. Energy Regul. Comm'n*, 584 F.2d 1084,

1087-88 (D.C. Cir. 1978) (holding that an agency's sudden, unexplained shift in the kind of data that a regulated party was required to submit was arbitrary); *Verizon Tel. Cos. v. F.C.C.*, 570 F.3d 294, 304 (D.C. Cir. 2009). ("[I]t is arbitrary and capricious for the FCC to apply such new approaches without providing a satisfactory explanation when it has not followed such approaches in the past."); *Fed. Energy Regul. Comm'n v. Triton Oil & Gas Corp.*, 750 F.2d 113, 116 (D.C. Cir. 1984) ("The Commission may not abuse its discretion by arbitrarily choosing to disregard its own established rules and procedures in a single, specific case.  Agencies must implement their rules and regulations in a consistent, evenhanded manner.")).  Finally, President Biden issued E.O. 14026 on April 27, 2021.  86 Fed. Reg. at 22,835.  DOL issued its proposed rule on July 22, 2021.  86 Fed. Reg. at 38,816.  DOL promulgated the final Biden Rule on November 24, 2021.  86 Fed. Reg. at 67,126.  Far from being a "sudden and unexplained" change, AVA and others have known that the Trump Rule could be rescinded for nearly nine months and, as discussed previously, President Biden and DOL have explained the policy change.

Because DOL "has considered the relevant factors and articulated a 'rational connection between the facts found and the choice made,'" *see United States Air Tour Ass'n*, 298 F.3d at 1005 (quoting *State Farm*, 463 U.S. at 43), and has "articulate[d] a satisfactory explanation for its action," *see Fox Television*, 556 U.S. at 513, plaintiffs have not shown a likelihood that they ultimately will establish that the Biden Rule is arbitrary and capricious.

### 3. Whether President Biden Violated the Separation of Powers or Non-Delegation Doctrine

Plaintiffs' final claim in their complaint is that, because "Congress did not bestow the President with the authority to issue a federal minimum wage requirement for entities like Plaintiffs, who do not have procurement contracts with the government," the President has violated the non-delegation doctrine through the Biden Rule. Docket No. 1 at 19, ¶ 73. Alternatively, plaintiffs allege, if Congress did "bestow such authority on the President, it would be an unlawful delegation of legislative authority" because, "if the [Biden Rule] were authorized by the Procurement Act, the Act unconstitutionally delegates legislative power to the President and DOL." *Id.*, ¶¶ 74, 76.

"The Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States' . . . and [the Supreme Court] ha[s] long insisted that 'the integrity and maintenance of the system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989) (first quoting U.S. Const. art. I, § 1; then quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)). However, "Congress may 'obtain[] the assistance of its coordinate Branches' – and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Mistretta*, 488 U.S. at 372). "[I]n our increasingly complex society, replete with ever changing and more technical problems," the Supreme Court has understood that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.* (quoting *Mistretta*, 488 U.S. at 372). Thus, the Supreme Court

has "held, time and again, that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.* 2123 (2019) (quoting *Mistretta*, 488 U.S. at 372; *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).  In fact, "[o]nly twice in this county's history (and that in a single year) has the [Supreme Court] found a delegation excessive – in each case because 'Congress had failed to articulate any policy or standard' to confine discretion." *Id.* (citing *Mistretta*, 488 U.S. at 373, n.3; *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).[8]  "By contrast, [the Supreme Court] ha[s] over and over upheld even very broad delegations." *Id.*  For example, the Court has upheld delegations to agencies to regulate in the "public interest," *id.* (citing *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932)); "to set 'fair and equitable' prices and 'just and reasonable' rates," *id.* (citing *Yakus v. United States*, 321 U.S. 414, 422, 427 (1944); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944)); and, more recently, "to an agency to issue whatever air quality standards are 'requisite to protect the public health.'" *Id.* (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001)).  The Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing

---

[8] "The nondelegation doctrine's continuing vitality is at least open to question." *United States v. Cotonuts*, 633 F. App'x 501, 505 (10th Cir. 2016) (quoting 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Proc.* § 4.8(b), at 649 n. 17 (5th ed. 2012) ("The only time the Court clearly invalidated a statute for being an excessive delegation of legislative authority was 1935.")).

or applying the law." *Whitman*, 531 U.S. at 474–475 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

In their motion, plaintiffs argue that "an interpretation of the Procurement Act that allow[s] the President to unilaterally *displace* existing minimum wage rules" would be too broad without more explicit congressional delegation.  Docket No. 7 at 15.  But plaintiffs cannot use the non-delegation doctrine to attack an exercise of delegated authority because the non-delegation doctrine asks whether the authority was delegated constitutionally, not whether it was exercised in accordance with the delegation.  *See Gundy*, 139 S. Ct. at 2123 (noting that "a nondelegation inquiry always begins (and often almost ends) with statutory interpretation" and that "[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion); *Cotonuts*, 633 F. App'x at 506 (citing *Mistretta*, 488 U.S. at 373 n.7 (noting that the non-delegation doctrine is largely "limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional"); John F. Manning, *The Nondelegation Doctrine as a Canon of Avoidance*, 2000 Sup. Ct. Rev. 223, 242–47 (arguing that the non-delegation doctrine has been enforced by the narrow construction of statutes that may otherwise confer open-ended authority to executive agencies)).[9]

---

[9]  Even if plaintiffs' non-delegation argument were posed properly, it would fail, as the Court has found a "sufficiently close nexus" between President Biden's directive and the "values of providing the government an economical and efficient system for procurement and supply."  *See Chao*, 325 F.3d at 366; *see also Kahn*, 618 F.2d at 793.  Moreover, plaintiffs have not shown that the Biden Rule *displaces* Congress's past legislation on federal contractor minimum wage.  As discussed previously, DOL

44

Plaintiffs' alternative argument is that, if Congress delegated to the President authority to regulate contractors' minimum wage, such delegation "would be an unlawful delegation of legislative authority."   Docket No. 1 at 19, ¶¶ 74, 76.  Although this argument asks the right question under the non-delegation doctrine, it is no more successful.  First, in their complaint, plaintiffs rely almost exclusively on *Schechter Poultry* and *Panama Refining*; however, the Supreme Court in *Gundy* explained that those two cases, from 1935, are the only instances in the Court's history that it has found Congress to have delegated impermissibly its legislative authority.  *Gundy*, 139 S. Ct. at 2129.  Plaintiffs cite no court that has found the Procurement Act to be a third instance, and *City of Albuquerque* forecloses such an argument.  In that case, the court held that the Procurement Act provides a sufficiently intelligible principle.  *City of Albuquerque*, 379 F.3d at 914–15 ("It is well established that Congress may delegate responsibility to the executive branch so long as Congress provides an 'intelligible principle' to guide the exercise of the power . . . .   Congress chose to utilize a relatively broad delegation of authority in the [Procurement Act].  However, Congress did instruct the President's exercise of authority should establish 'an economical and efficient system for . . . the procurement and supply' of property." (quoting 40 U.S.C. § 471, now codified at 40 U.S.C. § 101)).  The Sixth Circuit recently held similarly.  *See Kentucky*, 2022 WL 43178, at *14 n.14 ("We thus disagree with the district court that the [Procurement] Act likely presents non-delegation concerns.  Those might arise if the

_____

recognized that SCA, DBA, and PCA "establish 'minimum' wage . . . wage floors," meaning that DOL's efforts "to establish a higher minimum wage rate" would not be inconsistent with those statutes.  *See* 86 Fed. Reg. at 67,129.

[Procurement] Act had 'merely announce[d] vague aspirations" and then gave "the executive *carte blanche*' to do whatever the President saw fit.  The [Procurement] Act instead grants the President specific, enumerated powers to achieve specific, enumerated goals in administering the federal procurement system." (quoting *Gundy*, 139 S. Ct. at 2133, 2144 (Gorsuch, J., dissenting)).

Plaintiffs, therefore, have not shown a likelihood of success in their non-delegation claim because a delegation is overbroad "[o]nly if [the Court] could say that there is an absence of standards for the guidance of the [agency's] action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed."  *See Yakus*, 321 U.S. at 426.  The Supreme Court has only found Congress to have failed to provide an intelligible twice in the last 87 years, and the Tenth Circuit has specifically found the Procurement Act meets the test.  This forecloses plaintiffs' argument.

Because plaintiffs have not shown a likelihood of success on the merits of any of their claims, they have failed to demonstrate a "clear and unequivocal" right to relief. *Cf. Dalkita, Inc. v. Distilling Craft, LLC*, 356 F. Supp. 3d 1125, 1140–41 (D. Colo. 2018) (denying preliminary injunction where movants failed to show likelihood of success on the merits without considering remaining preliminary injunction factors) (citing *Beltronics*, 562 F.3d at 1070).  The Court will therefore deny plaintiffs' motion for a preliminary injunction without addressing the remaining preliminary injunction factors. *See Vill. of Logan v. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014) (unpublished) (noting that party's "failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted"); *Sierra Club, Inc.*

46

*v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013) (unpublished) (stating that "[a] party seeking a preliminary injunction must prove that all four of the equitable factors weigh in its favor").

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiffs' Motion for a Preliminary Injunction [Docket No. 7] is **DENIED**.


DATED January 24, 2022.


BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge