**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DUKE BRADFORD, *et al.*,<br>          Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR, *et al.*,<br>          Defendants. | CIVIL ACTION NO.: 1:21-cv-03283 |

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Duke Bradford, Arkansas Valley Adventure, LLC d/b/a AVA Rafting and Zipline (AVA), and the Colorado River Outfitters Association (CROA), move for summary judgment against Defendants, Pres. Joseph R. Biden, Sec. Martin J. Walsh, Acting Admin. Jessica Looman, the U.S. Dept. of Labor, and the Wage & Hour Division (collectively DOL or the Department), and an order setting aside the rule, *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 23, 2021).

Defendants' rule is unlawful because it exceeds the President's authority to regulate a system of *procurement*. As a panel of the Tenth Circuit already concluded, Plaintiffs have demonstrated that the rule is likely unlawful. That was because DOL has distorted the putative statutory authority for the rule—the Procurement Act—beyond any rational limits and tried to regulate businesses that neither procure nor supply anything to or from the government. Rather than meaningfully defending its rule, DOL deflects—claiming it had no choice but to follow the President's orders, and that this Court may not second-guess the President's judgment. The Tenth Circuit has already refused DOL's invitation to be a passive bystander to the agency's conduct. This Court should reach the same conclusion as the motions panel and set the rule aside.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

**I. Prior Agency Action**

1.      On February 12, 2014, President Obama issued EO 13658, *Establishing a Minimum Wage for Contractors*, putatively under the Federal Property and Administrative Services Act (The

Procurement Act), 40 U.S.C. § 101, directing DOL to establish a minimum wage for "federal contractors and subcontractors." 79 Fed. Reg. 9851, 9852-53.[1]

2.      DOL then mandated a $10.10/hr minimum wage plus overtime. *Establishing a Minimum Wage for Contractors*, 79 Fed. Reg. 60,634 (Oct. 7, 2014); 29 C.F.R. §§ 10.5(a), 10.24(a). It applied to "contracts or contract-like instruments," an "intentionally all-encompassing" definition that included employers with "special use permits." *Id.* at 60,652; 29 C.F.R. § 10.2.

3.      In 2018, President Trump issued EO 13838, exempting outfitters and guides from the minimum wage rule. *Exemption from Executive Order 13658 for Recreational Services on Federal Lands*, 83 Fed. Reg. 25,341 (May 24, 2018). The President explained that the rule's application "to outfitters and guides operating on Federal lands" would "not promote economy and efficiency" because of that sector's unusual work structures. *Id*.

4.      DOL issued a rule implementing the order and included an analysis that agreed with the President. 83 Fed. Reg. 48,537, 48,540 (Sept. 26, 2018).

**II. The New Rule**

5.      On April 27, 2021, President Biden reversed course, issuing EO 14026, *Increasing the Minimum Wage for Federal Contractors*, raising the previous threshold to $15/hr and revoking the exemption for recreational services on federal lands. 86 Fed. Reg. 22,835–37.

6.      On November 23, 2021, DOL issued its final rule implementing the order, effective January 30, 2022. *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126. The rule confirmed that its $15/hr minimum wage applied to recipients of special use permits like those held by Plaintiffs. *Id.* at 67,147.

7.      DOL estimated the rule would affect more than 500,000 private firms, including 40,000 firms that provide concessions or recreational services pursuant to special use permits on federal lands, *id.* at 67,194–96, and result in "transfers of income from employers to employees in the form

---

[1] By agreement of the parties, regulatory actions published in the Federal Register were not reproduced with the Administrative Record (AR) but is nonetheless part of the official record.

of higher wage rates" of "$1.7 billion per year over 10 years," with "average annualized direct employer costs" of "$2.4 million" for each firm, *id.* at 67,194. The rule is economically significant. *Id.*

8.      The rule recognized that these cost increases, as well "regulatory familiarization costs and [] implementation costs" would likely be passed on to the government itself—at least as to procurement contracts—and thus "Government expenditures may rise." *Id.* at 67,204, 67,206. But recreational firms holding permits to use federal lands are "[n]on-procurement" as they do not sell goods or services to the government, and thus "cannot as directly pass costs along to the Federal Government." *Id*. As a result, the rule "may result in reduced profits" for such firms, or outright losses, ameliorated only to the extent consumers are willing to pay "higher prices." *Id.*

9.      Despite DOL's suggestion that there was no "data or substantive information" proving that the minimum wage rule would result in price increases and damage profitability, *id.* at 67,207, the one study cited by DOL concluded that there is "a significant negative association between the [minimum wage] introduction and firm profitability" and "report[ed] evidence showing wages were significantly raised, and firm profitability was significantly reduced by the minimum wage." *Id.*; AR Vol. II at 130.

10.     Other research relied on by DOL suggests that firms will face reduced profits and will be forced to raise prices and reduce benefits and overtime for workers. *See* AR Vol. II, 4 (minimum wage resulted in "full or near-full price pass-through of minimum-wage-induced higher costs of labor"); AR Vol. II, 362 ("Firms have adapted to the remaining costs in a variety of ways, including cutting fringe benefits and overtime, hiring more highly trained workers, cutting profits and passing on costs to the city or to the public."); AR Vol. III, 61 ("Cost increases were instead absorbed through other channels of adjustment, including higher prices, lower profit margins, wage compression, reduced turnover, and higher performance standards."); AR Vol. III, 192 ("It is well established in the literature that minimum wage increases compress the wage distribution. Firms respond to these higher labour costs by reducing employment, reducing profits, or raising prices."); AR Vol. III, 213 ("firms respond to minimum wage increases not by reducing production and employment, but by raising prices").

11.     DOL claimed "this final rule would result in negligible or no disemployment effects," but relied on research that conflicted with that conclusion. *See id*. at 67,211; *see, e.g.*, AR Vol. V, 221

(meta-analysis of 15 years of research concluded that "the minimum wage [] has negative employment effects," which are "statistically significant").

12.     DOL's research suggested that minimum wage rules shift wage increases to more advantaged workers and away from less-advantaged workers. *See* AR Vol. I, 127 ("Our results show that a minimum wage hike is then not a transfer from rich firms to poor workers, but from *poor* workers to *rich* workers."); AR Vol. II, 172 ("There is a clear drop in employment at the bottom of the wage distribution . . . in cities with minimum wage[.]"); AR Vol. III, 134 ("The entirety of these [wage] gains accrued to workers with above-median experience at baseline; less-experienced workers saw no significant change to weekly pay," and minimum wage rules resulted in "a significant reduction in the rate of new entries into the workforce.").

13.     DOL also acknowledged that the rule might place permittees at a competitive disadvantage with competitors not operating on federal lands. *Id*. at 67,208.

14.     DOL declined to address its former rationale for exempting permittees, nor did it consider alternatives for permittees, saying instead that because the "purpose of this rulemaking is to implement Executive Order 14026," DOL viewed itself as having no discretion to consider these issues. *Id*. at 67,129, 67,216. Furthermore, whether statutory authority existed for the executive order and rule was, purportedly, "not within the scope of this rulemaking action." *Id*. at 67,131.

15.     DOL also attempted to justify the rule by pointing to economic research that it claimed proved that losses for special use permit holders would be "substantially offset" due to increased productivity and morale, which would improve services for the government and public. *Id.* at 67,153. DOL acknowledged, however, that the rule's impact on the outfitters and guides industry would not improve government services. *Id*. at 67,212.

**III**. **The Plaintiffs**

16.     AVA is a licensed river outfitter headquartered in Buena Vista, CO, which relies on special use permits to operate. Ex. A, Bradford Decl. ¶¶ 2-3. It recruits experienced guides who typically negotiate fixed rates based on the number of days a trip is expected to take. *Id*. If paid hourly, these

rates would typically exceed $15/hr, but because the trips last for multiple days, the guides work far more than 40 hours in a typical week. *Id*.

17.     Should the rule go into effect, AVA would need to expend resources immediately to ensure compliance with the rule, for instance, as Mr. Bradford testified, he expects to expend "between five and $10,000" just on attorney costs prior to the effective date. Ex. B; PI Hearing Tr., Bradford Testimony at 20:1–11 (Jan. 6, 2022). Mr. Bradford also explained that AVA would need to spend more on wage costs, hire more staff, limit hours for existing staff, and provide more housing for employees, all of which "will drive expenses up." *Id.* at 20:18–21:21. AVA would also need to eliminate overnight rafting trips entirely or else the "price would go beyond what our public could afford." *Id.* at 21:22–22:2. The rule would further make AVA less competitive with other outfitters not subject to the rule by increasing costs and decreasing revenue. *Id.* at 21:12–23:21.

18.     CROA is a trade association representing as many as 50 independently operating river outfitters, including AVA. Ex. C, Costlow Decl. ¶¶ 3, 6. Most CROA members operate on federal lands under special use permits, and they typically pay the government a fixed percentage of any fees they charge for services, regardless of profit or loss. *Id*. ¶¶ 6, 8.

19.     CROA's members typically pay their guides a flat fee on a per-trip basis. *Id*. ¶ 8. The work is seasonal, however, so many guides work as many hours as they can through the busy season— almost always working more than 40 hours in a week. *Id*. Increasing the wages for guides to $15/hr and paying overtime based on that wage would dramatically increase wage costs, and many of these outfitters would be forced to significantly raise the costs of their services to customers and eliminate many multi-day trips. *Id*. ¶¶ 10, 14. CROA members would also need to comply with the rule immediately should it go into effect and would need to pay new implementation and compliance costs to ensure they meet the new rule's requirements. *Id*. ¶¶ 12, 13.

**IV. Procedural History**

20.     Plaintiffs filed a Complaint for declaratory relief on December 7, 2021, challenging the rule. ECF No. 1. They then moved for a preliminary injunction on December 9, 2021, and after an evidentiary hearing, this Court denied the injunction in a written opinion. ECF No. 31.

21.     Plaintiffs filed a notice of interlocutory appeal, and on February 17, 2022, Judges Phillips and Kelly granted an injunction pending appeal in an order. Ex. D, Order. Noting that the Court must evaluate a motion for injunction pending appeal "using the [four-factor] preliminary injunction standard," and that "the right to relief must be clear and unequivocal," the panel concluded that Appellants "have demonstrated an entitlement to relief from the Minimum Wage Order." *Id.* at 1–2 (citations omitted). Accordingly, the Tenth Circuit enjoined enforcement of the rule as to "seasonal recreational services or seasonal recreational equipment rental for the general public on federal lands," pending "further order of this court." *Id.* at 2.

## ARGUMENT

In a typical case, a court may grant summary judgment to a movant who "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But when assessing a motion for summary judgment in an APA case, "the district judge sits as an appellate tribunal," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

The rule is unlawful for three independent reasons. First, it exceeds the Procurement Act's reach because it attempts to regulate conduct that does not involve the procurement of supply of anything to or from *the government*. Second, the rule fails the statutory economy and efficiency requirement because it is not necessary for the reduction of government expenditures. Third, the rule is arbitrary and capricious because it was enacted at the President's direction *irrespective* of economic benefits or policy alternatives. This Court should therefore follow the Tenth Circuit panel's decision and hold the rule unlawful.[2]

---

[2] While decisions made in unpublished orders from a motions panel are not binding precedent, a subsequent court "does not lightly overturn" such a decision. *Stifel, Nicolaus & Co. v. Woolsey & Co.*, 81 F.3d 1540, 1544 (10th Cir. 1996) (citation omitted).

# I. THE PROCUREMENT ACT DOES NOT PROVIDE A BASIS FOR THE RULE

## A. The Rule Does Not Relate to the Procurement or Supply of Nonpersonal Services by the Government

The executive branch's authority "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). A rule "in excess of statutory . . . authority" must be set aside. 5 U.S.C. § 706(2)(C).

The Procurement Act authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" an "economical and efficient system of" four limited categories of government activities, including "procuring and supplying property and nonpersonal services." 40 U.S.C. §§ 101(1), 121(a). But the statute only empowers the President to control such activities by "*the Federal Government*." *See id.* § 101(1) (emphasis added).[3]

The most natural reading of that statute suggests that the government is on one end of the transaction—either *procuring* or *supplying* nonpersonal services. "Contracting" must be "confined to its contextual meaning—the government's making of the agreement, rather than all subsequent performance of it." *Kentucky v. Biden*, 23 F.4th 585, 605 (6th Cir. 2022). It makes no sense therefore to adopt DOL's view that the agency can regulate a company, like AVA, who neither procures nor supplies any nonpersonal services to the government, just because AVA later supplies nonpersonal services to its customers; the government is simply not party to those transactions.

Certainly, the government's provision of permits *to Plaintiffs* is not the "supply[ of] nonpersonal services," defined to "mean[] contractual services . . . other than personal and professional services." *See* 40 U.S.C. §§ 101(1), 102. Instead, the Act empowers the President to regulate the supply of services that it produces itself, *see, e.g.*, 16 U.S.C. §§ 831c(d), 831h-1 (authorizing Tennessee Valley Authority to enter contracts for the sale of electrical service); *Matt v. Comm'r of Internal Revenue*, 59 T.C.M. (CCH) 472 (T.C. 1990) (mem.) (discussing

---

[3] DOL has not defended the rule based on the regulation of government "procurement." This is sensible as Plaintiffs' use of federal lands has nothing to do with procurement. Indeed, the final rule refers to Plaintiffs and other permittees as "*non-procurement* contractors." 86 Fed. Reg. at 67,512 (emphasis added).

"nonpersonal services" contracts that "USAID [] an agency of the United States Government," "supplies" "to foreign countries"), or that are procured from elsewhere.

Nor does the government's limited interest in how Plaintiffs conduct their activities pull them into the statute's reach. DOL's concern with how activities under a permit are conducted—and almost by definition, permitted activities require permits because the government is concerned with how such activities are conducted—does not transform the government's role into the entity conducting those activities. *See Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 70 (2d Cir. 2012) ("An activity does not become a program or activity of a public entity merely because it is licensed by the public entity.") (cleaned up). And this Court previously recognized that Plaintiffs' permits did "not subject [them] to the supervision and control of the government." ECF No. 31 at 19. Nor do the permits require Plaintiffs to operate. Thus, it cannot be said that *the government* is supplying services *through* Plaintiffs.

A contrary reading would construe the government to be supplying every service requiring a permit—trucking services, aviation services, financial services, broadcasting services, and more—simply because the government *allows* the actual provisioners of such services to operate pursuant to permits. Such a reading would then grant the President extraordinary unilateral power over these sectors under the provisions of the Act. That cannot be the case.

### B. The Rule Is Not Necessary for Economical and Efficient Procurement Policy

Courts have also concluded that "some content must be injected into the general phrases 'not inconsistent with' the [Act] and 'to effectuate the provisions' of the Act," to avoid a completely "open-ended" grant of authority. *AFL-CIO v. Kahn*, 618 F.2d 784, 788 (D.C. Cir. 1979) (*en banc*). "Any order" "must accord with the values of 'economy' and 'efficiency,'" and have "a sufficiently close nexus between those criteria and the procurement [] program[.]" *Id.* at 792; *accord Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004) (requiring that "the President's exercise of authority establish an economical and efficient system for the procurement and supply of property") (cleaned up). The "nexus" to cost savings must be "close," and must relate to "procurement and supply," not other benefits asserted "as a naked pretext."

*Kentucky*, 23 F.4th at 607, 609. It is not enough for DOL to claim that a rule makes "contractor employees . . . more 'economical and efficient'" through, for instance, reduced absenteeism. *Id.* at 606. It is "importan[t]," therefore, for the President to show a "nexus between the wage and price standards and likely savings to the Government." *Kahn*, 618 F.2d at 793.

These limits derive from the ordinary meanings of the statutory terms. The Act limits the President to actions he "considers necessary" for "economical and efficient" "[p]rocuring and supplying property." 40 U.S.C. §§ 101(1), 121(a). "What does it mean to be 'necessary'? The word implies more than something merely helpful or conducive. It suggests instead something indispensable, essential, something that cannot be done without." *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George*, 685 F.3d 917, 923 (10th Cir. 2012) (citation omitted). If the action serves some *other* goal, but is not *necessary* to serve the statutory one, then it fails the test. *Id*. at 924.

The terms "economical and efficient" also have an understood meaning. "Economical" implies the use of fewer resources—"marked by careful, efficient, and prudent use of resources." "Economical." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/economical (last accessed June 13, 2021). "Efficient" likewise suggests *less* of something—"capable of producing desired results without wasting materials, time, or energy." "Efficient." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/efficient (last accessed June 13, 2021).

The President's authority is therefore limited to actions that he considers "essential" to provide the "prudent use" of government resources "without wasting materials." *See* 40 U.S.C. §§ 101(1), 121(a). Or, as the Court in *Khan* said, actions that "likely have the direct and immediate effect of holding down the Government's procurement costs." 618 F.2d at 792.

DOL's invocation of the Act cannot be justified. For actual procurement contractors, DOL expects increased wage costs to be passed on to the government, and thus "Government expenditures may rise." 86 Fed. Reg. at 67,206. Non-procurement firms, like Plaintiffs, will have to make up their losses from "the public in the form of higher prices," at least to the extent that the public is willing to bear them. *Id.* To the extent the public is unwilling to pay, Plaintiffs will be

less competitive, and their guides will face "disemployment" of up to 0.9%. *Id.* at 67,207, 67,211. The net result will be *more* costs to the public, to non-procurement firms, and to the government—the opposite of a permitted action under the Act. *See Khan*, 618 F.2d at 792.

The Executive Branch itself previously arrived at the same conclusions. EO 13838 concluded that applying the contractor minimum wage standards "to outfitters and guides operating on Federal lands," "does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands." 83 Fed. Reg. 25,341. Instead, such a wage "threatens to raise significantly the cost of guided hikes and tours on Federal lands, preventing many visitors from enjoying the great beauty of America's outdoors." *Id.* Moreover, the wage would actually harm the affected workers because they "have irregular work schedules, a high incidence of overtime pay, and an unusually high turnover rate" such that "a minimum wage increase would generally entail large negative effects on hours worked by recreational service workers." *Id*. In other words, to maintain financial viability, employers would have to cut hours to avoid overtime limits, which would reduce overall wages for guides. DOL previously emphasized that rescinding the prior wage rule for these businesses would "[l]ower[] the costs of business," and "incentivize existing outfitters to hire more guides and to increase the hours of current employees." 83 Fed. Reg. at 48,541. *Significantly increasing* the minimum wage would have the opposite effect—increasing costs, cutting hours for guides and limiting access to public lands.

DOL's defense of the rule relies on factors that will not apply to those with special use permits or that have nothing to do with efficiency or economy in government expenditures. The Department says the rule could: (1) improve government services; (2) increase morale and productivity; (3) reduce turnover; (4) reduce absenteeism; and (5) reduce poverty and income inequality. 86 Fed. Reg. at 67,195. Employers like Plaintiffs, who merely have special use permits, provide no "government services" though, so that benefit would "not apply to the outfitters and guides industry." *See id.* at 67,212. The remaining purported benefits bear a striking resemblance to the benefits deemed too attenuated from procurement economy and efficiency to support the contractor vaccine mandate and are likewise inadequate to justify the rule here. *See Kentucky*, 23

10

F.4th at 606. And the language of *Kahn* is not ambiguous; the challenged rule was acceptable only because it "will likely have the direct and immediate effect of holding down the Government's procurement *costs*." 618 F.2d at 792 (emphasis added).

These purported benefits are not the ones required by the Procurement Act—"economical and efficient" use of *government* resources. *See* 40 U.S.C. §§ 101(1); 120(a). DOL agrees that these "benefits are not monetized," but that means that they cannot be shown to result in cost savings, much less cost savings to the *government*. To the extent the rule serves other policy goals, it cannot be said to be "necessary" for the statutory aims. *See Cinnamon Hills*, 685 F.3d at 924.

This Court previously suggested that even though the rule might be inefficient and uneconomical for Plaintiffs the "relevant savings is not to individual contractors or contractors as a whole, but rather to the government." ECF No. 31 at 27. But that conflicts with DOL's own analysis that for typical procurement contractors "Government expenditures may rise." 86 Fed. Reg. at 67,206. Moreover, even if the factual premise were correct, rules are reviewed in their entirety, not piecemeal. *See* 7 U.S.C. § 706(2)(A) ("reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law).

### C. This Court Must Read the Statute Narrowly To Harmonize Relevant Labor Laws and Avoid Major Policy and Difficult Constitutional Questions

This Court can resolve this case by looking to the plain language of the statute and concluding that the rule exceeds the President's authority. However, three related doctrines require this Court to construe any uncertainty in favor of the plaintiffs.

### i. The Procurement Act Must Not Be Read To Displace Congressional Action Concerning Federal Contractors

"Agency authority may not be lightly presumed." *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001). An agency "may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 485 (2001).

"In determining whether an agency's regulations are valid under a particular statute . . . [a court] begin with the question of whether the statute unambiguously addresses the 'precise

question at issue.'" *New Mexico v. DOI*, 854 F.3d 1207, 1221 (10th Cir. 2017) (quoting *Chevron, U.S.A., Inc. v. N.R.D.C.*, 467 U.S. 837, 842 (1984)). "If Congress has spoken *directly* to the issue, that is the end of the matter; the court, as well as the agency, must give effect to Congress's unambiguously expressed intent." *Id.* (citation omitted). "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Nat'l R.R. Pass. Corp. v. Nat'l Ass'n of R.R. Pass.*, 414 U.S. 453, 458 (1974).

Congress has long since waded into the general issue of what constitutes the federal minimum wage, and even into the specific issue of how much federal *contractors* should be paid. The Fair Labor Standards Act (FLSA) set "standards of minimum wages and maximum hours" for most private employers. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945). Further, at least three statutes, the Davis-Bacon Act (DBA), the Walsh-Healey Public Contracts Act (PCA) and the Service Contract Act (SCA) set wage standards for federal contractors. *See* 40 U.S.C. § 3142; 41 U.S.C. §§ 6502(1), 6702(a). Indeed, when Congress passed the SCA in 1965 it did so because "[t]he service contract is the only remaining category of Federal contracts to which no labor standards protection applies." S. Rep. No. 798, 89th Cong., 1st Sess., 3 (Oct. 1, 1965). Congress therefore meant to extend specific coverage to *certain* federal contractors. *See id.*

Congress has thus spoken to the issue of whether federal contractors should be required to pay a minimum wage—and it decided that only *some* contractors have legal obligations to do so. *See* 40 U.S.C. § 3142; 41 U.S.C. §§ 6502(1), 6702(a). But Congress also carefully limited those requirements. The DBA only applies to "mechanics or laborers" working on public buildings. 40 U.S.C. § 3142(a). The PCA covers manufacturing "contract[s] made by an agency of the United States." 41 U.S.C. § 6502. And the SCA excludes contracts that do not principally furnish "services" to federal agencies. *See* 40 U.S.C. § 3142. All three statutes require payment of a "prevailing wage," not a fixed hourly rate. *See* 40 U.S.C. § 3142(b); 41 U.S.C. §§ 6502(1), 6703(1).

It is "implausible" that Congress meant to grant the President the "implicit power to create an alternative to the explicit and detailed [] scheme" that Congress set out in these statutes. *See New Mexico*, 854 F.3d at 1226. This is particularly apt considering that the SCA, which comes the

closest to the rule's reach, came after the Procurement Act of 1949, which has been invoked in support of the rule. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.") (citation omitted).

Congress's longstanding rules governing federal contractor wages cannot be read as a free pass for the agency to legislate wherever the statutes end. Indeed, the rule specifically applies *only* to employers who are already covered by the limited reach of the FLSA, the SCA or the DBA. *See* 86 Fed. Reg. at 67,225. Plaintiffs, moreover, are required to pay prevailing wages under both the FLSA and SCA. *See* 86 Fed. Reg. 67,147-48 (special use permits "generally qualify as SCA-covered contracts"). The new rule exists simply to extend requirements to those already regulated by Congress, but in a manner separate and apart from the existing statutes.

To be sure, these statutes do not directly *conflict* with the rule, but that implicates a different question. The issue is not whether any agency, or perhaps even DOL, may, in the abstract, wade into questions concerning federal wage laws. It instead is whether DOL may do so *pursuant to the Procurement Act*, and whether that Act's generic grant of authority gave the President and the agency the "implicit power to create an alternative to the explicit and detailed [] scheme" that Congress set out in these statutes. *See New Mexico*, 854 F.3d at 1226. The Procurement Act, which never mentions wages, much less those affecting *non-procurement* permittees, cannot plausibly be read to have always been the source of such a vast authority over wages. *See id.* Instead, if DOL wants to wade in here, it should look to the statutes Congress passed concerning these matters.

### ii. The Procurement Act Must Be Read To Avoid Major Questions

Courts will not assume that Congress has assigned to the Executive Branch questions of "deep economic and political significance" unless Congress has done so "expressly." *King v. Burwell*, 576 U.S. 473, 486 (2015). "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, [the Court]

typically greet[s] its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citations omitted). A court should thus adopt a narrow reading of a statute when an agency tries "to exercise powers of vast economic and political significance." *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (citations omitted).

DOL rightly acknowledges that the rule "is economically significant," since it would result in *direct* costs to employers of "$1.7 billion per year over 10 years." 86 Fed. Reg. at 67,194. This is in *addition* to "regulatory familiarization costs," "implementation costs," "compliance costs, increased consumer costs, and reduced profits," "disemployment," and even increased "Government expenditures." *Id.* at 67,204, 67,206, 67,208, 67,211. This means this Court must meet DOL's rule "with a measure of skepticism," and look for a clear statement from Congress. *Util. Air Regul. Grp.*, 573 U.S. at 304. As discussed above, the best DOL has is a reed-thin argument that this is all about "procurement," despite applying the rule to "non-procurement" firms. This Court should therefore reject DOL's recent discovery of its "unheralded power." *See id.*

Moreover, there is no requirement in this doctrine that a rule exceed these kinds of economic impacts. The Supreme Court has applied the doctrine based on its unqualified statement that it applies whenever an agency exercises "powers of vast economic and political significance." *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022) (citation omitted). Indeed, in a concurring opinion Justice Gorsuch, joined by two others, noted that "[f]ar less consequential agency rules [than a vaccine mandate] have run afoul of the major questions doctrine," such as rate regulation for telephone companies. *Id.* at 668 (citing *MCI Telecomms. Corp. v. American Tele. & Telegraph Co.*, 512 U.S. 218, 231 (1994) (eliminating rate-filing requirement that might affect the prices of, at most, "40% of a major sector" of long-distance carriers)). There is simply no authority for the idea that the major questions doctrine empowers agency action until it reaches a certain value threshold. Instead, because the doctrine is about Congressional intent, it applies whenever a court cannot say with certainty that Congress meant for the outcome implicated by the rule. *See NFIB*, 142 S. Ct. at 665 (Gorsuch, J., concurring). That is the case here.

### iii. The Procurement Act Must be Read To Avoid a Non-Delegation Problem

The canon of constitutional avoidance instructs that a court must "construe [a] statute to avoid [serious constitutional] problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*, 485 U.S. 568, 575 (1988). Thus, if an agency's broad reading of a statute implicates "concerns over separation of powers principles" under the "nondelegation doctrine," a court must read the statute narrowly. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611, 617 (5th Cir. 2021) *aff'd by NFIB*, 142 S. Ct. at 664.

If the President's view of his own power is correct, then the Procurement Act would "raise a nondelegation problem." *See Tiger Lily, LLC v. HUD*, 5 F.4th 666, 672 (6th Cir. 2021). "In applying the nondelegation doctrine, the 'degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.'" *Id.* (quoting *Whitman*, 531 U.S. at 475). But an interpretation of the Procurement Act that allowed the President to unilaterally *sidestep* existing minimum wage rules for employers who merely have a special use permit, based on the pretense of his "procurement" authority, would be akin to saying the President can control any private company that receives any federal benefit. "Such unfettered power would likely require greater guidance than" the provisions set out in the Procurement Act. *See id.* As the Sixth Circuit recently concluded in analyzing the Procurement Act, "[i]f the government's interpretation were correct—that the President can do essentially whatever he wants so long as he determines it necessary to make federal contractors more 'economical and efficient'—then that *certainly* would present non-delegation concerns." *Kentucky*, 23 F.4th at 608 n.14.[4]

This is not a new concern. In *Kahn*, which ultimately upheld an order affecting bidding processes for procurement contracts, the court emphasized the need to enforce strict limits to avoid "the constitutional prohibition against excessive delegation of legislative power to the President,"

---

[4] Importantly, the rule cannot be viewed as a mere housekeeping rule that is within the President's primary area of discretionary authority. Minimum wage requirements for federal permittees are not merely directives of "internal operations," because they "substantively affect the regulated public." *Mendoza v. Perez*, 754 F.3d 1002, 1024 (D.C. Cir. 2014).

and make sure that its decision did "not write a blank check for the President to fill in at his will." 618 F.2d at 793 n. 51. Even those limits raised concerns from some members of the court, though. *See id.* at 797 (MacKinnon, J., dissenting) ("Moreover, I believe that were the majority's construction of section 205(a) correct, then the 1949 Act would amount to an unconstitutional delegation of legislative authority to the executive branch."). Judge MacKinnon also noted that the nondelegation problem seemed to animate much of the majority's reasoning, saying, "Apparently concerned about the limitless nature of the power the majority describes, two judges within the majority restrict their support by attaching separate concurrences stressing the narrowness of the majority's holding. The majority itself strains to emphasize the proximity of the nexus it approves." *Id.* Furthermore, the Tenth Circuit likewise found the Procurement Act constitutional but only because of the statutory limits on the President's authority. *See City of Albuquerque*, 379 F.3d at 914. This Court must therefore not construe the *Procurement* Act to allow DOL's intrusion into what it agrees are *non-procurement* contracts.

## II. THE FINAL RULE IS ARBITRARY AND CAPRICIOUS

A court must set aside agency action that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). While this review is "necessarily narrow, it is not insubstantial"—it requires "probing, in-depth review." *Qwest Commc'ns. Int'l, Inc. v. FCC*, 398 F.3d 1222, 1229 (10th Cir. 2005). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court may only consider the reasoning "articulated by the agency itself." *Id.* at 50.

When an agency changes course "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television, Inc.*, 556 U.S. 502, 515–16 (2009). An agency must provide "a more detailed justification" when

a "new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* at 515; *accord DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

"[W]hen an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quotation omitted). But "merely stating that an alternative was considered is not enough to show reasoned analysis." *Texas v. Biden,* 10 F.4th 538, 555 (5th Cir. 2021).

DOL's rule is arbitrary and capricious because the rule rescinded DOL's prior exception for non-procurement firms like Plaintiffs without explaining why it disregarded its own prior conclusions, considering alternatives, or supporting the rule with meaningful evidence. First, DOL blows past its prior rulemaking that had exempted Plaintiffs from a minimum wage, simply noting that it was rescinding the rule without explaining why. DOL also doesn't engage with President Trump's findings that applying a minimum wage rule to outfitters and guides "does not promote economy and efficiency in making these services available to those who seek to enjoy our Federal lands" because it would threaten "to raise significantly the cost of guided hikes and tours on Federal lands, preventing many visitors from enjoying the great beauty of America's outdoors" and "would generally entail large negative effects on hours worked by recreational service workers." 83 Fed. Reg. at 25,341. Nor did DOL acknowledge its *own* findings that exempting permittees like Plaintiffs would "lower[] the cost of business for outfitter providers," which "could incentivize small outfitters to enter the market," "incentivize existing outfitters to hire more guides and to increase the hours of current employees" and provide "more affordable guided tours and recreational services for visitors to Federal lands." 83 Fed. Reg. at 48,540. True, in response to comments DOL agreed it was rescinding the exception, but it insisted it "does not have the discretion to implement alternatives that would violate the text of the EO, such as the adoption of a higher or lower minimum wage rate, or continued exemption of recreational businesses." 86 Fed. Reg. at 67,216. That's hardly a meaningful explanation. *See Fox*, 556 U.S. at 515–16.

Any explanation hardly *could* justify the change though, because DOL's own findings show exactly why the rule harms Plaintiffs. It admits that outfitters and guides will suffer

"increased costs" that they will not be able to recoup from the government, and that will then be passed on to the public, will reduce profits, make these businesses less competitive, and will result in disemployment, all of which they will suffer to a much greater extent than for procurement contractors. 86 Fed. Reg. at 67,206–08, 67,211. It also admits that some of the purported benefits of the rule will not actually apply to the industry, and any benefit will only apply to the existing workforce, which will obviously be lessened by layoffs. *See id.* at 67,211–12. But DOL never explains why these harms should be cast aside, why it should rescind the old exception, and why it should lump in Plaintiffs with procurement contractors.

The Record is also filled with the research that DOL claimed supported its rule, but, in reality, undermines the President's directive. For instance, DOL insisted that it "believes this final rule would result in negligible or no disemployment effects." 86 Fed. Reg. at 67,211. But that's not what its own sources suggest. As an example, DOL cited to a study it says shows that "[s]ome authors even found positive effects on employment as a result of minimum wage increases." *Id.* The study, however, concluded that a minimum wage *can* result in slight increase in overall employment, but only "if employment [measurement] depends upon *both* the number of searching workers and the number of searching firms," because "increase in the number of searching workers may more than offset the decrease in the number of searching firms." AR Vol. I, 136. In other words, many firms will reduce their need for employees but they may see increased interest from higher-qualified candidates. *See id.* On balance though, the researchers concluded that "there are possibly large negative welfare effects from a minimum wage increase, even if the employment level stays constant or increases," because "a minimum wage hike is then not a transfer from rich firms to poor workers, but from *poor* workers to *rich* workers." *Id.* at 126–27. This is a point reinforced in other studies DOL cited. *See, e.g.*, AR Vol. II, 172 ("There is a clear drop in employment at the bottom of the wage distribution . . . in cities with minimum wage[.]").

Otherwise, the literature suggests significant negative effects. In one study concerning Los Angeles' living wage ordinance, the authors concluded that "[e]mployers have cut costs by making small reductions in employment and fringe benefits." AR Vol. II, 364. Indeed, in a metanalysis of

15 years of research, which DOL itself cited to, the authors concluded that the minimum wage []
has negative employment effects," which are "statistically significant." AR Vol. V, 221.

And even if the net loss in jobs might be small, DOL's research explains how the job losses
hurt the poorest workers. As discussed, minimum wage rules simply shift opportunities *away* from
less-qualified workers. AR Vol. I, 127. As other studies confirm, "The entirety of these [wage]
gains accrued to workers with above-median experience at baseline; less-experienced workers saw
no significant change to weekly pay," and, in fact, minimum wage rules resulted in "a significant
reduction in the rate of new entries into the workforce." AR Vol. III, 134. Jobs that can be
accomplished by automation are also simply eliminated. A "significant number of individuals who
were previously in automatable employment are nonemployed in the period following a minimum
wage increase." AR, Vol. III, 241. Such workers are "quite vulnerable to employment changes and
job loss because of automation following a minimum wage increase." *Id.*

DOL also dismissed concerns about price increases, which "would impact [companies']
profits, competitiveness, and viability," saying that there was no "data or substantive information"
submitted by commentators and asserting that there was "little literature showing a link between
minimum wages and profits." 86 Fed. Reg. at 67,207. The one study cited by DOL, however,
concluded that there is "a significant negative association between the [minimum wage]
introduction and firm profitability. We report evidence showing wages were significantly raised,
and firm profitability was significantly reduced by the minimum wage." AR, Vol. II, 130.

Yet again, DOL's "supporting" evidence proves its error. According to one study cited by
DOL, "It is well established in the literature that minimum wage increases compress the wage
distribution. Firms respond to these higher labour costs by reducing employment, reducing profits,
or raising prices." AR Vol. III, 192. Indeed, the one study DOL cited concerning losses to
automation found "full or near-full price pass-through of minimum-wage-induced higher costs of
labor." AR Vol. II, 4. Other researchers concluded that "firms respond to minimum wage increases
not by reducing production and employment, but by raising prices." AR Vol. III, 213. In other
instances, "Firms have adapted to the remaining costs in a variety of ways, including cutting fringe

benefits and overtime, hiring more highly trained workers, cutting profits and passing on costs to the city or to the public." AR Vol. II, 362. In yet others, "Cost increases were instead absorbed through other channels of adjustment, including higher prices, lower profit margins, wage compression, reduced turnover, and higher performance standards." AR Vol. III, 61.

The research, of course, was never meant to point the Department in one direction or another. It was provided just to give cover to whatever the Department was already doing, but it did so poorly. After all, by its own admission, DOL did *not* "consider the alternatives that are within the ambit of the existing policy" when it rescinded its prior policy for outfitters. *See Regents*, 140 S. Ct. at 1913. EO 14026 rescinded the prior rule without a word of explanation. 86 Fed. Reg. at 22,836–37. But DOL shook off criticisms of applying the rule to outfitters by blaming the President, saying "that due to the prescriptive nature of Executive Order 14026, the Department does not have the discretion to implement alternatives that would violate the text of the EO, such as the adoption of a higher or lower minimum wage rate, or continued exemption of recreational businesses." *Id.* at 67,216. It agrees it did not "consider the alternatives," because it claimed it couldn't. But the APA's arbitrary and capriciousness standard still applies in such contexts. Consider *Regents*—there the Attorney General had ordered the Acting Secretary of Homeland Security to rescind an executive policy. 140 S. Ct. at 1903. Regardless of whether the Secretary had any choice to depart from the Executive's directives, her action was still reviewed under the APA's arbitrary and capriciousness standard. *See id.* at 1911–12. And the agency action was invalid because the Secretary rescinded the prior policy without providing an explanation *beyond* the Attorney General's order. *See id.* at 1913. The rule here must also be vacated on this basis.

## CONCLUSION

The final rule exceeds Defendants' regulatory authority, and must be set aside.

DATED: June 15, 2022.

<div style="margin-left:50%">

Respectfully,

*/s/ Caleb Kruckenberg*
CALEB KRUCKENBERG
MICHAEL A. POON
STEVEN M. SIMPSON
*Counsel for Plaintiffs*

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2022, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully,

*/s/ Caleb Kruckenberg*
CALEB KRUCKENBERG
MICHAEL A. POON
STEVEN M. SIMPSON
Pacific Legal Foundation
3100 Clarendon Blvd, Suite 610
Arlington, VA 22201
202-888-6881
CKruckenberg@pacificlegal.org
MPoon@pacificlegal.org
SSimpson@pacificlegal.org
*Counsel for Plaintiffs*