**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

---

DUKE BRADFORD et al.,

      Plaintiffs,

    v.

U.S. DEPARTMENT OF LABOR et al.,

      Defendants.

Case No. 1:21-cv-03283-PAB-STV

---

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT & RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 56)

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants hereby move for summary judgment on all of Plaintiffs' claims. Additionally, Defendants oppose Plaintiffs' motion for summary judgment (ECF No. 56). The grounds for Defendants' motion and opposition follow.

### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

**1.** On February 12, 2014, President Obama issued Executive Order ("E.O.") 13,658, which required the inclusion of a minimum wage clause in certain contracts with the Federal Government. Exec. Order No. 13,658, 79 Fed. Reg. 9851 (Feb. 12, 2014).

**2.** E.O. 13,658 applied to new "contract[s] or contract-like instrument[s] for services covered by the Service Contract Act" and "contract[s] or contract-like instrument[s] entered into with the Federal Government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public," provided that "the wages of workers under such contract or contract-like instrument are governed by the Fair Labor Standards Act, the Service Contract Act, or the Davis-Bacon Act." *Id.* at 9853.

**3.** The minimum wage for non-tipped workers pursuant to E.O. 13,658 was $10.10 per hour beginning January 1, 2015, subject to annual increases indexed to inflation. *Id.* at 9851.

4. President Obama issued E.O. 13,685 pursuant to "the authority vested in [him] as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq.*" *Id.*

5. President Obama directed the Secretary of Labor to issue regulations implementing E.O. 13,658 by October 1, 2014. *Id.* at 9852.

6. On October 7, 2014, following notice-and-comment rulemaking, the Department of Labor ("DOL") published in the Federal Register a final rule implementing E.O. 13,658, which took effect on December 8, 2014. 79 Fed. Reg. 60,634 (Oct. 7, 2014) (codified as amended at 29 C.F.R. pt. 10).

7. DOL "defined the term contract and contract-like instrument collectively for purposes of [E.O. 13,685] as an agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law," including "licenses . . . and permits." *Id.* at 60,655.

8. The current minimum wage pursuant to E.O. 13,658 is $11.25 per hour. 86 Fed. Reg. 51,683 (Sept. 16, 2021).

9. On May 25, 2018, President Trump issued E.O. 13,838, which amended E.O. 13,658 to exempt "contracts or contract-like instruments entered into with the Federal Government in connection with seasonal recreational services"—including "river running, hunting, fishing, horseback riding, camping, mountaineering activities, recreational ski services, and youth camps"—"or seasonal recreational equipment rental for the general public on Federal lands." Exec. Order No. 13,838, 83 Fed. Reg. 25,341, 25,341 (May 25, 2018).

10. President Trump issued E.O. 13,838 pursuant to "the authority vested in [him] as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq.*" *Id.*

11. On September 26, 2018, DOL amended its regulations to reflect E.O. 13,838. 83 Fed. Reg. 48,537 (Sept. 26, 2018) (codified as amended at 29 C.F.R. pt. 10).

12.     On April 27, 2021, President Biden issued E.O. 14,026, which requires the inclusion of a clause in certain contracts with the Federal Government setting a minimum wage of $15 per hour, subject to annual inflation-indexed increases, for non-tipped "workers working on or in connection with [the covered] contract." Exec. Order No. 14,026, 86 Fed. Reg. 22,835, 22,835 (Apr. 27, 2021).

13.     E.O. 14,026 revoked E.O. 13,838. *Id.* at 22,836-37.

14.     E.O. 14,026 covers the same four categories of contracts as E.O. 13,658. *See id.* at 22,837.

15.     President Biden explained that "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." *Id.* at 22,835.

16.     President Biden issued E.O. 14,026 pursuant to "the authority vested in [him] as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq.*" *Id.*

17.     President Biden directed the Secretary of Labor to issue regulations implementing E.O. 14,026 by November 24, 2021. *Id.* at 22,836.

18.     On November 24, 2021, following notice-and-comment rulemaking, the DOL published in the Federal Register a final rule implementing E.O. 14,026. 86 Fed. Reg. 67,126 (Nov. 24, 2021) (codified as amended at 29 C.F.R. pts. 10 & 23) ("Final Rule").

19.     In response to comments proposing that DOL "extend the existing exemption for recreational service contracts under Executive Order 13658 and create a new similar exemption for such contracts under Executive Order 14026," DOL noted that E.O. 14,026 "explicitly revokes" E.O. 13,838. *Id.* at 67,154. DOL "therefore [did not] have the authority to unilaterally exempt such contracts from either Executive Order 13658 or Executive Order 14026; such exclusions would be in clear derogation of both the letter and spirit of Executive Order 14026." *Id.*

20.     DOL conducted a cost-benefit analysis of the Final Rule, as required under E.O. 12,866 and

E.O. 13,563. *Id.* at 67,194-67,217.

**21.**     With respect to the benefits of the Final Rule, DOL cited evidence to support its projection that the Final Rule would result in "improved government services, increased morale and productivity, reduced turnover, reduced absenteeism, and reduced poverty and income inequality for Federal contract workers." *Id.* at 67,195; *see id.* at 67,212-15. DOL discussed these benefits "qualitatively as indicators of . . . efficiency and economy." *Id.* at 67,212.

**22.**     DOL noted that "[t]here is no evidence to suggest that these benefits would not apply to the outfitters and guide industry," as "benefits such as increased morale and productivity and decreased turnover findings tend to be general rather than industry-specific." *Id.*

**23.**     With respect to the costs of the Final Rule, DOL projected "Year 1 direct employer costs to the private sector of $17.1 million, in regulatory familiarization and implementation costs" and "transfer payments for the private sector of $1.7 billion in Year 1, with an average annualized value of $1.8 billion over ten years." *Id.* at 67,224.

**24.**     DOL determined that the benefits of the Final Rule "will offset any direct employer costs." *Id.* at 67,204.

**25.**     With respect to non-procurement contractors generally, DOL noted that "there may be actions employers can take to mitigate costs, in addition to the various benefits they will observe, such as increased productivity and reduced turnover," and that, "[i]n some instances, increased contractor costs may be passed along to the public in the form of higher prices." *Id.* at 67,206. As a result of "increased efficiency and quality of services," non-procurement contractors may "attract more customers[,] . . . result[ing] in increased sales," DOL concluded. *Id.* at 67,153. "Such benefits may be realized even where the contractor has limited ability to transfer costs to the contracting agency or raise prices of the services that it offers." *Id.*

**26.**     With respect to firms that were exempt from E.O. 13,658 under E.O. 13,838, DOL noted that

the same "efficiency gains" are "applicable." *Id.*

27.     In response to comments that a $15 minimum wage could make it more difficult for recreational service providers who operate on Federal lands to compete with firms in the same industry that are not subject to the same wage requirements, DOL stated that "establishments operating on Federal property compete on characteristics other than price." *Id.* at 67,207. "Specifically," DOL continued, "recreating on Federal lands has many advantages to non-Federal lands (such as aesthetics and remoteness). This is evidenced by the willingness of contractors, including permittees, to pay greater costs to operate on Federal lands." *Id.*

28.     On January 24, 2022, this Court issued a forty-seven-page Opinion and Order holding that Plaintiffs "ha[d] not shown a likelihood of success on the merits of any of their claims" and denying their motion for a preliminary injunction. *Bradford v. DOL*, __ F. Supp. 3d __, No. 21-CV-03283-PAB-STV, 2022 WL 204600, at *19 (D. Colo. Jan. 24, 2022).

29.     The Final Rule took effect on January 30, 2022. 86 Fed. Reg. at 67,126.

30.     On February 17, 2022, a two-Judge motions panel of the Tenth Circuit found that "Plaintiffs ha[d] demonstrated an entitlement to relief" from the Final Rule "in their particular circumstances." ECF No. 56-4 ("10th Cir. Stay Order"), at 2. The motions panel accordingly enjoined enforcement of the Final Rule "in the context of contracts or contract-like instruments entered into with the federal government in connection with seasonal recreational services or seasonal recreational equipment rental for the general public on federal lands . . . until further order" of the Tenth Circuit. *Id.*

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT

**General Objection:** Defendants object to paragraphs 24-37 of Plaintiffs' Statement of Undisputed Material Facts as immaterial to the merits of Plaintiffs' claims.

1.     Admitted.

2.     Admitted in part and denied in part. President Obama set a minimum wage of $10.10 per

hour for work performed on or in connection with covered Federal contracts, subject to annual increases indexed to inflation. *See* E.O. 13,658, § 2(i), 79 Fed. Reg. at 9851. DOL promulgated regulations to implement that policy choice. *See* 79 Fed. Reg. at 60,721 (codified as amended at 29 C.F.R. § 10.1(1)). The implementing regulations did not alter the standards for determining when overtime pay is applicable, which are determined under the Fair Labor Standards Act and the Contract Work Hours and Safety Standards Act. *See id.* at 60,725-26 (codified as amended at 29 C.F.R. § 10.24).

**3.** Admitted.

**4.** Denied that E.O. 13,838 necessarily exempted "outfitters and guides." Defendants refer to paragraph 9 of Defendants' Statement of Undisputed Material Facts for the scope of the exemption.

**5.** Admitted.

**6.** Admitted that DOL issued a rule updating its regulations to reflect E.O. 13,838. Denied that DOL purported either to "agree[]" or disagree with the President's analysis.

**7.** The statement that "President Biden reversed course" is a non-factual characterization to which no response is required. The remainder of the paragraph is admitted.

**8.** Admitted, except to deny that the Final Rule was issued on November 23, 2021. It was published in the Federal Register on November 24, 2021. *See* 86 Fed. Reg. 67,126.

**9.** Admitted that DOL stated that "Forest Service special use permits will typically be subject to Executive Order 14026's requirements." *Id.* at 67,148. Denied that DOL determined the applicability of the Final Rule to any particular permits, including those held by Plaintiffs.

**10.** Admitted in part and denied in part. DOL estimated that there are 507,200 "potentially affected firms." *Id.* at 67,196. However, DOL estimated that only 327,300 employees (fewer than the total potentially affected firms) will be "actually affected" in the first year of implementation and "see an increase in their hourly wage." *Id.* at 67,194. That is because most employees of potentially affected firms already earn over $15 per hour. *See id.* at 67,200-01 & tbl.5. Among the 507,200 potentially

affected firms, 45,454 operate on Federal property and lands, but not all of these are special use permittees. *See id.* at 67,196-97 & tbls.2-3. DOL estimated that the Final Rule will "result in transfer payments for the private sector of $1.7 billion in Year 1, with an average annualized value of $1.8 billion over ten years." *Id.* at 67,224. DOL also projected "average annualized direct employer costs" of $2.4 million *total*—not for each firm—"[d]uring the first 10 years the rule is in effect." *Id.* at 67,194.

**11.**    Admitted, subject to clarification. DOL determined that the Final Rule is "economically significant" solely as that term is understood for purposes of regulatory review pursuant to Section 3(f) of E.O. 12,866 and not for any other purpose. *See id.* at 67,194.

**12.**    Admitted.

**13.**    Admitted.

**14.**    Admitted that DOL projected that the Final Rule "may result in reduced profits in certain instances." *Id.* at 67,206. Denied that DOL projected outright losses. Further denied that DOL projected that any reduced profits would be ameliorated only by higher prices. Rather, DOL "note[d] that there may be actions employers can take to mitigate costs, in addition to the various benefits they will observe, such as increased productivity and reduced turnover." *Id.*

**15.**    Admitted that DOL cited one study that found a correlation between the United Kingdom's introduction of a national minimum wage in 1999 and a reduction in firm profits. *See id.* at 67,207 & n.85 (citing Mirko Draca et al., *Minimum Wages and Firm Profitability*, Am. Econ. J.: Applied Econ., at 130 (Jan. 2011) (AR App'x, Tab R)). Denied that this was the only study that DOL cited concerning firm profitability. For example, DOL cited a study showing that a firm's 1 percent wage increase "reduced turnover by 3.0 to 4.5 percent, increased staff recruitment by 3.2 to 4.2 percent, and increased productivity by $1.10."[1] DOL also cited other studies showing that minimum wage increases may

---

[1] *Id.* at 67,213 & n.117 (citing Natalia Emanuel & Emma Harrington, *The Payoffs of Higher Pay: Elasticities of Productivity and Labor Supply with Respect to Wages*, Harv. U. Publ'ns (2020) (AR App'x, Tab V)). [2] *Id.*

lead to reduced turnover,[2] as well as studies delineating the high cost of turnover to firms.[3]  Indeed, "[a] review of 27 case studies found that the median cost of replacing an employee was 21 percent of the employee's annual salary." *Id.* at 67,213.

16.     Denied.  DOL concluded that the benefits of the Final Rule "could offset adverse impacts to prices or profits."  *Id.* at 67,206.  DOL acknowledged that employers may "reduc[e] employees' overtime hours," *id.* at 67,209, and that "small to negligible" reductions in "fringe benefits" also may result, *id.* at 67,208, but it did not conclude that these effects necessarily will occur.

17.     Admitted.

18.     Denied.  DOL concluded, based on decades of economic research, that the Final Rule will "result in negligible or no disemployment effects." *Id.* at 67,211.

19.     Denied.  "The consensus among a substantial body of research is that disemployment effects" of minimum wage increases "can be small or non-existent." *Id.* at 67,211.

20.     Denied.  DOL concluded that "establishments operating on Federal property compete on characteristics other than price."  *Id.* at 67,207.  "Specifically, recreating on Federal lands has many advantages to non-Federal lands (such as aesthetics and remoteness)," as "evidenced by the willingness of contractors, including permittees, to pay greater costs to operate on Federal lands." *Id.*

_____

at 67,213 & n.119 (citing Arindrajit Dube et al., *Do Frictions Matter in the Labor Market?: Accessions, Separations, and Minimum Wage Effects* (Inst. Of Lab. Econ., Discussion Paper No. 5811, 2011) (AR App'x, Tab U);  Shanshan Liu et al., *Impact of the Minimum Wage on Youth Labor Markets*, REV. OF LAB. ECON. & INDUS. RELS., March 2016, at 18 (AR App'x, Tab HH); Ekaterina Jardim et al., *Minimum Wage Increases and Individual Employment Trajectories* (Nat'l Bureau of Econ. Rsch., Working Paper No. 25182, 2018) (AR App'x, Tab EE)).

[2] *Id.* at 67,213 & n.119 (citing Arindrajit Dube et al., *Do Frictions Matter in the Labor Market?: Accessions, Separations, and Minimum Wage Effects* (Inst. Of Lab. Econ., Discussion Paper No. 5811, 2011) (AR App'x, Tab U);  Shanshan Liu et al., *Impact of the Minimum Wage on Youth Labor Markets*, REV. OF LAB. ECON. & INDUS. RELS., March 2016, at 18 (AR App'x, Tab HH); Ekaterina Jardim et al., *Minimum Wage Increases and Individual Employment Trajectories* (Nat'l Bureau of Econ. Rsch., Working Paper No. 25182, 2018) (AR App'x, Tab EE)).

[3] *Id.* at 67,213 & n.120 (citing Heather Boushey & Sarah Jane Glynn, *There are Significant Business Costs to Replacing Employees*, CTR. FOR AM. PROGRESS (Nov. 16, 2021) (AR App'x, Tab O)).

**21.**     Admitted.

**22.**     Admitted.

**23.**     Admitted.

**24.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**25.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**26.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**27.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**28.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**29.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**30.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**31.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**32.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**33.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**34.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**35.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**36.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**37.**     Defendants lack sufficient information to form a belief as to the truth of this statement.

**38.**     Admitted.

**39.**     Admitted.

**40.**     Admitted.

**41.**     Admitted.

**42.**     Admitted.

## INTRODUCTION

This Court previously held that Plaintiffs "ha[d] not shown a likelihood of success on the

merits of any of their claims." *Bradford*, 2022 WL 204600, at \*19. Plaintiffs have now had a full opportunity to develop those claims. Notwithstanding that opportunity, Plaintiffs' claims still fail for precisely the same reasons that the Court set forth in its Opinion and Order denying Plaintiffs' preliminary injunction motion: The breadth of the President's authority to set a contractor minimum wage pursuant to the Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 101 *et seq.*, is confirmed by statutory text, decades of historical practice, judicial precedent, and congressional ratification. Plaintiffs also fail to establish that employers who provide services to the public on Federal lands pursuant to a contract with the Federal Government fall outside the scope of that authority, and none of the canons of interpretation that Plaintiffs invoke calls for a different result. Finally, because the President is not subject to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the APA does not provide for arbitrary-and-capricious review of an agency action to the extent that action is compelled by the President's exercise of his own statutory authority. Moreover, even if it did, the decision to revoke the exemption that E.O. 13,868 had created was adequately explained. Accordingly, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

## LEGAL STANDARD

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). By agreement of the parties and by order of the Court, this case "sh[all] be decided without discovery and solely on the basis of the certified administrative record." ECF No. 52, at 5-6.

In the event that the Court reaches the merits of Plaintiffs' arbitrary-and-capricious claim, *see* ECF No. 1 ("Compl."), ¶¶ 60-65, *but see infra*, pp.28-32 (addressing unavailability of arbitrary-and-capricious review), the Court's inquiry "must be thorough, but the standard of review is very

deferential to the agency," *OXY USA Inc. v. U.S. Dep't of the Interior*, 32 F.4th 1032, 1044 (10th Cir. 2022) (cleaned up). "An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment." *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017) (cleaned up). "A presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action," and the Court "may set aside the agency's decision only for substantial procedural or substantive reasons." *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012) (cleaned up).

## ARGUMENT

### I. The Final Rule Implementing E.O. 14,026 Does Not Exceed the Scope of the President's FPASA Authority.

Defendants are entitled to summary judgment on Plaintiffs' claim that the Final Rule exceeds the scope of the President's FPASA authority, with respect either to its coverage of certain licensees and permittees who provide services on Federal Lands or the $15 minimum wage that it enacts.

### The FPASA Authorizes the President to Set Requirements for Contracts for the Provision of Services to the Public on the Government's Land, Provided that Such Requirements Have a Sufficient Nexus to Economy and Efficiency.

Contracts, including licenses and permits, that govern the provision of services to the public on the Federal Government's land fall within the scope of the President's FPASA authority. As relevant here, the FPASA authorizes the Federal Government to establish "an economical and efficient system" for "[p]rocuring and supplying . . . nonpersonal services, and performing related

functions including contracting." 40 U.S.C. § 101(1).[4] Where the Federal Government enters into contractual agreements (here, permits) with private entities governing the supply of services to the public on the Government's own land, the FPASA authorizes the President to "prescribe policies and directives that the President considers necessary," 40 U.S.C. § 121(a), to promote economy and efficiency in the supply of those services. In the context of permitting relationships like that of the Government and Plaintiffs, the Government does far more than merely authorize the Plaintiffs to supply services to the public. The Government provides and maintains the land on which Plaintiffs offer those services, and therefore plays an essential role in the transaction between licensees and the public for nonpersonal services. In light of that role, the Government's terms for the relevant permitting agreements are part of its system for the "supply[]" of services on its own land. At a minimum, such contracts fall within the scope of the President's authority to prescribe policies and directives to advance economy and efficiency in "functions including contracting" that are "*related*" to the "[p]rocur[ement]" or "supply[]" of nonpersonal services. 40 U.S.C. § 101(1) (emphasis added).

None of Plaintiffs' arguments that the Government is insufficiently involved in the supply of services on its own land pursuant to the licenses that the Government issues is persuasive. First, Plaintiffs suggest that the President's authority under FPASA covers only contracts by which the government "procures" goods or services or those by which a firm "supplies any nonpersonal services *to the government*." Pls.' Mot. 8 (emphasis added). But when a contractor provides goods or services directly to the federal government, the government is "procuring" those goods or services. *See, e.g.*, *Contract*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining a "procurement contract" as "[a] contract in which a government receives goods or services"). Plaintiffs' argument would thus give the

---

[4] A contract for "nonpersonal services" is defined as "a contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees." 48 C.F.R. § 37.101; *see* 40 U.S.C. § 102.

word "supplying" no meaning apart from "procuring." That would "flout[] the rule that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (quotation marks omitted).

Relatedly, Plaintiffs contend that "the [FPASA] empowers the President to regulate the supply of services that it produces itself, or that are procured from elsewhere." Pls.' Mot. 8 (citations omitted). But contracts by which the government "procure[s]" services "from elsewhere" are covered by the statutory reference to "[p]rocuring" goods or services, so that possibility does not give meaning to the word "supplying." And plaintiffs' attempt to limit the "supplying" provision of the statute to services that the Government "produces itself" has no basis in the statutory text.

Plaintiffs also argue that the Government has only a "limited interest in how Plaintiffs conduct their activities," which does not suffice to "pull them into the statute's reach." Pls.' Mot. 8. But that argument fails to adequately account for the fact, as noted above, that Plaintiffs' activities occur on land owned and maintained by the Federal Government itself. As the permits that Plaintiffs hold make clear, the Government therefore has a substantial interest in the manner in which they conduct their activities. *See, e.g.*, Ex. 1 (Special Recreation Permit Amendment stipulating that Plaintiff Arkansas Valley Adventures LLC ("AVA") must, for example, take "[p]recautions . . . to minimize the spread of aquatic invasive species via proper cleaning and disinfecting procedures," "take precautions to not spread noxious weeds to public lands," and ensure that clients and guides wear "properly-sized whitewater type I, III, or V life jacket[s] . . . at all times while in and on the water" (admitted as Defs.' Ex. 1 at Jan. 6, 2022 Prelim. Inj. Hr'g)).

In that respect, *Noel v. New York City Taxi & Limousine Commission*, 687 F.3d 63 (2d Cir. 2012), on which Plaintiffs rely, *see* Pls.' Mot. 9, is readily distinguishable. In *Noel*, the Second Circuit held that the services of licensed New York City taxi drivers are not "services . . . *of a public entity*" within the meaning of Title II(A) of the Americans with Disabilities Act ("ADA"). 687 F.3d at 68 (quoting 42

U.S.C. § 12132) (emphasis added), 70-72. As an initial matter, unlike the ADA, the FPASA does not limit its reach to the nonpersonal services of public entities. *Noel* is inapposite for that reason alone. Moreover, the Second Circuit in *Noel* expressly distinguished cases in which the Government "was not 'only engaged in a licensing arrangement,' but 'provide[d] an aid, benefit or service on a continuing basis to its licensee.'" *Id.* at 71 (quoting *Paxton v. W. Va. Dep't of Tax & Revenue*, 451 S.E.2d 779, 785 (1994)). In this case, the Government's provision of the land on which Plaintiffs operate constitutes just such a benefit. More than merely regulating Plaintiffs' business activities, the Government makes it possible for Plaintiffs to conduct those activities by providing the land on which to do so, pursuant to certain contractual terms. The Government's relationship to the services that Plaintiffs provide is accordingly much more direct than in *Noel*. This critical feature distinguishes Plaintiffs and other covered employers from Federal licensees and permittees who do not fall within the scope of the Final Rule because they do not provide services on Federal lands.

Moreover, the Final Rule's coverage of non-procurement contractors who supply certain services on Federal lands is independently authorized under a separate provision of the FPASA, pertaining to functions related to the supply of services, including contracting. Specifically, Congress authorized "policies and directives that the President considers necessary" to advance economy and efficiency in the performance of contracting functions *related* to the procurement and supply of nonpersonal services. 40 U.S.C. §§ 101(1), 121(a). There is no dispute that the Government is a party to—*i.e.*, is "on one end of"—Plaintiffs' licensing agreements for the supply of services on the Government's land. Pls.' Mot. 8. It is also beyond dispute that those licensing agreements are related to the supply of nonpersonal services; indeed, they both authorize and set meaningful requirements and limitations on the supply of those services to protect the Government's land and the public. *See* Ex. 1. The FPASA thus authorizes the President to require that the services that permitted entities like Plaintiffs provide on the Federal Government's land are economically and efficiently structured.

Plaintiffs argue in response that "'[c]ontracting' must be 'confined to its contextual meaning—the government's making of the agreement, rather than all subsequent performance of it.'" Pls.' Mot. 8 (quoting *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022)). But setting the terms of a contract is itself a necessary part of contract formation. See 11 WILLISTON ON CONTRACTS § 32.5 (4th ed. 2021) (noting that, for a contract to be enforceable, there must be agreement on essential terms). Thus, the inclusion of a minimum wage clause in a contractual agreement with the Government is part of "the government's making of the agreement." Moreover, the Sixth Circuit's interpretation in *Kentucky* cannot be reconciled with decades of precedent upholding actions pursuant to the FPASA that require the inclusion of certain substantive terms in contracts with the Federal Government. *See infra*, pp.15-18 & n.9. For these reasons, and others that the Government has advanced in subsequent briefing before the Sixth Circuit, the *Kentucky* decision relies on a crabbed understanding of the FPASA that conflicts with both statutory text and precedent.

Finally, to the extent that Plaintiffs also invoke the 10th Cir. Stay Order to suggest that the Final Rule is unlawful as applied to seasonal recreational service and equipment rental providers, *see* Pls.' Mot. 1, 7 & n.2, their argument is unpersuasive. The Tenth Circuit has held repeatedly that the decision of a motions panel that a plaintiff is likely to succeed on the success of its claims does not bind either the district court or a subsequent merits panel of the appellate court, for at least two reasons.[5] First, "a motions panel's decision is often tentative because it is based on an abbreviated record and made without the benefit of full briefing and oral argument." *Homans*, 366 F.3d at 905 (cleaned up). Second, even a conclusive determination that a plaintiff is likely to succeed on the merits, as necessary to support a preliminary injunction, is itself "tentative in nature" and not binding with

---

[5] *See Homans v. City of Albuquerque*, 366 F.3d 900, 904-05 (10th Cir. 2004); *accord Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1025, 1028 n.3 (10th Cir. 1998); *Stifel, Nicolaus & Co. v. Woolsey & Co.*, 81 F.3d 1540, 1543-44 (10th Cir. 1996).

respect to the ultimate merits of the plaintiff's claims. *Id.* at 904-05.

Plaintiffs thus have failed to establish that the Final Rule exceeds the scope of statutory authority to the extent that it applies to certain non-procurement contractors.

## B. The Final Rule Has the Requisite Nexus to Economy and Efficiency.

Since the FPASA was enacted in 1949, Presidents of both political parties have exercised their authority under the statute to issue E.O.s pertaining to the compensation of Federal contractors' employees. For example, Presidents have prohibited contractors from discriminating on the basis of race, creed, color, or national origin and have required "affirmative action" on these bases as to "rates of pay or other forms of compensation," *see, e.g.*, Exec. Order No. 10,925, 26 Fed. Reg. 1977 (Mar. 6, 1961) (Pres. Kennedy); Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sept. 24, 1965) (Pres. Johnson); prohibited contractors from discriminating on the basis of age, *see* Exec. Order No. 11,141, 29 Fed. Reg. 2477 (Feb. 12, 1964) (Pres. Johnson)[6]; specified certain terms and conditions of employment, including wages, for state prison inmates employed by contractors, *see* Exec. Order No. 11,755, 39 Fed. Reg. 779 (Dec. 29, 1973) (Pres. Nixon); required contractors to comply with anti-inflationary wage and price standards, *see* Exec. Order No. 12,092, 43 Fed. Reg. 51,375 (Nov. 1, 1978) (Pres. Carter); and required contractors to provide their employees with paid sick leave, *see* Exec. Order No. 13,706, 80 Fed. Reg. 54,697 (Sept. 7, 2015) (Pres. Obama).

More broadly, Presidents have also exercised their authority under the FPASA to impose wide-ranging policies related to the hiring and supervision of contractors' employees, including requiring contractors to inform their employees that they have a right not to join a union or pay certain union dues, *see* Exec. Order No. 12,800, 57 Fed. Reg. 12,985 (Apr. 13, 1992) (Pres. George H.W. Bush);

---

[6] Although the anti-discrimination Orders do not cite the FPASA (or any other statute) as their source of authority, "only the FPASA could have provided statutory support" for them before the enactment of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967, respectively. *AFL-CIO v. Kahn*, 618 F.2d 784, 790-91 & n.29 (D.C. Cir. 1979).

Exec. Order No. 13,201, 66 Fed. Reg. 11,221 (Feb. 17, 2001) (Pres. George W. Bush); requiring contractors to use an electronic system to verify their employees' eligibility to work in the United States, *see* Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 6, 2008) (Pres. George W. Bush); and encouraging contractors to adopt and enforce policies prohibiting employees from text messaging while driving company- or Government-owned vehicles or performing work on behalf of the Government, *see* Exec. Order No. 13,513, 74 Fed. Reg. 51,225 (Oct. 1, 2009) (Pres. Obama).[7]

Interpreting the scope of the President's authority to issue such Orders, courts—including the Tenth Circuit—have recognized that the FPASA confers on the President broad authority to set conditions on Government contracting that the President deems necessary for economical and efficient contracting. The Tenth Circuit has held that "Congress chose to utilize a relatively broad delegation of authority in the Federal Property and Administrative Services Act of 1949." *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004). Likewise, in *Kahn*, the *en banc* D.C. Circuit recognized that "economy" and "efficiency"—the twin objectives that define the scope of the President's FPASA authority—"are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services." 618 F.2d at 789. That Congress conferred such broad authority on the President is unsurprising, the *Kahn* court reasoned; the statutory language "recognizes that the Government generally must have some flexibility to seek the greatest advantage in various situations" and to "mak[e] sophisticated judgments in pursuit of economy and efficiency." *Id.* at 788-89. Likewise, the Fifth Circuit has recognized that "Congress has committed to the

---

[7] As shorthand, the Government refers throughout this brief to Orders issued under FPASA as "requir[ing]" or "prohibit[ing]" certain actions of Federal contractors. To be clear, however, none of these—including E.O. 14,026—requires anything of contractors absent their agreement. Rather, the Orders and their implementing regulations condition Federal agencies' entering into contracts on the inclusion in those contracts of clauses requiring or prohibiting certain actions as a condition of the contracts. As discussed further below, private parties always remain free to opt out of contracting with the Federal Government if they are unwilling to comply with its conditions.

President broad authority" through the FPASA. *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967).

As a corollary to this broad delegation of authority, the standard of judicial review of E.O.s issued pursuant to the FPASA (and, by extension, their implementing rules) is "lenient." *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 367 (D.C. Cir. 2003). Courts uphold such actions provided that "a sufficiently close nexus" exists between "the values of 'economy' and 'efficiency'" and the challenged policy, *Kahn*, 618 F.2d at 792—even where that nexus "may seem attenuated" or "one can with a straight face advance an argument claiming opposite effects [with respect to economy and efficiency] or no effects at all," *Chao*, 325 F.3d at 366-67. Such deference to the President's policy judgment is compelled by the statutory text, which provides that "[t]he President may prescribe policies and directives *that the President considers* necessary" to "provide the Federal Government with an economical and efficient system" for the procurement and supply of property and non-personal services, among other functions not relevant here. 40 U.S.C. §§ 101, 121(a) (emphasis added).[8] Where Congress uses such "broad language," the "presumed point" is to "produce general coverage—not to leave room for courts to recognize ad hoc exceptions." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020) (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (2012)). Moreover, the deference that Congress dictated here makes abundant sense: decisions regarding the economy and efficiency of Federal contracting frequently involve predictive

---

[8] Significantly, the statute does not provide merely for the President to prescribe policies and directives that *are* necessary for such purposes, but rather that the President, in his judgment, *considers* necessary. In this context, the term "necessary" is not given a restrictive construction. The Tenth Circuit has confirmed that courts must give effect to such qualifying terms in connection with the term "necessary," and that in such circumstances, "the courts . . . have frequently interpreted 'necessary' to mean something less than absolute necessity." *Fish v. Kobach*, 840 F.3d 710, 735-36 (10th Cir. 2016); *see also id.* at 734 (noting that, in "common parlance," the word "necessary" "generally implies a pressing need rather than absolute indispensability" (citing THE NEW OXFORD ENGLISH DICTIONARY 1135 (2005))).

judgments and trade-offs among competing policy goals, which "[t]he President and his Administration are in a better position than [the courts] to make." *Chamber of Com. of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 738 (D. Md. 2009).

Thus, for example, the D.C. Circuit recognized in *Kahn* that the challenged E.O., which imposed anti-inflationary wage and price controls on contractors, could "divert[]" Government contracts "from low bidders who are not in compliance with the wage and price standards to higher bidders," seemingly resulting in "an unwarranted drain on the public fisc." 618 F.2d at 792; *see also Chao*, 325 F.3d at 367 (noting that, in *Kahn*, "there was a rather obvious case that the order might in fact increase procurement costs (as it plainly did in the short run)"). Nevertheless, the *Kahn* court deferred to the President's judgment, reasoning that, "if the voluntary restraint program [were] effective in slowing inflation in the economy as a whole," the Government would "face lower costs in the future than it would have otherwise," and that those lower costs would "more than offset" any short-run "higher costs." *Kahn*, 618 F.2d at 793. Likewise, courts have sustained E.O.s establishing wide-ranging policies regarding Federal contracting—including several described above, pertaining to contractors' employees' compensation, hiring, and supervision—as valid exercises of the President's authority under the FPASA.[9]

E.O. 14,026—and, by extension, the Final Rule implementing the E.O.—readily meet this standard. As President Biden explained in the EO, "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." 86 Fed. Reg. at 22,835. This rationale is at least as robust as the justifications on which courts have relied in upholding

---

[9] *See, e.g., Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 5 (3d Cir. 1964) (concluding that the FPASA authorized E.O. 10,925); *Farkas*, 375 F.2d at 632 (same); *Contractors Ass'n of E. Pa. v. Sec. of Labor*, 442 F.2d 159, 163 (1971) (same, as to E.O. 11,246); *Kahn*, 618 F.2d at 794 (same, as to E.O. 12,092); *Chao*, 325 F.3d at 366 (same, as to E.O. 13,201); *Napolitano*, 648 F. Supp. 2d at 729 (same, as to EO 13,465).

other E.O.s issued under the FPASA. For example, the D.C. Circuit upheld E.O. 13,201 based on President Bush's statement that "[w]hen workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced." *Chao*, 325 F.3d at 366 (quoting 66 Fed. Reg. at 11,221). Similarly, a court in the District of Maryland sustained E.O. 13,465 over a challenge that it exceeded the President's FPASA authority, relying on President Bush's statement that "[c]ontractors that adopt rigorous employment eligibility confirmation policies are much less likely to face immigration enforcement actions, because they are less likely to employ unauthorized workers, and they are therefore generally more efficient and dependable procurement sources than contractors that do not employ the best available measures to verify the work eligibility of their workforce." *Napolitano*, 648 F. Supp. 2d at 738 (quoting 73 Fed. Reg. at 33,285).

Additionally, and as noted above, the *en banc* D.C. Circuit emphasized in *Kahn* that "'[e]conomy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." 618 F.2d at 789. E.O. 14,026 promotes the quality of services provided by Federal contractors by "generat[ing] higher-quality work" and promotes their availability by "enhanc[ing] worker productivity," including by "reducing absenteeism." 86 Fed. Reg. at 22,835. On these bases alone, E.O. 14,026 and the Final Rule pass muster under the *Kahn* standard. Moreover, with respect to price, DOL predicted that the benefits of the minimum-wage increase will "offset" any increased labor costs. *Id.* at 67,152.

That prediction is supported by the empirical data cited in the Final Rule. *See id.* at 67,212-15. For example, DOL cited a 2003 study which "found that increased wages paid to workers at the San Francisco airport increased productivity and shortened airport lines" and a 2011 study which found that, "in both full and limited-service restaurants[,] productivity increased due to improved worker morale after a wage increase." *Id.* at 67,212-13. DOL likewise cited various studies showing that "[a]n increase in the minimum wage . . . decrease[s] both turnover rates and the rate of worker separation,"

which "can lead to an increase in the profits of firms, as the hiring process can be both expensive and time consuming"—with the cost of replacing an employee averaging 21 percent of the employee's annual salary, according to one empirical survey. *Id.* at 67,213 (footnote and citations omitted). Consistent with this analysis, surveyed managers of "traditionally low-wage firms explained that in nearly all instances, increased wages led to both a decrease in turnover and an increase in profits." *Id.* Likewise, a 2005 study found that a locality's minimum wage increase resulted in a 31% decrease in the turnover rate for all healthcare providers and 51% for new healthcare providers. *Id.* This data all supports the reasonableness of President Biden's determination that increasing the minimum wage for Federal contractors will promote economy and efficiency by "enhanc[ing] worker productivity and generat[ing] higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." 86 Fed. Reg. at 22,835.

Additionally, as discussed above, Presidents have exercised their FPASA authority for well over half a century to set policies governing the compensation of Federal contractors' employees. *See supra*, p.15. And, more specifically, each of the past three Presidents has concluded that he had the authority to set a minimum wage for Federal contractors.[10] As the D.C. Circuit explained in *Kahn*, when "the President's view of his own authority under a statute . . . has been acted upon over a substantial period of time without eliciting congressional reversal, it is 'entitled to great respect'" and "'should be followed unless there are compelling indications that it is wrong.'" 618 F.2d at 790 (first

---

[10] Although President Trump exempted seasonal recreational services and equipment rental providers from the coverage of E.O. 13,658, he did so solely based on his policy judgment that the economy-and-efficiency rationale underlying that E.O. does not apply with the same force to seasonal recreational workers, in light of their "irregular work schedules, a high incidence of overtime pay, and an unusually high turnover rate." 83 Fed. Reg. at 25,341. Eliminating any possible doubt that President Trump understood the FPASA to authorize the President to set a minimum wage for Federal contractors, he specified that providers of lodging and food services associated with seasonal recreational services—to whom, he concluded, the same policy considerations did not apply—would continue to be subject to E.O. 13,658. *Id.*

quoting *Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 248 (1978); and then quoting *Miller v. Youakim*, 440 U.S. 125, 144 n.25 (1979))); *see also Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (relying in part on an agency's "longstanding practice" to determine the scope of its statutory authority); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment) ("[T]he government's early, longstanding, and consistent interpretation of a statute . . . could count as powerful evidence of its original public meaning." (emphasis omitted)).

Moreover, Congress has repeatedly revised the FPASA against the background of this longstanding consensus among the courts of appeals, and it has never modified or restricted the President's power. *See, e.g.*, Pub. L. No. 99-500, 100 Stat. 1783, 1783-345 (1986); Pub. L. No. 99-591, 100 Stat. 3341, 3341-345 (1986); Pub. L. No. 104-208, 110 Stat. 3009, 3009-337 (1996). In fact, Congress recently recodified—without substantive change—both the FPASA's statement of purpose and the operative provision authorizing the President to set policies to achieve that purpose. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("This Act makes no substantive change in existing law . . . ."). "[I]t is well established that 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.'" *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1155 (9th Cir. 2010) (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) (some quotation marks omitted)).

In short, decades of historical practice, judicial precedent, and congressional ratification confirm that the FPASA authorizes the President to set policies relating to the compensation of Federal contractors' employees. And the past three Presidents' practice further supports the conclusion that this authority includes the specific power to set a minimum wage for such employees.

To the extent that Plaintiffs suggest that the President's authority under the FPASA is limited to actions that "have the direct and immediate effect of holding down the Government's procurement

costs," Pls.' Mot. 11 (quoting *Kahn*, 618 F.2d at 792 (emphasis omitted)), that argument cannot be squared with either text or precedent. With respect to text, if direct and immediate price savings were necessary, then the term "efficient" would not do any work independent of the term "economical." *Compare Economical*, MERRIAM-WEBSTER ("marked by careful, efficient, and prudent use of resources") *with Efficient*, MERRIAM-WEBSTER ("productive of desired effects"). With respect to precedent, the D.C. Circuit did not hold in *Kahn* that executive actions pursuant to the FPASA *always* must have the direct and immediate effect of reducing costs. It merely stated that in the context of "negotiated contract[s]"—only a subset of those covered under the challenged E.O., which required compliance with wage and price controls—the Order would "likely have the direct and immediate effect of holding down the Government's procurement costs." *Kahn*, 618 F.2d at 792. But the *Kahn* court also recognized that Government contracts could be "diverted from low bidders who are not in compliance with the wage and price standards to higher bidders," thereby increasing costs. *Id.* Indeed, the D.C. Circuit later confirmed that the E.O. at issue in *Kahn* "plainly" *did* increase the Government's costs "in the short run." *Chao*, 325 F.3d at 367. Moreover, it cannot be said that either E.O. 13,201 (requiring notification of an employee's rights not to join a union or pay union dues) or E.O. 13,465 (requiring verification of an employee's eligibility to work in the United States) had the direct and immediate effect of reducing Government expenditures. Yet the D.C. Circuit and a court in the District of Maryland, respectively, held that those Orders were authorized under the FPASA. *See Chao*, 325 F.3d 360; *Napolitano*, 648 F. Supp. 2d 726.

Further, Plaintiffs' arguments regarding the Final Rule's expected effects on non-procurement contractors do not adequately account for the benefits to non-procurement contractors that DOL projected. *See* Pls.' Mot. 10. DOL noted that even contractors with "limited ability to transfer costs to the contracting agency or raise prices of the services that it offers" will likely realize benefits including "increased efficiency and quality of services," which in turn may "attract more customers

and result in increased sales." 86 Fed. Reg. at 67,153; *see also id.* at 67,206 (similar).

Plaintiffs also are wrong to argue that the benefits of the Final Rule "bear a striking resemblance to the benefits deemed too attenuated from procurement economy to support the contractor vaccine mandate." Pls.' Mot. 11 (citing *Kentucky*, 23 F.4th at 606). In declining to grant a stay pending appeal of the district court's preliminary injunction of the vaccine mandate in *Kentucky*, the Sixth Circuit distinguished the vaccine mandate from the actions at issue in *Kahn*, *Chao*, and *Napolitano*, reasoning that the Federal Government had never before exercised its FPASA authority to "impos[e] a medical procedure upon the federal-contractor workforce." *Kentucky*, 23 F.4th at 608. By contrast, however, the Government has long imposed conditions on the hiring and supervision of Federal contractors' employees, including their compensation, and courts have upheld those actions.

Finally, Plaintiffs' contention that the Court may not consider the Final Rule's effects on procurement and non-procurement contractors separately is belied by controlling precedent on severability. Although the Final Rule's application to non-procurement contractors is well supported for the reasons set forth above, if it were not, the proper remedy would not be vacatur of the Final Rule in its entirety, as Plaintiffs suggest. *See* Pls.' Mot. 11-12. *But see Arizona Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009) ("We may partially set aside a regulation if the invalid portion is severable."); 86 Fed. Reg. at 67,228 (Final Rule's severability clause).

### C. Plaintiffs' Invocation of Various Canons of Construction Does Not Alter the Conclusion that the EO Is Within the Scope of the President's FPASA Authority.

None of the canons of interpretation on which Plaintiffs rely calls for a different result. First, Plaintiffs invoke three statutes, each of which sets certain wage standards for Federal contractors,[11]

---

[11] Plaintiffs cite the Davis-Bacon Act ("DBA"), which requires the payment of prevailing wages to "mechanics or laborers" working on the construction of public buildings and public works, 40 U.S.C. § 3142(a), (b); the Walsh-Healey Public Contracts Act ("PCA"), which requires the payment of prevailing wages to employees of contractors engaged "by an agency of the United States for the manufacture or furnishing" of certain goods, 41 U.S.C. § 6502; and the McNamara-O'Hara Service

and argue that it is implausible that Congress intended to confer on the President authority "'to create an alternative' to these statutes." Pls.' Mot. 14 (quoting *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1216 (10th Cir. 2017)). That argument fails because the Final Rule does not create an "alternative" to the statutes on which Plaintiffs rely. The Final Rule and the statutes that Plaintiffs invoke each sets a *minimum* wage, not a fixed wage. It is therefore wholly possible to comply with the statutes simultaneously with the Final Rule—indeed, it is required where more than one apply. That feature distinguishes the Final Rule from the regulations that the Tenth Circuit struck down in *New Mexico*, which authorized the Secretary of the Interior to issue Class III gaming procedures *without* the finding of bad faith that Congress established as a necessary precondition to the issuance of such procedures. *See New Mexico*, 854 F.3d at 1221-35. Here, by contrast, the Final Rule does not permit employers to circumvent the requirements of the DBA, PCA, or SCA. To the contrary, it expressly provides that E.O. 14,026 and the Final Rule "shall [not] excuse noncompliance with any applicable Federal or state prevailing wage law or any applicable law or municipal ordinance establishing a minimum wage higher than the minimum wage established under the Order." 86 Fed. Reg. at 67,225 (codified as amended at 29 C.F.R. § 23.10(b)(2)) (internal quotation marks omitted). In short, the Final Rule no more provides an "alternative" to other minimum wage statutes than do Federal, State, and local minimum wage requirements that apply to the same workers create alternatives. In none of these scenarios does compliance with one minimum wage requirement excuse noncompliance with another; instead, employers must pay at least the highest applicable minimum wage.

Next, Plaintiffs invoke the major questions doctrine, *see* Pls.' Mot. 14-15, which applies only to those "'extraordinary cases' in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to

---

Contract Act ("SCA"), which requires the payment of prevailing wages to service employees on Federal government contracts that are principally for services, *id.* §§ 6702, 6703.

hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000))). This is no such extraordinary case, for at least five independent reasons.

First, the statutory text makes plain that Congress assigned the President the authority to determine which "policies and directives" are "necessary to carry out" the objectives of economy and efficiency in Federal contracting. 40 U.S.C. § 121(a). If an E.O. bears a reasonable nexus to those broadly stated objectives, then the statute expressly authorizes it. This lawsuit therefore does not implicate the principle that "cryptic" statutory provisions should not be read to "delegate[e]" the power to decide extraordinarily significant questions. *Brown & Williamson*, 529 U.S. at 159-160. Section 121(a) also is not a "previously little-used backwater" provision of the FPASA, but rather its central authorizing provision. *West Virginia*, 142 S. Ct. at 2613.

Second, Presidents have exercised their authority under the FPASA to set conditions on the wages that contractors pay their employees since the statute's inception in the middle of the last century. *See supra*, p.15. In implementing E.O. 14,026, DOL therefore does not purport to have "discover[ed]" a previously "unheralded power" in "a long-extant statute." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see also NFIB v. OSHA*, 142 S. Ct. 661, 662 (2022) ("OSHA has never before imposed such a mandate."); *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) ("This claim of expansive authority under § 361(a) is unprecedented."). Rather, E.O. 14,026 simply builds on the foundation of decades of precedent—including Federal contractor minimum wage requirements that have been in effect during the past three Presidential Administrations.

Third, that the authority here is delegated to the President himself distinguishes this case from those where courts have questioned whether Congress meant to delegate authority over a "major question" to an agency. Whereas courts have expressed the concern that agencies lack direct political accountability, *see, e.g., NFIB*, 142 S. Ct. at 669 (Gorsuch, J., concurring), the President is

unquestionably "accountable to the people," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513 (2010), for the consequences of his decisions.

Fourth, the Final Rule does not exercise regulatory authority at all, but rather reflects the Federal Government's exercise of proprietary authority. When the government acts "in its capacity 'as proprietor' and manager of its 'internal operation,'" it "has a much freer hand" than when it "exercise[s] its sovereign power 'to regulate.'" *NASA v. Nelson*, 562 U.S. 134, 148 (2011). The challenged minimum wage requirement does not apply to employers generally, or even to employees of covered employers who do not perform work on or in connection with Federal contracts.[12] It simply reflects the President's management decision that the Federal Government will do business with companies and other entities only on terms the President regards as promoting economy and efficiency. Stated differently, the Final Rule dictates only the decisions of Federal agencies. Unlike where the President exercises regulatory authority, here, private parties remain free to choose whether to enter into a contract with the Government, subject to the terms and conditions of that contract.

Fifth, any concern about agencies exceeding their statutory authority, *cf. NFIB*, 142 S. Ct. at 666, applies here with diminished force against the background of the President's inherent Article II power to exercise "'general administrative control' . . . throughout the Executive Branch of government, of which he is the head," *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002), including by managing the performance of employees and contractors alike, *see Nelson*, 562 U.S. at 150.[13] For all of these reasons, the major questions doctrine does not apply here.

Plaintiffs finally reach for the non-delegation doctrine, but that doctrine fails to support their

---

[12] Even for covered employees, the requirement applies only to those hours that the employees spend working on or in connection with a covered Federal contract. *See* 86 Fed. Reg. at 67,153.

[13] The Government also disputes the premise that any action deemed economically significant for purposes of E.O. 12,866 is a "major question" for purposes of the major questions doctrine. *See* Pls.' Mot. 14.

claims under binding precedent. The Supreme Court recently reaffirmed—as it has, "time and again"—"that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). The FPASA plainly supplies an intelligible principle to guide the President's discretion in administering the statute: it permits the President to "prescribe policies and directives that the President considers necessary" to "provide the Federal Government with an economical and efficient system" for procuring and supplying property and nonpersonal services and performing related functions; using and disposing of property; and managing records. 40 U.S.C. §§ 101, 121(a). Indeed, the Tenth Circuit held just that in *City of Albuquerque v. U.S. Department of Interior*, 379 F.3d 901, 914 (10th Cir. 2004). This Court is bound by that conclusion, which accords with the Supreme Court's rejection of non-delegation challenges to other broad delegations, including the authority to set "fair and equitable" prices, *Yakus v. United States,* 321 U.S. 414, 427 (1944); to determine "just and reasonable" rates, *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 600 (1944); to regulate broadcast licensing "as public convenience, interest, or necessity" require, *Nat'l Broadcasting Co. v. United States,* 319 U.S. 190, 214 (1943); to allow railroad acquisitions in the "public interest," *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24-25 (1932); and to issue any air quality standards "requisite to protect the public health," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

For all of these reasons, Plaintiffs' claim that the FPASA does not authorize the President to set a minimum wage for Federal contractors fails as a matter of law.

### The Final Rule is Not Subject to Arbitrary-and-Capricious Review Under the APA, But Even If It Were, the Decision to Rescind the Exemption for Recreational Service Providers Is Adequately Explained.

Plaintiffs' claim that the Final Rule is arbitrary and capricious because it does not adequately explain the decision to rescind E.O. 13,838 fails as a matter of law for two independent reasons. First,

arbitrary-and-capricious review is unavailable where an agency's action is compelled by an E.O. of the President, issued pursuant to the President's own statutory authority. Second, even if arbitrary-and-capricious review were available, the Final Rule is adequately explained.

The APA waives sovereign immunity in actions for review of "agency action, findings, and conclusions" that are allegedly "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court has held repeatedly that "[t]he actions of the President . . . are not reviewable under the APA because . . . the President is not an 'agency.'" *Dalton v. Specter*, 511 U.S. 462, 470 (1994); *accord Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). To be sure, courts generally may review the actions of executive officials, including the President, to determine whether they exceeded the bounds of their statutory or constitutional authority. *See Franklin*, 505 U.S. at 801 ("Although the President's actions may still be reviewed for constitutionality, we hold that they are not reviewable for abuse of discretion under the APA." (citations omitted)); *Utah Ass'n of Cntys. v. Bush*, 316 F. Supp. 2d 1172, 1183 (D. Utah 2004) (holding that, where the President exercises his own statutory authority, "judicial review . . . is at best limited to ascertaining that the President in fact invoked his powers under the [relevant statute]"); *cf. Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (holding that no waiver of sovereign immunity is required in actions alleging that an officer has acted outside the bounds of his statutory authority, because such actions are "ultra vires [the officer's] authority" and therefore "not sovereign actions"). But once a court has established that the President acted pursuant to valid constitutional or statutory authority, as President Biden did in enacting E.O. 14,026, the APA does not provide a cause of action to determine whether the President's exercise of discretion was reasonable and adequately explained.

Here, Plaintiffs challenge the Final Rule, rather than the E.O. that it implements, but the result is no different. Agency actions such as the Final Rule are not subject to arbitrary-and-capricious review pursuant to the APA to the extent that they are compelled by the President's exercise of his

own (not the agency's) authority.[14]

Indeed, the Tenth Circuit has confirmed that the "APA's requirement that an agency explain its decision applies when the agency exercises its discretion," but not when there is "no exercise of discretion to explain." *N.M. Health Connections v. HHS*, 946 F.3d 1138, 1167 (10th Cir. 2019). Where, as here, agency action is compelled by presidential action that is independently authorized by law, there is no exercise of agency discretion to explain.

Plaintiffs here do not challenge any provision of the Final Rule that was *not* compelled by E.O. 14,026, which in turn was issued pursuant to presidential statutory authority. That feature distinguishes the Final Rule from the policy at issue in *Gomez v. Trump*, 485 F. Supp. 3d 145, *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v. Biden*, No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021), where the court held that agency action was likely arbitrary and capricious to the extent that it "expanded the scope" of Presidential Proclamations

---

[14] For example, in *Tulare County v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002), the court held that the plaintiff failed to state a claim for APA review of an action of the Forest Service that was "an extension of the President's action" pursuant to presidential authority. *Id.* at 29. Likewise, in *Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012), the court held that the actions of the State Department and a State Department official on behalf of the President pursuant to "delegated presidential authority, rather than pursuant to authority conferred directly to the agency by statute," were "not reviewable under the APA." *Id.* at 402-03; *see also Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 101 (D.D.C. 2016) (holding that agency action "involv[ing] the exercise of discretionary authority committed to the President" is "presidential in nature" and therefore unreviewable under the APA), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *opinion amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018), *and aff'd*, 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018); Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2351 (2001) (distinguishing between Congressional delegations of authority to executive agencies, on one hand, and to the President, on the other, for purposes of judicial reviewability). To be sure, in *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), the D.C. Circuit stated in dictum that the APA may have provided for review of regulations implementing an E.O. that President Clinton issued pursuant to the FPASA. *Id.* at 1326-27. But the scope of review in that action was limited to the question of whether the E.O. was within the scope of the President's authority, not whether it was arbitrary and capricious. The Government does not dispute that judicial review of both E.O. 14,026 and the Final Rule is available to determine whether they are authorized pursuant to the FPASA.

without explanation beyond the "incorrect assumption" that the Proclamations compelled the challenged policy. *Id.* at 178, 194.

Further, because President Biden issued E.O. 14,026 pursuant to authority delegated directly to the President—not to an agency—by Congress, the E.O. independently has the "force and effect" of law. *Farkas*, 375 F.2d at 632; *accord Farmer*, 329 F.2d at 7 & n.8 (collecting cases); *Delgadillo v. Astrue*, 601 F. Supp. 2d 1241, 1248 (D. Colo. 2007). That feature distinguishes the Final Rule implementing the E.O. from the rule in *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021), which implemented a Presidential Proclamation that "d[id] not have the force of law" independent of its implementing rule, and which the Ninth Circuit reviewed as agency action under the APA. *Id.* at 659. In short, to the extent that the Final Rule merely incorporates the provisions of E.O. 14,026, which itself has independent legal effect, the APA does not provide for arbitrary-and-capricious review.

To support their contention that DOL was required to consider exempting seasonal recreational contracts from the Final Rule—in direct contravention of E.O. 14,026—Plaintiffs rely on *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1901 (2020). Pls.' Mot. 20. But that case actually undermines their argument. In *Regents*, the Attorney General sent a letter to the Acting Secretary of Homeland Security, "advis[ing]" the Acting Secretary "to rescind DACA, based on [the Attorney General's] conclusion that [DACA] was unlawful." 140 S. Ct. at 1901, 1903. The Acting Secretary, who was "bound" under 8 U.S.C. § 1103(a)(1) "by the Attorney General's legal determination," acted on that determination and announced the rescission of DACA in a memorandum that "detailed how the program would be wound down." *Id.* at 1903, 1910 (emphasis omitted). The Supreme Court expressly declined to consider the plaintiff-respondents' claims that the Acting Secretary's memorandum "d[id] not adequately explain the conclusion that DACA is unlawful, and that this conclusion [was], in any event, wrong." *Id.* at 1910. Indeed, the Court held that the lower courts' decisions that the rescission was arbitrary and capricious on these grounds "overlook[ed]

an important constraint on [the] Acting Secretary['s] decisionmaking authority," namely, the binding nature of "the Attorney General's legal determination." *Id.* Instead, the Supreme Court considered only the claim that the DACA rescission was arbitrary and capricious because the Acting Secretary failed to consider alternatives to the manner in which the Acting Secretary decided to wind down the program, which was an exercise of the "discretionary authority" delegated directly to her by statute, *see* 8 U.S.C. § 1103(a)(1)—discretionary authority "which picked up where the Attorney General's legal reasoning left off," *Regents*, 140 S. Ct. at 1911. Against this backdrop, the Court held that the Acting Secretary's decision as to the manner of the wind-down was arbitrary and capricious solely because it failed to consider alternatives that were *not* "compelled" by the Attorney General's legal determination. *Id.* at 1912; *see also id.* at 1915 (emphasizing that the Attorney General's legal determination did not "foreclose[]" the alternatives that the Acting Secretary erroneously failed to consider).

Here, as noted, Plaintiffs do not dispute that DOL lacked "discretion to implement alternatives that would violate the text of the EO, such as the adoption of a higher or lower minimum wage rate, or continued exemption of recreational businesses." Pls.' Mot. 20 (quoting 86 Fed. Reg. at 67,216). Stated differently, they accept that the reversal of E.O. 13,838 and the selection of a $15 minimum wage were compelled by the President's exercise of his own statutory authority—much like the threshold decision to rescind DACA, which was compelled by the Attorney General's legal determination that the program was unlawful, as distinct from policy decisions regarding implementation of the wind-down of that program. The Supreme Court did not review the decision *to* rescind DACA—as distinct from *how to* rescind DACA—under the arbitrary-and-capricious standard, precisely because the Acting Secretary lacked discretion to deviate from the Attorney General's determination. Analogously, DOL lacked discretion to deviate from the E.O. Under *Regents*, therefore, DOL was not required under the APA to provide any additional explanation for actions that it was required to take or to consider alternatives that it was prohibited from

implementing, such as leaving in place the exemption for recreational service providers under E.O. 13,838. And, by contrast to the plaintiff-respondents in *Regents*, Plaintiffs here do not challenge any aspect of the Final Rule that was *not* compelled by the E.O., *i.e.*, as to which DOL exercised discretionary authority. For this reason alone, their arbitrary-and-capricious claim fails.

Moreover, even if the Final Rule's reversal of the seasonal recreational services exemption or its selection of a $15 minimum wage were not compelled by President Biden's E.O. and APA review was available, these aspects of the Rule were both "reasonable and reasonably explained," which is all that the APA's arbitrary-and-capricious provision requires. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). For example, DOL "recognize[d] and acknowledge[d] that there may be particular challenges and constraints experienced by non-procurement contractors"—including the holders of "outfitter and guide permits"—"that do not exist under more traditional procurement contracts." 86 Fed. Reg. at 67,152. To that end, it cited comments expressing concern that "Executive Order 14026 will significantly increase the labor costs of entities performing overnight and/or multi-day excursions in national parks, where overtime costs will be substantial and are unavoidable." *Id.* Ultimately, however, DOL explained that it "anticipates that the economy and efficiency benefits of Executive Order 14026 will offset potential costs, including for holders of" non-procurement contracts, such as Plaintiffs. *Id.* DOL further noted that the comments that it received from non-procurement contractors, including Plaintiff AVA, "generally do not account for several factors that [DOL] expects will substantially offset any potential adverse economic effects on their businesses arising from application of the Executive order." *Id.* at 67,152-53. "In particular," DOL continued, "these commenters do not seem to consider that increasing the minimum wage of their workers can reduce absenteeism and turnover in the workplace, improve employee morale and productivity, reduce supervisory and training costs, and increase the quality of services provided to the Federal Government and the general public." *Id.* at 67,153. DOL also emphasized the potential for "increased

efficiency and quality of services" as a result of the minimum-wage requirement to "attract more customers and result in increased sales"—economic benefits that "may be realized even where the contractor has limited ability to transfer costs to the contracting agency or raise prices of the services that it offers." *Id.* In short, DOL offered a thorough and compelling rationale for the Final Rule that well exceeds the APA's arbitrary-and-capricious standard.

None of the record materials that Plaintiffs cite casts doubt on that conclusion. For example, Plaintiffs cite a study that found a correlation between the United Kingdom's introduction of a national minimum wage in 1999 and a reduction in firm profits. *See* Pls.' Mot. 19 (citing Mirko Draca et al., *Minimum Wages and Firm Profitability*, AM. ECON. J.: APPLIED ECON., at 130 (Jan. 2011) (AR App'x, Tab R)). But DOL expressly acknowledged that study, *see* 86 Fed. Reg. at 67,207, and explained that the cited benefits of the Rule, including increased productivity and reduced turnover, "could offset adverse impacts to . . . profits," *id.* at 67,206. The same is true of the studies regarding the effect of a minimum wage increase on prices that Plaintiffs cite. *See* Pls.' Mot. 19. With respect to non-procurement firms, in particular, DOL projected that "any price increase needed to cover increased payroll costs will not be large enough to deter access" and, moreover, "that increased productivity and reduced turnover benefits . . . would help offset the costs." 86 Fed. Reg. at 67,207. Finally, Plaintiffs cite studies that DOL considered indicating that minimum wage increases sometimes result in employment redistribution away from lower-wage workers. Once again, DOL acknowledged and addressed this literature. *See id.* at 67,211 ("Disemployment of low-wage workers occurs when employers substitute capital or fewer more productive higher-wage workers to perform work previously performed by larger numbers of low-wage workers. Economists have studied the size of this potential disemployment effect of increased minimum wages for decades."). Considering the totality of this "substantial body of research," however, DOL projected that the Final Rule will "result in negligible or no disemployment effects." *Id.* (citing Arindrajit Dube, *Impacts of Minimum Wages:*

*Review of the International Evidence*, HM Treasury (Nov. 2019) (AR App'x, Tab T)). It reached this conclusion in part because "[t]he employment effects of a $15 minimum wage can be quite different depending on whether current wages are already close to $15 or substantially lower." *Id.* at 67,211. Whereas some of the studies predicting disemployment projected the effects of a nationwide Federal minimum wage increase from $7.25 to $15, workers who are covered under the Final Rule "are already often paid at a rate higher than the Federal minimum wage of $7.25." *Id.* at 67,211-12. Even for "companies operating on Federal lands under nonprocurement contracts, who might be more limited in their ability to pass costs along to the Federal government," any disemployment effects are likely to be "fairly small," based on a review of the academic literature in its totality. *Id.* at 67,212.

For all of these reasons, Plaintiffs fail to establish that the Final Rule is arbitrary and capricious, even if the APA provided for such review, which it does not.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: August 1, 2022

Respectfully submitted,

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

/s/ Taisa M. Goodnature
TAISA M. GOODNATURE
Trial Attorney (N.Y. Bar No. 5859137)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Washington, DC 20530
Telephone: (202) 514-3786 | Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

I hereby certify that on August 1, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

ckruckenberg@pacificlegal.org

mpoon@pacificlegal.org

ssimpson@pacificlegal.org

kate.talmor@usdoj.gov

justin.sandberg@usdoj.gov

/s/ *Taisa M. Goodnature*
TAISA M. GOODNATURE
Trial Attorney (N.Y. Bar No. 5859137)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Washington, DC 20530
Telephone: (202) 514-3786 | Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*