**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

DUKE BRADFORD et al.,

       Plaintiffs,

      v.

U.S. DEPARTMENT OF LABOR et al.,

       Defendants.

Case No. 1:21-cv-03283-NYW-STV

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT (ECF NO. 63)**

**INTRODUCTION**

Plaintiffs challenge President Biden's decision to revoke an exemption for recreational service providers, returning to the prior status quo, as well as to raise to $15 per hour the minimum wage that Federal contractors must agree to pay their workers as a condition of contracting with the Government. As explained in Defendants' Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment, ECF No. 63 ("Defs.' Cross-Mot. & Resp."), that decision falls comfortably within the range of actions that Presidents of both parties have taken for more than half a century and that courts have upheld as valid exercises of the President's authority under the Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 101 *et seq.* Plaintiffs' Response and Reply, ECF No. 73 ("Pls.' Resp. & Reply"), largely rehashes the reasons why Plaintiffs disagree with President Biden's decision as a policy matter. But their arguments fall well short of establishing that President Biden exceeded the scope of his FPASA authority or that the Department of Labor's ("DOL") codification of the decision to revoke the recreational services exemption—a decision that rested in the President's exclusive statutory authority and that the President made unambiguously—was arbitrary or capricious. Accordingly, the Court should deny Plaintiffs' Motion

for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and enter final judgment in favor of Defendants.

## ARGUMENT

Plaintiffs fail to establish that DOL's Final Rule implementing E.O. 14,026, 86 Fed. Reg. 67,126 (Nov. 24, 2021) (codified as amended at 29 C.F.R. pts. 10 & 23) (the "Final Rule") exceeds the scope of the President's FPASA authority either in its scope of coverage or its substance. The Final Rule also is not subject to arbitrary-and-capricious review to the extent that it merely codifies policy decisions of the President—who is not an agency within the meaning of the APA—pursuant to his own delegated authority. Even if the Final Rule were subject to such review, however, an agency is not required to explain an action from which it lacked discretion to deviate, and, in any event, DOL thoroughly explained the economy-and-efficiency rationale for extending the scope of the Final Rule to certain recreational service contracts, such as the permits that Plaintiffs hold.

## I.    The Final Rule Does Not Exceed the President's Scope of Authority in Its Application to Entities that Provide Services to the Public on Federal Lands.

In their Response and Reply, Plaintiffs still fail to explain how their interpretation of the FPASA—under which the statute reaches only contracts for services rendered *to* the Government, *i.e.*, services that the Government procures—does not render the "supplying" provision of 40 U.S.C. § 101 superfluous. Plaintiffs overlook the foundational principle of statutory interpretation that no statutory provision "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012); *see also id.* ("[I]t is no more the court's function to revise by subtraction than by addition."); *Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121, 1130-31 (10th Cir. 2013). And the "supplying" provision is straightforward: as relevant here, it authorizes the President to issue policies and directives that the President considers necessary to an economical and efficient system for supplying services (as well as contracting to supply services). President Biden

adopted just such a directive when he required the inclusion of a minimum wage clause in permits that the Government extends to entities for the supply of services to the public on the Government's own land.  Plaintiffs offer no basis for this Court to read "supplying" out of the FPASA.

Plaintiffs' attempts to explain away this defect in their reading of the statute are unpersuasive. They posit, for example, that the "supplying" provision might apply where the Tennessee Valley Authority enters into contracts for the supply of "electrical service."  Pls.' Resp. & Reply at 4.  But Plaintiffs offer no authority or explanation for the proposition that a contract for electrical service, *i.e.*, electricity, constitutes a "nonpersonal services contract" within the meaning of the FPASA, that is, "a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply," under which "the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees."  48 C.F.R. § 37.101; *see* 40 U.S.C. § 102(8).

Similarly unavailing is Plaintiffs' reference to *Matt v. Commissioner*, 59 T.C.M. (CCH) 472, 1990 WL 50675 (T.C. 1990).  *See* Pls.' Resp. & Reply at 4.  The personal and nonpersonal services discussed in that case were not services that the agency provided; they were services that the agency *procured* to help it "perform[] its work" for foreign beneficiaries.  *See Matt*, 59 T.C.M. (CCH) at 472 (describing the contract that the petitioner signed with a Federal agency for her personal services to the agency's mission).  That example thus fails to help Plaintiffs distinguish the statutory reference to "supplying" services from its reference to "procuring" services.

Plaintiffs also contend that their permits do not *require* them to provide any services, *See* Pls.' Resp. & Reply at 5, but that is irrelevant.[1]  Nowhere in its text does the FPASA limit its scope to

---

[1] Moreover, Forest Service special use permits may be revoked for non-use.  *See* 36 C.F.R. § 251.60(a)(2)(i)(B).

contracts that require, rather than permit, the performance of services. And Plaintiffs do not dispute that they, in fact, provide nonpersonal services on Federal lands; if they did not, there would be no reason to pay the permitting fee required. *See* ECF No. 63, Ex. 1 (setting a commercial permit fee of the greater of $100 per year or 3% of gross revenue). For the same reason, Plaintiffs' hypothetical regarding a host on a Federal campground undermines their argument, as it is not clear on what basis Plaintiffs themselves are distinguishable from the hypothetical camp host, except perhaps on the immaterial basis of whether the relevant contracts with the Government require or permit the provision of recreational services on the Federal Government's land. *See* Pls.' Resp. & Reply at 5.

Finally, Plaintiffs accuse Defendants of "transpos[ing] . . . the word 'related' to modify the entire scope of authority.'" Pls.' Resp. & Reply at 5-6. Far from "preposterous," *id.* at 6, this interpretation follows directly from the plain text of the FPASA, which addresses a system of functions, including contracting, that are "related" to the procurement and supply of nonpersonal services. 40 U.S.C. § 101. Thus, the statutory term "related" unambiguously modifies the functions, including contracting, that must be related to the provision or supply of nonpersonal services (among other activities not relevant here) to fall within the statute's scope.

For all of these reasons, and the reasons set forth in Defendants' Cross-Motion and Response, Plaintiffs fail to support their interpretation of the FPASA, which would exclude contractual agreements between the Federal Government and entities that provide services on Federal lands.

## II.   The Final Rule Has an Adequate Nexus to Economy and Efficiency Under Well-Established Precedent, Including of the Tenth Circuit.

The Final Rule also falls well within the scope of the President's FPASA authority in that the challenged minimum wage requirement has a clear nexus to the economy and efficiency of the services for which the Government contracts. In attempting to establish otherwise, Plaintiffs rely principally on the opinion of a single Judge of the Eleventh Circuit in *Georgia v. President of the United States*, --- F.4th ----, 2022 WL 3703822 (11th Cir. Aug. 26, 2022). *See* Pls.' Resp. & Reply at 2-3, 6-7. That

opinion—which is not binding even in the Eleventh Circuit, as it did not command a majority, *see* 2022 WL 3703822, at \*17 (Edmondson, J., concurring in the result)—is of no help to Plaintiffs, because it squarely contradicts the Tenth Circuit's decision in *City of Albuquerque v. U.S. Department of Interior*, 379 F.3d 901, 906 (10th Cir. 2004). The Tenth Circuit held in that case that an executive order directing agencies to prioritize central business areas when buying or leasing new space was "a valid exercise of" the President's delegated authority to "establish 'an economical and efficient system for . . . the procurement and supply of property'"—citing the FPASA's statement of purpose currently codified at 40 U.S.C. § 101—even though the FPASA "does not specifically mention . . . central business areas." *Id.* at 914-915. Numerous other courts in various jurisdictions likewise have held that the FPASA delegates authority to the President to prescribe policies and directives with a nexus to economy and efficiency in Federal contracting. *See* Defs.' Cross-Mot. & Resp. at 17-20. By contrast, the cited opinion in *Georgia* expressly "disagree[d]" with that consensus. 2022 WL 3703822, at \*10. This Court, of course, remains bound by the Tenth Circuit's interpretation of the FPASA in *City of Albuquerque*.

In any event, the cited opinion in *Georgia* is unpersuasive. Against the weight of authority noted above, the opinion refused to read the delegation of authority to the President in 40 U.S.C. § 121(a) in connection with the statement of purpose in 40 U.S.C. § 101. *See id.* at \*8-9. Instead, the opinion substituted its own interpretation of the FPASA's purpose for Congress's express textual statement of purpose, inferring from various other provisions of the statute that the ultimate objective of the FPASA is to "achiev[e] 'full and open competition' in the procurement process." *Id.* at \*7 (quoting 41 U.S.C. §§ 3301, 3306(a)(1), 3306(b)(2)(B)). Even if this Court were not bound by *City of Albuquerque*, there would be no sound basis to disregard the text of a statute in favor of a court's own alternative interpretation, unmoored from the statute's text, of the interests that Congress intended to promote.

Plaintiffs next invoke *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021), to argue that the Court should not give meaning to the statutory phrase "that the President *considers* necessary." 40 U.S.C. § 121(a) (emphasis added); *see* Pls.' Resp. & Reply at 7-8. In that case, the Supreme Court held that the scope of the CDC's authority pursuant to 42 U.S.C. § 264(a) "to make and enforce such regulations as in [the Surgeon General's] judgment are necessary" to control the spread of a communicable disease is "inform[ed]" by the examples enumerated in the following sentence, which "illustrat[e] the kinds of measures that could be necessary." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488. Here, by contrast, Plaintiffs do not suggest that the requirements of the Final Rule are out of step with examples that Congress enumerated of the kinds of policies and directives that could be necessary to carry out the relevant statutory subtitle. (Nor could they, given that 40 U.S.C. § 121(a), unlike 42 U.S.C. § 264(a), does not limit its grant of authority to measures similar to those set forth in any illustrative list.)

Plaintiffs also insist that an action pursuant to the FPASA "surely . . . should have something to do with financial considerations." Pls.' Resp. & Reply at 8 (emphasis omitted). As an initial matter, Plaintiffs fail to explain why measures to promote economy and efficiency necessarily must be financial in nature. *See* Defs.' Cross-Mot. & Resp. at 23 (distinguishing between the ordinary meanings of "economical" and "efficient"). In any event, it is reasonable to expect that the Final Rule will produce financial benefits—if not necessarily financial savings, then at least better value (*i.e.*, higher quality services without significant cost increases).

Plaintiffs also claim that Defendants "insist[] that the terms of the statute should include all sorts of intangible and noneconomic interests." Pls.' Resp. & Reply at 8 (citing Defs.' Cross-Mot & Resp. at 24). It is unclear to what "intangible and noneconomic interests" Plaintiffs refer. To the extent they invoke DOL's projection that covered contractors "will likely realize benefits including 'increased efficiency and quality of services,' which in turn may 'attract more customers and result in

increased sales,'" Defs.' Cross-Mot. & Resp. at 23-24 (quoting 86 Fed. Reg. at 67,153), those benefits are plainly connected to both economy and efficiency.  For the same reason, Plaintiffs' attempt to dismiss these benefits of the Final Rule as "non-economic offsets" fails.  Pls.' Resp. & Reply at 9 (emphasis omitted).

Plaintiffs also note that President Trump reached a different conclusion regarding the optimal policy to promote economy and efficiency in Federal contracting, determining that providers of lodging and food services associated with seasonal recreational services should continue to be subject to the minimum wage requirement, but that providers of seasonal recreational services and equipment rental should not.  *See* Exec. Order No. 13,838, 83 Fed. Reg. 25,341, 25,341 (May 25, 2018); *see* Pls.' Resp. & Reply at 9.  That different Presidents may reach different conclusions regarding the best policy does not establish that either policy alternative falls outside the scope of statutory authority, however.  Indeed, if the law were as Plaintiffs suggest, then President Trump would have lacked statutory authority to deviate from the policy approach that President Obama adopted in E.O. 13,658.

Plaintiffs also argue that "congressional inaction" does not warrant consideration in statutory interpretation.  *See* Pls.' Resp. & Reply at 9-10.  But the relevant consideration here is not congressional inaction but rather congressional ratification.  As noted in Defendants' Cross-Motion and Response, Congress recodified the relevant provisions of the FPASA in 2002, against the background of Executive practice that Defendants have described.  *See* Defs.' Cross-Mot. & Resp. at 22; *see also id.* at 16-17.  Plaintiffs note that, in 2002, Presidents had not yet exercised their FPASA authority to direct Federal agencies to contract only with entities that pay their employees a particular minimum wage.  *See* Pls.' Resp. & Reply at 10.  True, but Presidents had imposed myriad other requirements affecting the compensation of Federal contractors' employees for decades prior to that recodification.  *See* Defs.' Cross-Mot. & Resp. at 16.

Plaintiffs also observe that Congress included a rider in the Consolidated Appropriations Act

of 2016 to prevent DOL from using funds appropriated by Congress to enforce E.O. 13,658. *See* Pls.' Resp. & Reply at 10. If anything, this history shows that Congress has levers at its disposal to prevent the effectuation of actions under the FPASA with which Congress disagrees as a policy matter. Notably, Congress did not amend the FPASA in response to E.O. 13,658, suggesting that Congress disagreed not with President Obama's understanding of the scope of his FPASA authority, but rather with his discretionary choice of the manner in which to exercise it. Moreover, as noted in Defendants' Cross-Motion and Response, President Trump also understood the FPASA to confer the authority to set minimum wage requirements for Federal contractors, including non-procurement contractors, even as he disagreed with President Obama regarding the best policy approach to promote economy and efficiency in the context of recreational service contracts. *See* Defs.' Cross-Mot. & Resp. at 21 & n.10.

In their Response and Reply, Plaintiffs also clarify that they have abandoned their previous argument that the Final Rule conflicts with or creates an "alternative" to statutes other than the FPASA. *Compare* Pls.' Resp. & Reply at 11 ("The question is not whether the rule directly conflicts with existing wage statutes—it does not.") *with* ECF No. 5 ("Pls.' Prelim. Inj. Mot."), at 5 ("The President, acting through DOL, has attempted to impose wage requirements that conflict with existing limits set by Congress."), *and* ECF No. 56 ("Pls.' Summ. J. Mot."), at 13 (characterizing E.O. 14,026 and the Final Rule as creating an "alternative" to the relevant statutes (quoting *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1216 (10th Cir. 2017)). Instead, Plaintiffs now argue that it is implausible that Congress intended to delegate to the President the authority to regulate the wages of Federal contractors through the FPASA, given that it also has passed a trio of statutes that directly regulate the wages of certain Federal contractors. *See* Pls.' Resp. & Reply at 11.

This Court should decline Plaintiffs' invitation to read an extratextual limitation on the President's FPASA power into the statute based on a notion of what Congress may have meant when

it passed either the FPASA or any of the other statutes on which Plaintiffs rely. As the Supreme Court has instructed, "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020). It is accordingly immaterial whether Congress conceived in 1949 that it was delegating to the President the authority to direct Federal agencies to contract only with entities that pay their employees a particular minimum wage. Regardless, Congress plainly did so through the text of the FPASA—provided that the minimum wage has the requisite nexus to economy and efficiency in Government contracting. For the reasons set forth above and in Defendants' Cross-Motion and Response, the $15 minimum wage set by E.O. 14,026 and the Final Rule readily satisfies that nexus test. *See* Defs.' Cross-Mot. & Resp. at 16-24.

In any event, it is not at all implausible that Congress meant just what it said in the FPASA— namely, that the President may prescribe policies and directives that he considers necessary to carry out the relevant statutory subtitle and that are consistent with that subtitle, including policies related to wages that satisfy that statutory standard. That Congress also has legislated directly as to certain Federal contractors' wages does not negate the plain text of the FPASA. And, as noted, Plaintiffs no longer argue that the Final Rule is inconsistent with other statutes governing contractors' wages.

The major questions doctrine likewise does not change the outcome of this case, for each of the five independent reasons set forth in Defendants' Cross-Motion and Response. *See* Defs.' Cross-Mot. & Resp. at 26-27. None of Plaintiffs' arguments to the contrary is persuasive.

To begin with, Plaintiffs fail to establish that the Final Rule is an exercise of regulatory, not proprietary, authority, and they do not dispute that the Supreme Court has never applied the major questions doctrine in the latter context. *See* Pls.' Resp. & Reply at 12. Contrary to Plaintiffs' representation, *see id.*, the Final Rule expressly binds only "executive departments and agencies," which may not enter into covered contracts unless they include the requisite wage clause, 86 Fed. Reg. at 67,225 (codified as amended at 29 C.F.R. § 23.10(b)); *see also* 86 Fed. Reg. at 67,228 (codified as

amended at 29 C.F.R. § 23.110). Whereas only the Government has the authority to regulate the conduct of private parties, there is nothing unique about a market participant setting the terms on which it is willing to contract. The concerns regarding Government overreach that animate the major questions doctrine therefore are inapposite here. *See* Defs.' Cross-Mot. & Resp. at 27.

In attempting to establish otherwise, Plaintiffs invoke *NFIB v. OSHA*, 142 S. Ct. 661 (2022) (per curiam); *see* Pls.' Resp. & Reply at 12. But that case featured regulatory, not proprietary, action; the requirement in question applied to "virtually all employers with at least 100 employees." *NFIB v. OSHA*, 142 S. Ct. at 662. Unlike the Final Rule, its scope of coverage was not limited to parties that choose to do business with the Government, subject to the Government's terms and conditions.

By contrast, on the same day that the Supreme Court decided *NFIB v. OSHA*, it also decided *Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam), which implicated similar issues, as both cases addressed workplace COVID-19 vaccination requirements. In *Missouri*, however, the relevant requirement applied only to facilities that choose to participate in the Medicare and Medicaid programs. *See id.* at 650. Unlike in *NFIB v. OSHA*, the Supreme Court notably did not apply the major questions doctrine in *Missouri*, where the Government did not regulate but rather exercised its influence by imposing conditions on a voluntary agreement with the Government.

Plaintiffs also contend that the Final Rule has a "profound reach," Pls.' Resp. & Reply at 13, but they fail to establish that this is the sort of "extraordinary case" to which the major questions doctrine is relevant, *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). It is not. By the numbers, approximately 1.8 million workers fall within Final Rule's scope of coverage. *See* 86 Fed. Reg. at 67,195; *see also id.* at 67,201 & tbl. 5 (providing the basis for this projection by industry). Among these, only approximately 327,300 workers will actually "see an increase in wages" as a result of the $15 minimum, because the vast majority of relevant employers already pay their workers at least that amount for work performed

on or in connection with contracts covered under the Final Rule. *Id.* at 67,195. To place these figures in context, the United States workforce currently numbers around 164 million. *See* U.S. BUREAU OF LAB. STATS., *Table A-1. Employment status of the civilian population by sex and age*, https://www.bls.gov/news.release/empsit.t01.htm (last modified Sept. 2, 2022). Thus, the outer bound of the Final Rule's theoretical reach is just over 1% of the national workforce, while its actual reach is approximately 0.2% (across all categories of covered contracts, not limited to the recreational services context). With respect to the Final Rule's economic impact, DOL projected "Year 1 direct employer costs to the private sector of $17.1 million, in regulatory familiarization and implementation costs," and "transfer payments for the private sector of $1.7 billion in Year 1, with an average annualized value of $1.8 billion over ten years." 86 Fed. Reg. at 67,224.

By comparison, the Supreme Court has applied the major questions doctrine in addressing, for example, an agency action that potentially affected at least 80% of the country and had the immediate potential to actually affect between 6 and 17 million people, *see Ala. Ass'n of Realtors*, 141 S. Ct. at 2489, and another that applied to approximately 84 million workers, *see NFIB v. OSHA*, 142 S. Ct. at 662. Plaintiffs invoke the policy at issue in *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218 (1994), as an example of a "less consequential" agency action to which the Court has applied the major questions doctrine. Pls.' Resp. & Reply at 13 (quoting *NFIB*, 142 S. Ct. at 668 (Gorsuch, J., concurring)). But that policy affected 40% of all long-distance telephone customers nationwide and all but one long-distance carrier, *see MCI Telecomms. Corp.*, 512 U.S. at 232—a dramatically greater reach than that of the Final Rule. With respect to economic impact, the Court has applied the doctrine in addressing an agency action that was expected to reduce GDP by at least $1 trillion by 2040, *see West Virginia*, 142 S. Ct. at 2604, and another with an economic impact of approximately $50 billion, *see Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. In sum, the Supreme Court has applied the major questions doctrine only when addressing actions with far greater reach and economic impact than the Final Rule.

In attempting to establish that the Final Rule is a fundamentally novel exercise of FPASA authority, Plaintiffs also state that the FPASA "has never been understood to regulate wages." Pls.' Resp. & Reply at 14. Plaintiffs are mistaken. As set forth in Defendants' Cross-Motion and Response, Presidents have imposed myriad constraints affecting the compensation of Federal contractors' employees pursuant to the FPASA since at least the early 1960s, and Congress has recodified the statute against that backdrop. *See* Defs.' Cross-Mot. & Resp. at 16.

Plaintiffs find no more success in invoking *Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014), in an attempt to dispute that the President has inherent Article II authority to exercise administrative control over the Executive Branch. *See* Pls.' Resp. & Reply at 13. That case addressed the distinction between substantive and procedural rules for purposes of an exception to the APA's notice-and-comment requirement. *See Mendoza*, 754 F.3d at 1023-24 (discussing 5 U.S.C. § 553(b)). That distinction has nothing to do with a President's inherent Article II authority, and Plaintiffs cite no case law to the contrary.

Moreover, Plaintiffs fail to address the remaining reasons Defendants have provided why the major questions doctrine has no application here, namely, that the statutory text is clear and that the President, unlike an agency, is directly accountable to the people. *See* Defs.' Cross-Mot. & Resp. at 26-27. "Courts routinely deem an issue 'waived' when a party fails to respond to a movant's substantive argument." *Graves v. Wirta*, No. 20-CV-03595-NYW, 2022 WL 1443058, at *5 (D. Colo. May 6, 2022) (quoting *Northcutt v. Fulton*, No. CIV-20-885-R, 2020 WL 7380967, at *2 (W.D. Okla. Dec. 15, 2020)).

Finally, with respect to the non-delegation doctrine, Plaintiffs contend that a non-delegation problem would arise if the Court "jettison[ed] the limits" on Presidential authority under the FPASA that the Tenth Circuit set forth in *City of Albuquerque*. Pls.' Resp. & Reply at 15. Defendants do not ask this Court to jettison those limits, which the Tenth Circuit held readily satisfy the non-delegation

doctrine's intelligible-principle requirement, but rather to recognize that the Final Rule falls squarely within them.

### III. The APA Does Not Provide for Arbitrary-and-Capricious Review of DOL's Codification of an Unambiguous Policy Choice that the President Made Pursuant to His Own Statutory Authority, but Even If It Did, DOL Adequately Explained the Revocation of the Recreational Services Exemption.

As explained in Defendants' Cross-Motion and Response, *see* Defs.' Cross-Mot. & Resp. at 28-35, Plaintiffs' arbitrary-and-capricious claim fails as a matter of law for at least three independent reasons: First, the revocation of the recreational services exemption is Presidential action, and thus is unreviewable under the APA's arbitrary-and-capricious standard pursuant to *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and *Dalton v. Specter*, 511 U.S. 462, 470 (1994).[2]  Second, even if the provision of the Final Rule that Plaintiffs contend was inadequately explained were agency action for purposes of the APA, the APA does not require an agency to explain an action from which it lacks discretion to deviate.  And, third, even if such a requirement applied, the revocation of the recreational services exemption is adequately explained in the Final Rule.  *See* Defs.' Cross-Mot. & Resp. at 28-35. None of Plaintiffs' attempts to establish otherwise is persuasive.

To grant summary judgment to Defendants on Plaintiffs' arbitrary-and-capricious claim, this Court need go no further than to recognize that the provision of the Final Rule that Plaintiffs contend was inadequately explained—namely, the application of the Final Rule to recreational service providers such as Plaintiffs—does not reflect any exercise of discretion by DOL.  That is the only provision of the Final Rule that Plaintiffs challenge as arbitrary and capricious.  *See* ECF No. 1 ("Compl."), ¶ 63 (alleging that "DOL's rule is arbitrary and capricious because it has rescinded its prior exception for non-procurement contractors like Plaintiffs without [adequate explanation, in various respects]"); Pls.'

---

[2] By contrast, although the APA does not provide for review of Presidential action, there is no dispute that judicial review is available to determine whether a President's action exceeded the bounds of Presidential authority.  *See infra* page 18.

Summ. J. Mot. at 17 (contending that DOL inadequately explained the "resci[ssion of] DOL's prior exception for non-procurement firms like Plaintiffs").  And Plaintiffs do not dispute, nor could they, that the challenged provision was mandated by the express terms of E.O. 14,026.  *See* Exec. Order No. 14,026, 86 Fed. Reg. 22,835, 22,836 (Apr. 27, 2021) ("Executive Order 13838 of May 25, 2018 . . . is revoked as of January 30, 2022."); *see also* Exec. Order No. 13,838, 83 Fed. Reg. at 25,341 (exempting "contracts or contract-like instruments entered into with the Federal Government in connection with seasonal recreational services" from the minimum wage requirements of E.O. 13,658).

Accordingly, the Tenth Circuit's holding in *New Mexico Health Connections v. DHS*, 946 F.3d 1138 (10th Cir. 2019), squarely controls this case and requires dismissal of Plaintiffs' arbitrary-and-capricious claim.  There, the court held that "[t]he APA's requirement that an agency explain its decision applies when the agency exercises its discretion," but not where "there was no exercise of discretion to explain."  *Id.* at 1167.  Plaintiffs' efforts to distinguish *New Mexico Health Connections* fail.  First, Plaintiffs observe correctly that, in the statute at issue in *New Mexico Health Connections*, the agency's discretion was constrained by "specific directions from Congress, which the agency could not disregard."  Pls.' Resp. & Reply at 18 (emphasis omitted).  Likewise, DOL's discretion here was constrained by specific directions from the President, pursuant to the President's own statutory authority, which the agency could not disregard.  Plaintiffs offer no plausible basis to limit the holding of *New Mexico Health Connections* to agency actions that are compelled by Congress's exercise of its own authority, but not by the President's exercise of authority expressly delegated to the President by Congress.

Plaintiffs' critical error in attempting to distinguish *New Mexico Health Connections* is in stating that an agency may not "take marching orders from the President about how it exercises *its* [*i.e.*, the agency's] discretion."  *Id.* (emphasis altered).  But the discretion here was *not* the agency's; it was the President's, delegated by Congress through the FPASA.  President Biden exercised that authority with

no room for deviation by DOL when he expressly and unambiguously revoked the recreational services exemption.

Plaintiffs also observe that, in *New Mexico Health Connections*, the Tenth Circuit "engaged in substantive arbitrary and capricious review of a rule." *Id.* (citing *N.M. Health Connections*, 946 F.3d at 1162). That is true—but only as to HHS's decision to use the statewide average premium in the risk adjustment program under the Affordable Care Act. *See N.M. Health Connections*, 946 F.3d at 1162-65. As to that decision, the agency made a choice between two available alternatives, which it was required to (and did) explain. *See id.* By contrast, the Tenth Circuit held that HHS "did not violate the arbitrary and capricious standard" by failing to explain the budget-neutral design of the program, because "[i]t lacked funding to do otherwise," and thus "there was no exercise of discretion to explain." *Id.* at 1166-67. The revocation of the recreational services exemption here is directly analogous to the budget-neutral design of the risk adjustment program at issue in *New Mexico Health Connections*; DOL lacked authority to deviate from the express terms of E.O. 14,026 and accordingly exercised no discretion as to that provision of the Final Rule. *See* 86 Fed. Reg. at 67,154. That conclusion suffices to require dismissal of Plaintiffs' arbitrary-and-capricious claim.[3]

In any event, Plaintiffs' remaining arguments regarding arbitrary-and-capricious review are similarly unpersuasive. Contrary to Plaintiffs' suggestion, *see* Pls.' Resp. & Reply at 16, the Supreme Court's decision in *DHS v. Regents of the University of California*, 140 S. Ct. 1891 (2020), does not support their claim. As explained in Defendants' Cross-Motion and Response, Defs.' Cross-Mot. & Resp. at 31-33, the agency action at issue in *Regents* had two distinct components: first, the decision to terminate DACA-related benefits, which was compelled by the Attorney General's legal determination that the

---

[3] Defendants do not understand Plaintiffs to challenge the adequacy of DOL's explanation for the $15 minimum wage rate, subject to annual inflation-based increases, that the Final Rule imposed. But to the extent they did, the same analysis would apply, *i.e.*, the minimum wage rate codified in the Final Rule was required under the express terms of E.O. 14,026. *See* 86 Fed. Reg. at 22,835-36.

benefits program was illegal; and, second, the decision to terminate DACA's forbearance program, which rested "squarely within the discretion" of the Acting Secretary of Homeland Security. *Regents*, 140 S. Ct. at 1912. The Supreme Court held that the Acting Secretary's decision was arbitrary and capricious because it failed to explain her discretionary decision to terminate the forbearance program. *See id.* at 1910-15. By contrast, as to the mandatory termination of benefits, the Court cast doubt on the proposition that the Acting Secretary "was required to explain a legal conclusion that was not hers to make," although it did not need to decide that issue to resolve the case. *Id.* at 1910.

Attempting to analogize to *Regents*, Plaintiffs argue that "the rule here was an exercise of the agency's determinations about how best to implement the President's directives." Pls.' Resp. & Reply at 16. As noted, however, Plaintiffs do not contend that any discretionary determination by DOL about how best to implement E.O. 14,026 was inadequately explained. Rather, the provision of the Final Rule that they challenge as arbitrary and capricious is directly analogous to the termination of DACA-related benefits in *Regents*, which was compelled by the Attorney General's exercise of his own statutory authority. *See Regents*, 140 S. Ct. at 1910. In any event, the Tenth Circuit squarely decided in *New Mexico Health Connections* what the Supreme Court suggested in *Regents*, holding that an agency is not required to explain an action if it was foreclosed from adopting any alternative.[4]

In their attempt to establish that DOL inadequately explained President Biden's exercise of Presidential authority, Plaintiffs next invoke *Washington v. U.S. Department of State*, 420 F. Supp. 3d 1130, 1140 (W.D. Wash. 2019), in which the district court rejected the argument that the challenged agency action was "wholly discretionary" and thus exempt from APA review pursuant either to 5 U.S.C. § 701(a)(2) or the common law. *Id.* at 1140-41; *see* Pls.' Resp. & Reply at 17. That conclusion

---

[4] Plaintiffs' arbitrary-and-capricious claim also fails for the independent reason that the authority requiring DOL to revoke the recreational services exemption rested exclusively with the President, as to whom the APA does not apply, in contrast to the Attorney General, whose authority required termination of DACA-related benefits in *Regents*. *See* Defs.' Cross-Mot. & Resp. at 28-29, 31.

is irrelevant to this case. There is no suggestion that DOL had unbounded discretion to exempt recreational service providers such as Plaintiffs from the Final Rule; rather, DOL had *no* discretion to do so.

As to *Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020), *see* Pls.' Resp. & Reply at 17, the court in that case held that a State Department rule implementing a Presidential Proclamation was arbitrary and capricious for failing to adequately define certain terms and standards left open in the Proclamation itself, resulting in a rule that "le[ft] applicants and consular officers facing an unmoored inquiry." 475 F. Supp. 3d at 261. Such gap-filling is, by definition, discretionary, in contrast to DOL's direct codification of the express terms of E.O. 14,026. Moreover, the State Department has an independent role in administering the statute at issue in *Make the Road*, *see id.* at 243-44, whereas Section 121(a) of the FPASA, as noted, delegates authority solely to the President.

*National Association of Manufacturers v. Perez*, 103 F. Supp. 3d 7 (D.D.C. 2015) ("*NAM*"), which Plaintiffs invoke in a parenthetical, *see* Pls.' Resp. & Reply at 17, is similarly inapposite. There, the court sustained the challenged requirement as a valid exercise of the President's FPASA authority because it had the requisite nexus to economy and efficiency. *See NAM*, 103 F. Supp. 3d at 19-21. The court also, for the same reasons, rejected the plaintiffs' claim that the order "lacked an evidentiary basis" in violation of the APA, notwithstanding "the [alleged] absence of *any* studies, analysis, [or] expert opinions" in the record that could support it. *Id.* at 21 & n.12 (emphasis added). That holding in no way supports Plaintiffs' argument here that DOL inadequately explained the President's decision to terminate the recreational services exemption. The Final Rule justified that decision with ample evidence and research, *see infra* pages 19-20, and thus exceeded the standard that the court applied in *NAM*.

It is also beyond reasonable dispute that the APA does not provide for review of Presidential action, although Presidential action remains subject to *ultra vires* review. Contrary to Plaintiffs'

characterization as an "[unsupported] effort to split different causes of action," Pls. Resp. & Reply at 18, this distinction has been clearly established by the Supreme Court. *See Franklin*, 505 U.S. at 801 ("Although the President's actions may still be reviewed for constitutionality, we hold that they are not reviewable for abuse of discretion under the APA." (citations omitted)); *cf. Dalton*, 511 U.S. at 474 ("We may assume for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable *outside the framework of the APA*." (emphasis added)). That is because an express waiver of sovereign immunity uniquely is not required to challenge a Governmental action as *ultra vires*, because such an action allegedly is not of a sovereign nature at all. *See* Defs.' Cross-Mot. & Resp. at 29. Accordingly, for purposes of an *ultra vires* claim, it is immaterial whether the authority for the relevant action belongs to the President or to an agency. By contrast, as to a claim that an otherwise valid action was inadequately explained, the APA waives sovereign immunity only for agency action, not Presidential action.

In attempting to dispute that the APA does not provide for review of Presidential action, Plaintiffs contend that "both the Tenth and the D.C. Circuit have specifically held that *Executive Orders* issued under the [FPASA] are themselves reviewable under the APA." Pls.' Resp. & Reply at 17 (citing *City of Albuquerque*, 379 F.3d 901; *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)). With respect to *City of Albuquerque*, Plaintiffs are wholly mistaken to suggest that the Tenth Circuit held in that case that the APA provides for review of executive orders. Rather, the court recognized that, under certain circumstances, an executive order may be *enforced* through judicial action pursuant to the APA. *See City of Albuquerque*, 379 F.3d at 913-14. The Tenth Circuit's analysis of whether the order at issue in that case was *ultra vires*—which was necessary to its determination that the order was enforceable pursuant to the APA—did not cite the APA or otherwise suggest that statute provided for a cause of action to review the order itself. *See id.* at 914-15.

As for *Reich*, that case lends no support to Plaintiffs' claim that DOL inadequately explained a

decision that was not DOL's to make. There, the D.C. Circuit suggested in dictum that the APA may provide for review of a rule based on an executive order to determine whether it exceeded the scope of FPASA authority. *See Reich*, 74 F.3d at 1326-27. As noted, Defendants do not dispute that the Court has authority to review the Final Rule to determine whether it exceeds the scope of the President's authority. Although the D.C. Circuit was mistaken to conceive of such review as arising under the APA, the distinction between APA review and non-statutory review of an *ultra vires* claim is immaterial for the reasons described above. Indeed, the court expressly recognized in *Reich* that no waiver of sovereign immunity is required to decide an *ultra vires* claim against a Government official. *See Reich*, 74 F.3d at 1329. The D.C. Circuit did not suggest that judicial review is available to determine whether the President adequately explained an exercise of the President's own authority, in which context only the APA would provide for review. Moreover, and in any event, *Reich*—unlike *Franklin* and *Dalton*—is not binding on this Court.

There also is no merit to Plaintiffs' suggestion that DOL was required to explain the President's policy choices simply because DOL engaged in notice-and-comment rulemaking. *See* Pls.' Resp. & Reply at 19. As an initial matter, Plaintiffs cite no authority for the proposition that the availability of APA review or the degree of explanation required to satisfy the APA turns on whether an agency engages in such rulemaking. Otherwise, agencies would have a strong incentive not to engage in notice-and-comment rulemaking where it is not required. Moreover, here, DOL engaged in notice-and-comment rulemaking to ensure it gave adequate consideration to the policy choices that it *did* make in implementing E.O. 14,026, which required DOL to flesh out certain details that President Biden did not address directly. As noted repeatedly, the decision to end the recreational services exemption was not one of those details that the President left to the agency to decide.

In any event, the Final Rule is replete with evidentiary support and explanation supporting the revocation of the recreational services exemption. *See* Defs.' Cross-Mot. & Resp. at 33-35; *see also id.*

at 4-5, ¶¶ 21-22, 24-27.  In response, Plaintiffs merely repeat the same policy objections with which DOL thoroughly engaged in the Final Rule, *see id.* at 33-34, and Plaintiffs continue either to overlook or to dispute the extent of the benefits that DOL projected, *see* Pls.' Resp. & Reply at 20.  Plaintiffs may disagree with the President's policy choice in E.O. 14,026 and the cited academic literature that supports it, but that does not render the choice arbitrary or capricious.  The arbitrary-and-capricious standard does not require the selection of "a perfect solution—just a rational one."  *Zzyym v. Pompeo*, 958 F.3d 1014, 1027 (10th Cir. 2020).  To the extent that standard applies here, the President's choice to revoke E.O. 13,838 and DOL's codification of that choice well exceed it.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and enter final judgment for Defendants.

Dated: September 28, 2022      Respectfully submitted,

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

/s/ *Taisa M. Goodnature*
TAISA M. GOODNATURE
Trial Attorney (N.Y. Bar No. 5859137)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Washington, DC 20530
Telephone: (202) 514-3786 | Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

I hereby certify that on September 28, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

ckruckenberg@pacificlegal.org

jkintz@democracyforward.org

kate.talmor@usdoj.gov

mpoon@pacificlegal.org

ssimpson@pacificlegal.org

/s/ Taisa M. Goodnature
TAISA M. GOODNATURE
Trial Attorney (N.Y. Bar No. 5859137)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, Washington, DC 20530
Telephone: (202) 514-3786 | Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*